UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Geomatrix, LLC,

               Plaintiff,

v.

NSF International,
BioMicrobics, Inc.,
Hoot Systems, LLC,
James Bell, individually, and
Ronald Suchecki, individually,

               Defendants.

Case No.

Hon.

**DEMAND FOR JURY TRIAL**

---

**THE MILLER LAW FIRM, P.C.**
E. Powell Miller (P39487)
Kevin F. O'Shea (P40586)
950 W. University Dr., Suite 300
Rochester, Michigan 48307
(248) 841-2200
epm@millerlawpc.com
kfo@millerlawpc.com

*Attorneys for Plaintiff*

---

## COMPLAINT

Plaintiff, Geomatrix, LLC ("Geomatrix"), by its attorneys, The Miller Law

Firm, P.C., brings this civil action against Defendants NSF International ("NSF"),

BioMicrobics, Inc. ("BioMicrobics"), Hoot Systems, LLC ("Hoot Systems"), James

Bell, and Ronald Suchecki (BioMicrobics, Hoot Systems, Bell, and Suchecki are

collectively referred to as "Corporate Defendants") under the antitrust laws of the

United States, the Lanham Act, the Michigan Consumer Protection Act, and the common law of unfair competition, defamation, injurious falsehood, tortious interference, and promissory estoppel.

For its Complaint, Geomatrix states as follows:

## INTRODUCTION AND SUMMARY

1.     NSF is an organization accredited by the American National Standards Institute ("ANSI") that sets quality standards for a number of industries and certifies many of the products brought into commerce in those industries. Many of NSF's standards are adopted into federal and state laws.

2.     NSF sets quality standards for and certifies products sold in the water and wastewater management industries. Many states have incorporated the standards NSF has adopted into statutes, codes, regulations, or mandatory technical guidance standards such that the standards operate as barriers to entry in such states.

3.     As a standard-setting organization, NSF operates as a gatekeeper for the marketplace. Because of this, NSF is required to operate independently, fairly, and in accordance with antitrust laws, and—even more so than other entities—it must refrain from making knowingly false and misleading claims.

4.     Geomatrix brings this action to end NSF's conspiracy and NSF's ratification of the actions of its co-conspirators and agents/apparent agents, in violation of U.S. antitrust laws, that is foreclosing competition in the markets for

products that provide onsite treatment and dispersal of wastewater. NSF has engaged in unlawful concerted and coordinated anticompetitive actions, has ratified the actions of its co-conspirators and agents/apparent agents, and has repeatedly violated its own due process rules that are necessary to safeguard fair competition and unbiased standard setting. NSF and its co-conspirators have succeeded in excluding competitive onsite wastewater treatment devices from the market.

5.      NSF and the Corporate Defendants colluded to better achieve their anticompetitive objectives. NSF knowingly allowed certain co-conspirators and agents/apparent agents, including James Bell, Vice-President of BioMicrobics, Ronald Suchecki, President of Hoot Systems, Nicolas Noble, Government Relations Manager of Orenco Systems, Inc. and Sara Heger, Ph.D., of the University of Minnesota, to exercise extraordinary authority as voting members and officers of the Joint Committee on Wastewater, as Chairmen of key Task Groups, and as officers of the Industry Group, all of which oversee standardization of onsite wastewater treatment systems, to approve and facilitate due process violations and subvert NSF's due process safeguards. NSF knew that acting with the Corporate Defendants and ratifying the actions of its agents/apparent agents, and Corporate Defendant that they could, and would, get away with violating NSF's due process rules and antitrust law – and they have.

6.      Inclusion in the NSF standards is vital to commercial success of onsite wastewater treatment products once a state adopts a standard.  Exclusion from a standard guarantees commercial failure and, in most instances, absolute foreclosure from the market. It is an absolute prerequisite.

7.      Standardization implicitly is an agreement not to manufacture, distribute, or purchase products that do not follow the standard.  *Allied Tube & Conduit Corp. v. Indian Head, Inc.,* 486 U.S. 492, 500 (1988).  As a general principle, agreements not to manufacture, distribute, or purchase products violate Section 1 of the Sherman Act.  It is only permissible for competitors to enter into such otherwise unlawful agreements in the context of standard setting, and only permissible for standard setting organizations, such as NSF, to facilitate such agreements among competitors if the organization and its participants strictly follow rules that safeguard fairness, objectivity, and due process.  As the Court of Appeals for the Third Circuit has stated:

> [T]hat 'private standard-setting by associations comprising firms with horizontal and vertical business relations is permitted at all under the antitrust laws [is] only on the understanding that it will be conducted in a nonpartisan manner offering procompetitive benefits,' and in the presence of 'meaningful safeguards' that 'prevent the standard-setting process from being biased by members with economic interests in stifling product competition,'

*Broadcom Corp. v. Qualcomm, Inc.,* 501 F.3d 297, 309-310 (3rd Cir. 2007) citing *Allied Tube,* 486 U.S. at 501; *Am. Soc. Of Mech. Eng'rs v. Hydrolevel Corp.,*

456 U.S. 556, 572 (1982).  Through their conspiracy, the Defendants violated the meaningful safeguards of the NSF and ANSI due process rules.  They biased the NSF processes to gain unfair advantages for the Contained Systems they preferred, and to prevent or delay standardization and marketability of Geomatrix's innovative technology and the technology of other manufacturers.

8.     The only reason Geomatrix has been precluded from the market, while the products of the Corporate Defendants have advanced, is because the Defendants agreed to work together to manipulate the NSF standard-setting process, and NSF failed in their duty to ensure compliance with the due process rules.  The actions of the Defendants violated Section 1 of the Sherman Act.

9.     The direct consequence of the conspiracy is that Geomatrix's technologies, and other competitors, have been foreclosed from competition in onsite wastewater treatment markets and have been harmed in their continued ability to develop and market innovative technologies within and beyond these markets that require standards that are met.

## NATURE OF THE CASE

10.     Geomatrix innovates, manufactures, and sells wastewater treatment and dispersal products.

11.     For at least the past last five years, the Defendants have manipulated the standard-setting process by, *inter alia,* making false statements, advancing the

false claims, and attempting to exclude or otherwise undermine certain Geomatrix products from existing and proposed standards, all in an effort to prevent Geomatrix from entering the marketplace and competing.

12.   For example, NSF falsely stated that Geomatrix's NSF certified onsite residential wastewater treatment systems are ***not*** suitable and should not be eligible for the very certification NSF approved and granted. NSF made these statements even though it knew they were false, were contrary to the very conclusions NSF's own certification process reached, would preclude Geomatrix products from the market, and would have a negative impact on Geomatrix's ability to enter and/or compete in the market.

13.   In addition to making its own false and defamatory statements, NSF has enabled, encouraged, and ratified the Corporate Defendants, who are agents/ apparent agents of NSF, and other interested parties' disparagement of Treatment and Dispersal Systems, including Geomatrix's GeoMat™ Leaching System ("GeoMat").  NSF has enabled, encouraged, and ratified the false assertions that these products are not eligible for, and should not have been granted, certification for onsite treatment of residential wastewater under NSF standards.  The Defendants published these false and defamatory statements to regulators and users of GeoMat products, knowing that they were false and intended to harm the marketability of Treatment and Dispersal Systems.   NSF has remained silent and failed to enforce

its and ANSI's due process rules or defend its standards or the certification process that Geomatrix's product, and other similarly situated products, successfully passed.

14.    Defendants' disparagement, and NSF's ratification of the disparagement of others, include the Corporate Defendants, of Geomatrix's products did not stop there. Defendants have falsely and without scientific basis asserted that Geomatrix's GeoMat, GST, and SoilAir systems cannot be certified for treatment of high strength wastewater discharged from commercial establishments, like restaurants and convenience stores.

15.    Defendants made these false and defamatory statements, NSF has ratified the false and defamatory statements of its agents/apparent agents, including the Corporate Defendants, perpetuated these false statements, and otherwise engaged in a relentless campaign to cause damage to Geomatrix in an effort to keep its products out of the marketplace, all to protect incumbent competitor manufacturers, including the Corporate Defendants, that represent a larger segment of the market. Defendants' conduct deliberately and unfairly targets and removes, delays entry, or and excludes Geomatrix from the marketplace, all in violation of law and NSF's own Antitrust Guide and NSF and ANSI due process rules.

16.    The conduct of NSF, its actual and apparent agents, and the Corporate Defendants, violates Sections 1 and 2 of the Sherman Act, the Lanham Act, Michigan's Consumer Protection Act, and the common law of unfair competition,

7

defamation, tortious interference, and promissory estoppel, and has caused and will continue to cause significant and irreparable harm to Geomatrix and other participants and consumers in the onsite wastewater treatment market. Geomatrix has been left with no choice but to bring this action for injunctive relief, for the recovery of the damages it has sustained, treble damages, and the costs of its suit, including reasonable attorney fees pursuant to 15 U.S.C. §§ 15, 26, 15 U.S.C. § 1117, and/or MCL § 445.911, as well as all other relief available under common law.

## THE PARTIES

17.     Plaintiff, Geomatrix, is a limited liability company, organized under the laws of the State of Connecticut, with its principal place of business in Old Saybrook, Connecticut. Geomatrix's members are David and Elizabeth Potts who reside in Lyme, Connecticut.

18.     Upon information and belief, Defendant NSF is a non-profit corporation organized under the laws of the State of Michigan with its principal place of business in Ann Arbor, Michigan. Upon information and belief, NSF is recognized as a 501(c)(3) tax exempt organization by the United States Internal Revenue Service.

19.     Upon information and belief, Defendant BioMicrobics is a corporation organized under the laws of the State of Kansas with its principal place of business in Lenexa, Kansas.

20.     Upon information and belief, Defendant Hoot Systems is a limited liability company organized under the laws of the State of Louisiana with its principal place of business in Lake Charles, Louisiana.

21.     Upon information and belief, Defendant James Bell is a resident of the State of Kansas.

22.     Upon information and belief, Defendant Ronald Suchecki is a resident of the State of Louisiana.

## JURISDICTION AND VENUE

23.     This Court has jurisdiction over the subject matter of this action pursuant to 15 U.S.C. § 1121; 15 U.S.C. §§ 15, 26; and 28 U.S.C. §§ 1331, 1332, and 1367. The amount in controversy exceeds $75,000, exclusive of interest and costs, and the defendants do not share a state of citizenship with Geomatrix. The state law claims are integrally interrelated to the federal claims and arise from a common nucleus of operative facts, such that the determination of the state law claims with the federal claims furthers judicial economy.

24.     This Court has *in personam* jurisdiction over NSF because it resides in this District.

25.     This Court has *in personam* jurisdiction over BioMicrobics and Hoot Systems because they have conducted significant business in the State of Michigan, have availed themselves of the laws of the State of Michigan, have continuously

participated in the NSF standard-setting process in this District during all relevant times, and a significant portion of the acts alleged in this Complaint took place in this District.

26.    This Court has *in personam jurisdiction* over Defendants James Bell and Ronald Suchecki as they have substantial contacts in the State of Michigan and have repeatedly and continually participated in the NSF standard-setting process in this District, and a significant portion of the acts alleged in this Complaint took place in this District.

27.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because this is the judicial district where NSF resides and/or a substantial part of the events or omissions that gave rise to the claims occurred here.

## GENERAL ALLEGATIONS

### A. Wastewater Treatment Systems Generally

28.    Sixty-six million Americans—and approximately 20% of all U.S. households—depend on onsite wastewater systems to treat their sewage water.  In some states, onsite wastewater systems serve up to 50% of the population, and more than one-third of all new development in the U.S. relies on onsite wastewater systems. These systems are especially prevalent in rural and economically-challenged communities.

29.     Historically, and even today, residential, and commercial onsite systems have been comprised of a septic tank and a drain field or "leaching" system, which is installed in native soil or sand. The septic tank separates water constituents by density and acts as an anaerobic digester. The leaching system provides the surface area needed for the septic tank effluent to contact soil or sand, where microorganisms are present to provide treatment before dispersing treated water back into the environment. The large surface area of sand and/or soil, the high oxygen levels in this shallow soil profile, and the diverse community of microorganisms all result in a high level of treatment. Once the microorganisms in the soil have broken down the wastewater constituents in the septic tank effluent, the water infiltrates downwardly towards the water table for further treatment and groundwater recharge.

30.     There are now generally two options on the market for wastewater treatment: aerobic treatment units or "ATUs" also known as "black box" systems and now referred to by NSF as contained systems with an associated leach field device (herein referred to as "Contained Systems") and sand/soil-based treatment and dispersal systems, typically with a septic tank, also called by Defendants as open bottom system and now referred to by Defendants as uncontained systems (referred to herein as "Treatment and Dispersal Systems").

31.     Contained Systems include a variety of devices used to treat wastewater prior to discharge. These systems can include a tank of water with aeration devices, or a variety of saturated and unsaturated media such as peat, plastic balls, fabrics/textiles, etc. Some systems combine a number of these features. These systems initially were used to treat wastewater prior to discharge to open water courses and ditches, in areas of high groundwater or where soil could not effectively infiltrate wastewater. They are most often used today to treat wastewater prior to discharge to a leach field.

32.     Treatment and Dispersal Systems are capable of both treating wastewater and recharging back into the environment without an additional leach field that is typically required with Contained Systems. Treatment and Dispersal Systems are installed in the soil, typically in a layer of sand. Due to their larger surface area present in the sand, their ability to both treat and disperse wastewater and a decreased reliance on mechanical functions, Treatment and Dispersal Systems are typically much more cost effective and require less ongoing maintenance than Contained Systems.

33.     The Contained System manufacturers have made a variety of statements regarding the alleged superiority of Contained Systems in comparison to Treatment and Dispersal Systems, even though the data generated through NSF/ANSI Standard 40 is not supportive of this position.  Wastewater treatment is

not an especially complex process. Predominantly aerobic microorganisms, present on surfaces within and in close proximity to the wastewater, metabolize the constituents present in the wastewater and ultimately the dirty water becomes clean water again. Microbially mediated waste reduction has been around since the beginning of time and is so simple that its effectiveness is often taken for granted.

34.     This process can be enhanced or reduced by varying a few important factors or inputs, such as oxygen and surface area. Treatment and Dispersal systems, as described further in Paragraph 57, have at least as much, if not more, oxygen available for microorganisms as Contained Systems. Standard 40 Contained Systems are proprietary devices configured within some sort of vessel. These vessels are significantly smaller than a typical Treatment and Dispersal system. As such, more space, or surface area, is present for microorganisms to populate. Additionally, the sand media that is the basis of these systems has many times more surface area present within it than the media in any comparably sized Contained Systems unit.

35.     Moreover, Contained Systems incorporate sealed vessels and Treatment and Dispersal Systems do not. Because Contained Systems are sealed, the only way for microorganisms to enter is through the inlet pipe. Conversely, Treatment and Dispersal Systems are in direct contact with the surrounding native soil; microorganisms can enter into the system through the inlet pipe; and can also

populate the system through the open perimeter.  During startup, or when a toxic substance is present in the influent, the Contained System is more negatively impacted and takes longer for the microbial community to rebound back to the former size and, in certain instances, Contained Systems need to be reseeded with microorganisms.  Treatment and Dispersal Systems are much more stable because they are larger and therefore the toxic dose is more spread out and less concentrated.  This results in lower toxicity to the microorganisms and any microbial die off within the sand media can be replaced quickly via microbial immigration from the perimeter.

36.    From a theoretical science and engineering perspective, the more oxygen, surface area, and microbial diversity present, the better the treatment.  Additionally, most state codes are based on these systems.  Only a biased group could conclude that Contained Systems would unequivocally outperform Treatment and Dispersal Systems.  Furthermore, the reality is that soil and sand Treatment and Dispersal Systems have been around for far longer than Contained Systems and, ironically, these systems are far more tested and proven than Contained Systems that in themselves vary widely in performance.

37.    High strength wastewater is wastewater with more organic matter present than is typical in normal residential wastewater. Wastewater strength is typically measured in Biological Oxygen Demand ("BOD").  The higher waste

strength water is not per se an environmental contaminant, but it can more completely clog a leaching system in a shorter period of time.

38.    Many states have prescriptive codes and rules for wastewater treatment systems. Manufacturers of Treatment and Dispersal Systems are often prevented from marketing and selling their technology in a given state if the device is found not to comply with the prescriptive codes or rules.

39.    Because of NSF's extensive lobbying efforts, the majority of states have incorporated NSF standards into their codes; thus, requiring NSF certification or successful testing to NSF standards, prior to eligibility to offer products for sale in the state. Upon obtaining NSF certification, Treatment and Dispersal Systems should be entitled to approval as wastewater treatment systems in the majority of states in the same manner as Contained Systems, when a state has such a standard in their rules.

## B. Geomatrix and its Innovative Products

40.    Geomatrix invents, manufactures, and sells innovative onsite wastewater treatment and dispersal products. For the past 20 years, Geomatrix has been providing consumers with innovative and science-based solutions to onsite wastewater challenges.

41.    Geomatrix owns over 25 patents for onsite wastewater treatment and dispersal products and technologies.

42.     Geomatrix has an onsite testing laboratory in Connecticut where it evaluates inventions, ideas, its products, and other products available on the market.

43.     Geomatrix began offering one of its Treatment and Dispersal Systems, GeoMat, in 2005.

44.     GeoMat is a low-profile leaching system designed for maximum treatment and infiltration of wastewater into soil. GeoMat is nominally one inch thick and available in widths ranging from 6 to 39 inches wide. It is comprised of an entangled filament core covered by a hydroscopic membrane with an incorporated distribution pipe.

45.     GeoMat is often installed on a layer of sand for treatment and dispersal. Six inches of sand or soil generally provides a level of treatment that is at least as good, if not better, than many Contained Systems.

46.     GeoMat has been shown through independent testing conducted at the Massachusetts Alternative Septic System Test Center ("MASSTC") and the University of Rhode Island to treat wastewater as well or better than traditional and Contained Systems.

47.     MASSTC is an NSF approved testing facility that conducts testing on many of the onsite wastewater treatment products seeking certification by NSF under its standards.

48.     The fact that GeoMat can treat and disperse wastewater and can remove contaminants at comparable levels to many Contained Systems, without the mechanical complexity, energy demands, and cost is tremendously disruptive to the established market.

49.     The performance of GeoMat, and Treatment and Dispersal Systems, is very consistent due to the large surface area provided in the sand, high level of oxygen associated with the shallow profile, relatively consistent soil temperatures , and the simple non-mechanical nature of the technology.

50.     Due to the shallow burial depth and the high surface area to void space ratio in GeoMat, gas exchange has been shown to be significantly greater in GeoMat than in other leach field technologies. This increased oxygen transfer rate results in increased removal of pathogens, BOD, total suspended solids ("TSS"), and nutrients such as nitrogen and phosphorus in a shallower soil profile. The combination of the highly transmissive core and hygroscopic membrane draw the water between the application points and uniformly apply the water to the surrounding soil. The soil then draws the water away from the surrounding membrane through capillary action. This results in a much more uniform application of water to the soil and minimizes the point loading associated with other systems.

51.     GeoMat disperses treated effluent without the need for an additional leach field.  Because, in general, Contained Systems cannot both treat effluent and

17

infiltrate it into soil, they must construct a separate leaching system at a significant additional cost. This results in significant cost increase associated with Contained Systems. GeoMat's significantly lower cost for the same treatment level and combined dispersal is very disruptive to the established market.

52.     GeoMat's application and benefits are not limited to residential wastewater treatment. Geomatrix's products can also treat and disperse high strength wastewater as well or better than traditional systems and Contained Systems. In fact, several major convenience store chains have ceased use of Contained Systems when allowed by state regulations due to repeated problems with odors, high costs of construction and operation, leach field clogging, excess ponding, and failed leaching systems. These chains have increasingly switched to using Geomatrix solutions whenever possible.

53.     GeoMat is disruptive to the established market because of, *inter alia,* its high level of performance, low profile and small footprint, and cost savings beginning at installation and continuing through the life of the product. But it is also a minority player in the market.

54.     Increasing the availability of oxygen in a system can control the biomat buildup. In this regard, Geomatrix leaching systems, such as GeoMat and Geomatrix's SoilAir, increase oxygen supply over what is available in traditional systems, many Contained Systems and other Treatment and Dispersal Systems.

55.     Manufacturers have marketed Contained Systems as a way to enhance treatment prior to discharge to leaching systems and prevent leaching systems from clogging, ponding, and failure. Results of scientific studies have been varied regarding the success of this approach. *See, e.g.,* Daniel, T. C., and J Bouma. "Column Studies of Soil Clogging in a Slowly Permeable Soil as a Function of Effluent Quality," *Journal of Environmental Quality* 3, no. 4 (1974): 321-326. The Effect of Selected Treatment Technologies on the Hydraulic Function of Stressed Onsite Septic Absorption Systems – The Results of a Pilot Test, G. Huefelder and K. Mroczka, April 20, 2010 – June 30, 2013.

56.     Recognizing this issue, some Contained Systems use an air diffuser to introduce air into water in a tank; this leads to air bubbles rising up, agitating, and suspending organic matter in the water column.  It can also break up the organic matter into smaller pieces which then remain in suspension longer. This organic matter then flows into the leaching system and can accentuate the clogging process. Treatment systems that aerate wastewater in tanks are limited to transferring oxygen at the solubility level of oxygen in water; this is based on the given temperature and pressure present.  At 55 degrees Fahrenheit and at sea level, the solubility of oxygen in water is 10 ppm.

57.     When wastewater enters a Treatment and Dispersal System, especially GeoMat, in part because it is so shallow, there is a high level of oxygen present in

the soil or sand pores around the GeoMat.   Since Air contains 21% oxygen, and as compared to the example in Paragraph 56 with 10 ppm dissolved oxygen,   the unsaturated GeoMat has 21,000 times more oxygen  than is possible in a saturated environment such as a Contained system aerobic treatment tank.  This difference can be simply understood in that people cannot breathe under water, but they can in air. This significant increase in oxygen supply allows the microorganisms to oxidize the organic matter more efficiently in the wastewater and prevents organic accumulations from occurring.

58.    To solve the problems of leaching systems clogging and subsequently clogging associated with Contained Systems described above, Geomatrix developed SoilAir—a patented process owned by Geomatrix—that introduces air directly into the leaching system to reduce and/or eliminate organic clogging.

59.    Third-party peer reviewed studies have proven that SoilAir can unclog clogged leaching systems even when the size of the leaching system is reduced, and flows are increased. Amador, Potts, Loomis, Kalen, Patenaude & Gorres 2010, *Improvements of Hydraulic and Water Quality Renovation Functions by Intermittent Aeration of Soil Treatment Areas in Onsite Wastewater Treatment Systems, Water* 2010, vol 2, pp 886-903*; Amador. Loomis, Kalen, Patenaude, Gorres & Potts 2007, Evaluation of Leachfield Aeration Technology for Improvement of Water Quality and Hydraulic Functions in Onsite Wastewater Treatment Systems,* NOAA/UNH

Cooperative Institute for Coastal and Estuarine Environmental Technology, September 2, 2007. This has also been proven in the field, including unclogging leaching systems associated with Contained Systems.

60. Historically, leaching systems serving facilities producing high strength wastewater, such as convenience stores and restaurants, have had a short lifespan, often only a few years. The manufacturers of NSF certified Contained Systems have marketed, and continue marketing, their technologies to the owners of these facilities as a way to increase leaching system lifespan despite the fact that they sometimes clogged even sooner than traditional systems not connected to a Contained System.

61. Geomatrix's SoilAir is increasingly relied on by owners of high strength wastewater facilities to effectively treat and discharge high strength wastewater back into the environment. Geomatrix is engaged by facilities that produce high strength wastewater for assistance and use its technology to rejuvenate clogged leaching systems, including those served by Contained Systems certified under NSF standards for onsite wastewater treatment.

62. Facilities producing high strength wastewater became interested in SoilAir in an effort to rejuvenate failed systems. SoilAir can be, and has been, successfully implemented on traditional systems with a septic tank and on Contained Systems. Once customers experienced the benefits of SoilAir, word spread, and customers began requesting SoilAir be used on their new projects and as an

21

inexpensive solution on both traditional and Contained Systems to prevent leaching systems from clogging and also to rejuvenate systems that clogged prematurely.

63.     In some instances, state codes require that Contained Systems be used at all facilities that produce high strength wastewater. In these states, some facilities have voluntarily installed SoilAir to ensure that the mandated Contained Systems would function properly. Geomatrix's patented SoilAir product was, and continues to be, very disruptive to this established market.

64.     SoilAir has been successful at preventing clogging, ponding, and failure in systems processing high strength wastewater. Geomatrix is in a unique position in the high strength wastewater market as other manufacturers of Contained Systems cannot offer the patented SoilAir technology.

## C. NSF and NSF/ANSI Standard 40 Certification

65.     NSF holds itself out as a non-profit, non-governmental organization, and a leader in standards development, product certification, and risk-management for public health and safety.

66.     NSF promulgates quality standards and provides certification for many products in commerce. Certain of NSF's standards have been adopted by and become a part of federal and state law.

67.     In its Revised Articles of Incorporation dated May 18, 2016, NSF affirmed its role as an independent body that serves the public interest. The Revised

Articles of Incorporation state that the purposes for which NSF is organized are as follows:

A. To further the educational, scientific and charitable purposes of promoting progress in public safety, the environment, sanitation, public health and education of and for mankind.

B. To conduct activities to further scientific research, including research in public safety, public health, the environment and sanitation, and to engage in experiments, tests for public safety, including public health, environmental and sanitation testing, demonstrations, studies, education, training, practical application, publication and dissemination of information, to do such other things as the Board of Directors of the Corporation may deem necessary or proper for the accomplishment of said purposes; and to establish, maintain, equip, and provide facilities and courses of study and otherwise to aid or assist colleges, universities, high schools, institutions and agencies for said purpose.

C. To establish, own, operate and conduct in the public interest, scientific research and scientific testing laboratories to test for public safety, including environmental , sanitation and public health; to measure and determine sanitary effectiveness and efficiency of equipment, materials, articles, products and methods of use and operation thereof in the public interest; and in conformity with previously determined standards established, approved or accepted by the Corporation, to promulgate the results thereof; to issue marks for public protection and benefit; and to publish lists of the companies which have received the marks.

D. To acquire, own, dispose of and deal with real and personal property and interests therein and to apply gifts, grants, bequests and devices and the proceeds thereof in furtherance of the purposes of the Corporations.

E. To do such things and to perform such acts to accomplish its purposes as are not forbidden by Section 501(c)(3) of the Internal revenue Code of 1986 or corresponding provisions of subsequent legislation (the "Code"), with all the powers conferred on nonprofit corporations by the laws of the State of Michigan.

68.     NSF serves as the recognized United States standard-setting organization for at least twelve industries including aerospace, automotive, building products and interiors, chemical, consumer products, food and safety, medical devices, nutritional products, pharmaceuticals and biotech, plastics, sustainability and environment, and water and wastewater. Especially pertinent to this case, NSF writes and promulgates technical standards related to onsite wastewater treatment systems.www.nsf.org/services;www.nsf.org/services/by-industry/water-wastewater/onsite-wastewater

69.     NSF claims to have "over 40 years of experience in onsite wastewater treatment systems." It says that its "standards group facilitates the development of standards and protocols," and that its "global water program tests and certifies products." NSF claims to provide the gold-standard for the industry, and that its services "deliver confidence to consumers, assurances of performance to public health officials, and market access for product manufacturers in the onsite wastewater treatment industry." www.nsf.org/services/by-industry/water-wastewater/onsite-wastewater

70.     NSF also touts its accreditation by the American National Standards Institute ("ANSI") claiming that this accreditation "attest[s] to the competency of the services provided and compliance with established national and international standards for third-party certification." www.nsf.org/about-nsf/accreditations

71.     NSF states that its American National Standards are developed through a voluntary consensus process that "meet[s] the requirements of due process as defined in the current version of American National Standards Institute (ANSI) Essential Requirements: Due Process Requirements for American National Standards.  In addition, these Policies are consistent with the "OMB A-199 Federal Participation in the Development and Use of Voluntary Standards." NSF International Standards Development and Maintenance Policies ("Standards Development Policy") (September 27, 2013), page 1.

72.     NSF's process for developing a standard includes appointment of a joint committee, which NSF defines as "[t]he consensus body responsible for development and revision of any NSF/ANSI Standard." Standards Development Policy, page 1.  One such joint committee is the Joint Committee on Wastewater Technology, which presides over the development and maintenance of NSF standards relating to wastewater (the "Joint Committee").

73.     NSF also relies on task groups, which are defined as "[a] group appointed by the J[oint] C[ommittee] Chair to address a specific issue or standard. Task Groups can be formed on an *ad hoc* or standing basis." Standards Development Policy, page 1.

74.     The Joint Committee is not an independent organization but is directed, trained, and overseen by NSF employees.  NSF employees serve as members of the

25

Joint Committee and task groups.  The Joint Committee and task groups are subject to NSF's due process rules and Antitrust Guide.  Additionally, the Joint Committee reports directly to NSF employees.

75.    As recently stated by Robert Powitz, the current Chair of the Joint Committee, "Steve Williams [of NSF] keeps me in line."

76.    NSF developed NSF/ANSI Standard 40, initially adopted in November 1970, as a consensus standard. The standard "contains minimum requirements for residential wastewater treatment systems having rated treatment capacities between 1514 L/day (400 gal/day) and 5678 L/day (1500 gal/day). Management methods for the treated effluent discharged from residential wastewater treatment systems are not addressed by this Standard." NSF/ANSI Standard 40 § 1.2.

77.    NSF partnered with the U.S. Environmental Protection Agency ("EPA"), and the EPA office of Decentralized Wastewater has endorsed NSF and its Standards on their webcast series. Upon information and belief, this endorsement was given after substantial lobbying efforts by NSF.

78.    At least the following states have accepted and adopted NSF/ANSI Standard 40 into their statutes, state administrative codes, or mandatory technical standards and guidelines:

- *Washington*
- *California*
- *Hawaii*

- *Oregon*
- *Alaska*
- *Idaho*

26

- *Utah*
- *Arizona*
- *Montana*
- *Wyoming*
- *Colorado*
- *New Mexico*
- *Kansas*
- *Oklahoma*
- *Texas*
- *Minnesota*
- *Iowa*

- *Missouri*
- *Arkansas*
- *Louisiana*
- *Illinois*
- *Indiana*
- *Ohio*
- *Kentucky*
- *Tennessee*
- *Mississippi*
- *Alabama*
- *Georgia*

- *Florida*
- *North Carolina*
- *West Virginia*
- *Pennsylvania*
- *Delaware*
- *New Jersey*
- *New York*
- *Vermont*
- *Maine*

79.    Many of the states that have not adopted NSF/ANSI Standard 40 rely on NSF/ANSI Standard 40 certification and testing reports in making product approval decisions.

80.    NSF markets NSF/ANSI Standard 40 as "the most recognized and required standard for the residential wastewater treatment industry[.]" www.nsf.org/services/by-industry/water-wastewater/onsite-wastewater/residential-wastewater-treatment-systems

81.    NSF markets its standards, including NSF/ANSI Standard 40, to manufacturers, including Geomatrix, as "[a] way to differentiate your product from

your competitors and gain advantage in the market." www.nsf.org/about-nsf/nsf-mark

82. NSF also advertises various benefits of certification under NSF/ANSI Standard 40 on its website claiming that "NSF/ANSI 40 is the most recognized and required standard for the residential wastewater treatment industry with more than 30 years of market use and acceptance." NSF claims that "[c]ertification to NSF/ANSI 40 provides your company access to the onsite residential wastewater market."www.nsf.org/services/by-industry/water-wastewater/onsite-wastewater/residential-wastewater-treatment-systems.

83. NSF licenses products certified to the applicable standard, including NSF/ANSI Standard 40, to use the NSF Mark. NSF promotes the benefits of using the NSF Mark including the following:

> **The NSF Mark increases the acceptance of your product or service.** Your clients, potential clients, regulators, retailers, and dealers are all more inclined to accept your products, advertising and promotion that bear the NSF Mark.

> **The NSF Mark allows for easier entry into new markets.** Whether it's a new industry segment or a new international market, the NSF Mark on product packaging, advertising and literature makes it easier to reach potential clients.

> **The NSF Mark provides a faster communication tool.** The challenge for any company is to communicate product safety and reliability quickly and effectively. The NSF Mark is one tool that does this. It is a small mark with a giant message.

> **The NSF Mark gives your products and services additional exposure.** With the NSF Mark, your product's exposure is greatly increased through NSF's online listings and the regularly distributed NSF listings.
>
> **The NSF Mark reduces marketing costs.** Credibility and confidence come faster with independent certification, reducing marketing expenses for that purpose.
>
> **The NSF Mark increases sales.** When you combine all of the advantages, the bottom line is that the NSF Mark will help increase sales. But this is only true for a company that consistently uses it, prints it, displays it and promotes the fact that their product or service is qualified to bear this valuable mark.
>
> **The NSF Mark inspires consumers and reassures clients.** NSF's mission is to make the world safer. The mark symbolizes safety and trust.

Guide for Using the NSF Mark (2008), page 8.

84.    NSF represents that "the NSF mark is a powerful marketing tool available to manufacturers as they build customer confidence in their products and materials." *Id.* at 7.

85.    NSF markets its commitment to consumer protection through the investigation of all complaints regarding an NSF certified product. NSF states that "anyone can bring a Complaint" and that the Complaint will be investigated by NSF with "corrective action" where appropriate. www.nsf.org/media/enews/documents/ww_reuse_testing_certification_webinar.pdf

86.    The majority of products certified under NSF/ANSI Standard 40 are Contained Systems.

29

87.     Prior to 2007, NSF certified at least one system that can be configured as a Contained System or Treatment and Dispersal System, the Anua peat filter, under NSF/ANSI Standard 40. This system could disperse water into the soil from openings in the bottom of the device or discharge through a discreet drainpipe . NSF certified this system before any other Treatment and Dispersal System. Neither NSF nor its participants have made any allegations of substandard performance or attempt to decertify the Anua system.

88.     Concerns about Treatment and Dispersal Systems by NSF and manufacturers and suppliers of Contained Systems did not arise until Treatment and Dispersal Systems—like GeoMat—became disruptive in the market as consumers began to realize they were equally or more effective and less expensive than Contained Systems and a leach field.

89.     Upon information and belief, there have been no formal complaints filed with NSF concerning the performance of NSF/ANSI Standard 40 certified Treatment and Dispersal Systems, other than those expressed by the Defendants.

**D. Geomatrix's NSF/ANSI Standard 40 Certification Efforts**

90.     In 2012, Geomatrix became aware of the advertised benefits of NSF/ANSI Standard 40 certification through NSF's participation in trade shows, NSF's marketing efforts, and discussions with regulatory authorities. After learning

of the benefits NSF advertised, Geomatrix began discussions with NSF related to the potential testing and certification of GeoMat.

91. NSF/ANSI Standard 40 has been accepted and adopted in the statutes, codes, regulations, or mandatory technical guidance or standards of at least the states set forth in Paragraph 78 above and is, therefore, generally necessary to obtain approval to sell residential and commercial onsite wastewater treatment systems in those states. NSF/ANSI Standard 40 certification also provides a substantial advantage in obtaining regulatory approval and selling wastewater treatment systems in states that have not formally adopted NSF/ANSI Standard 40.

92. Regulatory agencies are often slow to allow new technologies into the market. National standards, when created and implemented fairly, can be of great assistance to regulators' evaluation of new technologies. Because of regulatory resistance to new technology and the difficulty of changing state regulations once adopted, however, national standards can also be used as a tool by manufacturers and suppliers of established technologies to restrict new and/or innovative technologies from entering the market. Such is the case here.

93. Regulators have a vested interest in ensuring that regulations and standards they promulgated are upheld and product approval decisions that they have made are not undermined. Regulators are often outspoken against additional testing for established technologies as additional testing may show that prior product

approval decisions were incorrect, not based on sound scientific evidence, and/or not in the best interest of the public health, the environment, or consumers. Regulators often exhibit resistance to including new technologies under standards which their states have adopted as it will require them to allow those technologies to enter their state's market. In theory, regulatory agents should not receive any direct benefit from approving new products and technology; however, if they approve something that turns out to be problematic, they could find their job in jeopardy. This results in regulators being resistant to approving new technology and products in general and especially ones that are innovative and/or outside of current regulations, rules, etc.

94. Geomatrix sought NSF/ANSI Standard 40 certification from NSF based on NSF's claims about its "commit[ment] to act impartially in carrying out [NSF] certification, testing, inspection, registration, validation and verification activities" and the "Benefits of Certification" NSF touted on its website and in advertising materials including access to, and advantages in, the onsite residential wastewater market.

95. NSF claimed, and continues to claim, that it was and is the premier third-party independent testing and standard-setting organization for onsite wastewater treatment and that its standards were well respected by regulatory agencies and consumers.

96.     Geomatrix and NSF had extensive discussions regarding testing protocols and test cell design related to the GeoMat system between December 2012 and June 2013. In June 2013, Geomatrix and NSF agreed on a testing protocol and test cell design that would satisfy NSF/ANSI Standard 40.

97.     On or about June 12, 2013, after significant discussion with NSF, Geomatrix and NSF entered into Evaluation of Standard Performance Residential Wastewater Treatment Systems—NSF/ANSI Standard 40 Contract for testing of GeoMat under NSF/ANSI Standard 40.

98.     By email dated May 2, 2013, Tom Bruursema, NSF's General Manager of Water and Wastewater Certification at the time, acknowledged that Treatment and Dispersal Systems would be eligible for certification under NSF/ANSI Standard 40. He stated:

> As we have discussed, this technology, along with several others that NSF has or will be certifying are different from the technologies certified in the past under Standard 40. We are working to try go [sic] get a handle on how certification of these soil based systems would best be handled. Our desire is to provide flexibility in the certification to reflect the flexible nature of the technology. We must, however, know as the certifier how the technology will be used in field applications. While probably not perfect, we have determined that knowing limits that will be used in design of installations is where we are comfortable in certifying these systems.

99.     Both NSF management and its Joint Committee had repeatedly affirmed that Treatment and Dispersal Systems were eligible for certification under NSF/ANSI Standard 40.

100.   Previously, at a 2007 Joint Committee meeting, the Joint Committee heard a presentation from Presby Environmental Inc. ("Presby") regarding its Treatment and Dispersal System that had been tested to and met the requirements of NSF/ANSI Standard 40.   The Joint Committee voted in favor of recognizing Presby's Treatment and Dispersal System as eligible for NSF/ANSI Standard 40 certification.

101.   At the 2008 Joint Committee meeting, Mr. Bruursema stated, "[c]hanges were incorporated into NSF/ANSI [Standard] 40 and 245 that allowed testing of bottomless systems" and "[t]here was no objection from the J[oint] C[ommittee]" in this regard.

102.   During the 2010 Joint Committee meeting, NSF made clear that purported issues related to Treatment and Dispersal Systems under NFS/ANSI Standard 40 were settled and NSF disbanded the Bottomless System Task Group— a task group assembled to address the newer technology of Treatment and Dispersal Systems.

103.   At the 2010 and 2011 Joint Committee meetings, no issues were raised related to Treatment and Dispersal Systems.

104.   Based on Mr. Bruursema's representations and Geomatrix's understanding, beginning in June 2013, Geomatrix conducted testing of GeoMat under the direction of NSF at MASSTC at great expense to Geomatrix.

105.   To date, Geomatrix has invested a significant amount of money on NSF testing and certification. Geomatrix also paid employees who traveled to and participated in installation of the test system. Geomatrix employees also expended considerable time and effort before, during, and after the test period on designing, installing, monitoring, and reviewing the testing and results.

106.   GeoMat received NSF/ANSI Standard 40 Certification from NSF on or about July 18, 2014.

107.   Another Treatment and Dispersal System, Eljen GSF, received NSF/ANSI Standard 40 around the same time as GeoMat in mid-2014.

108.   After NSF's issuance of these certifications, the co-conspirators began their attacks on Treatment and Dispersal Systems as set forth more fully in the following Paragraphs.

## CO-CONSPIRATORS AND THE CONSPIRACY

109.   In or about September 2019, NSF agreed, combined, and conspired with a number of other persons and entities with regard to the conduct described in this Complaint including Defendants BioMicrobics, Hoot Systems, Mr. Bell, and Mr. Suchecki among others.

110.   The co-conspirators have an economic interest in the exclusion of Geomatrix and its products from the relevant product markets because Geomatrix's products tend to displace competing onsite wastewater treatment products

manufactured, marketed, promoted, and/or sold by co-conspirators, including Contained Systems.

111.   The co-conspirators known at this time to Geomatrix include certain members of the Joint Committee and NSF task groups that are described hereinafter. These co-conspirators include several representatives of Contained System manufacturers including the Corporate Defendants – James Bell of BioMicrobics, Ronald Suchecki of Hoot Systems acting individually and on behalf of their employers –  and Nicholas Noble of Orenco Systems, Inc. ("Orenco"), acting on behalf of his employer. They also include Sara Heger, Ph.D., of the University of Minnesota (collective "co-conspirators").

112.   Mr. Bell served in influential positions on the Joint Committee that allowed him to place himself and other co-conspirators in positions of authority on key task groups to further the conspiracy.

113.   Jim Bell has served as a member of the Joint Committee since at least 2006 and as Vice-Chair of the Joint Committee since at least 2011.  Additionally, between 2007 and the present, he has been appointed, or appointed himself, as Chairperson of at least the following Task Groups:

- Nutrient Reduction

- Bottomless Systems

- Alarms

- Open Access

- High Strength Wastewater

- Disinfection Mechanics

- NSF 360

- Field Performance Evaluation

114.   Mr. Bell used his position of authority on the Joint Committee to limit competition for his employer, BioMicrobics, through presenting issue papers that question the validity of NSF certification of Treatment and Dispersal Systems, initiated and directing discussion questioning the validity of NSF certification of Treatment and Dispersal Systems, proposing and establishing task groups to purportedly evaluate the efficacy of NFS's certification of Treatment and Dispersal Systems, and appointing his co-conspirators to lead task groups that questioned NSF's certification of Treatment and Dispersal Systems.  Including the presentation on Issue Paper No. 2015-3 dated August 25, 2015 and entitled NFS/ANSI 40 – 2015 Edits in which he proposes the following:

> At the 2014 Joint Committee Meeting a Task Group was established to evaluate the testing protocol of NSF Std. 40 to address the changes that may need to be made for products being certified under NSF Std. 40 with open bottom for effluent to directly drain into the drainfield.  In a recent Task Group Conference call it appears that Std. 40 may be divided into two testing protocols.  If this is done how does NSF certify products to both categories as applicable? Does the listing change to reflect that it is certified to the specific testing protocol?  How will the

regulatory community deal with this as NSF Std. 40 has been in state regulation for several decades?

115.    The co-conspirators have presented all but one of the motions presented to the Joint Committee related to Treatment and Dispersal Systems between 2007 and 2020.

116.    Despite being made aware of Mr. Bell's dominance and improper use of the authority granted to him by NSF on multiple occasions, NSF did not take meaningful action to curtail Mr. Bell's dominance and control of the Joint Committee and associated task groups or his improper use of authority granted by NSF.

117.    Dr. Heger who was appointed to the Joint Committee and as chair of significant task groups, including the HSW Task Group,  has received funding from BioMicrobics related to her research at the University of Minnesota specifically related to high strength wastewater.  Upon information and belief Dr. Heger has also been paid by a dealer of BioMicrobics and Hoot Systems for assistance in marketing their products. This funding was never disclosed to NSF participants or regulatory authorities by Dr. Heger, BioMicrobics, Hoot Systems, or NSF.

118.    Other members of the Joint Committee and task groups acted in concert with the foregoing co-conspirators.

119.    Since September 2017, the co-conspirators have worked in concert with NSF and participated in activities of the Joint Committee and NSF task group with

aim of using the standard-setting process to exclude Geomatrix and other Treatment and Dispersal Systems from the relevant product market.

120.   The acts charged in this Complaint have been done by NSF and/or its co-conspirators, or were authorized, ordered, or done by their respective officers, agents, employees, or representatives while actively engaging in the management of their respective business or affairs.

## AGENCY

121.   Many of the co-conspirators, including Mr. Bell, Mr. Suchecki, and Dr. Heger, acted with the actual or apparent agency of NSF.

122.   Said co-conspirators, as more fully set forth below, served as voting members of the Joint Committee and served as Chairs of the most significant task groups.

123.   Said co-conspirators, used their authority to establish new task groups, disband existing task groups, establish objectives for the Joint Committee and task groups, direct work to their preferred task groups, and appoint themselves, or others with aligned interests, to leadership positions on those task groups. Including, but not limited to the following examples of actions taken by co-conspirators:

- Appointment of Jim Bell as Chairperson of the Industry Group on or about September 20, 2007;

- Continuation of the "Bottomless Systems" Task Group despite no issue papers being presented on or remaining open issues on Motion by Mr. Bell for the purpose of "addressing" "issues and questions with [bottomless systems] that need to be address [[sic]" and appointment of Mr. Bell as chairperson, despite his obvious conflict of interest as a manufacturer of a competing product on October 28, 2009;

- Appointment of Mr. Bell as chairperson of the High Strength Wastewater Task Group on September 23, 2014;

- Creation of the NSF/ANSI 40 Task Group based on Mr. Suchecki's recommendation that Treatment and Dispersal Systems "may require different ways to verify performance through testing" on September 24, 2014;

- Setting the objective that the United States Environmental Protection Agency's ETV Protocol be the basis for a high strength standard despite NSF, Mr. Bell, and Dr. Heger's having a financial interest in the ETV protocol without disclosure of such financial interest after straw poll submitted to the Joint Committee in 2013;

- Reactivating the "Open Bottom" Task Group and appointing Mr. Bell as chairperson despite his employer selling a competing product and no "open bottom" products;

- Appointment of Sara Heger, who received funding from BioMicrobics related to the US EPA ETV, and upon information and belief she received funding from a distributor of BioMicrobics and Hoot Systems regarding marketing assistance, as Chairperson of the High Strength Wastewater Task Group on September 24, 2014 after Mr. Bell resigned due to complaints of a conflict of interest by participants;

- Mr. Bell directed that the issue of whether NSF/ASNI Standard 40 should be divided into two sections to "differentiate between open bottom cell technology" should be presented to the State Onsite Regulatory Association, an association comprised of almost all of the state regulatory agencies, on September 24, 2014;

- Mr. Bell's presentation of Issue Paper No. 2015-3 recommending that the Joint Committee treat Contained and Treatment and Dispersal Systems differently under NSF/ANSI Standard 40;

- Dr. Heger's recommendation that a High Strength Standard initially not include Treatment and Dispersal Technologies on, at least, March 2, 2016;

- Mr. Bell's direction that the HSW Task Group take "the question of whether or not to include bottomless systems in [the High Strength Wastewater] standard is taken back to the Joint Committee for a vote…" on March 2, 2016;

- Dr. Heger's continued statement supporting and pursing the exclusion of Treatment and Dispersal Systems from the High Strength Wastewater Standard as chairperson of the HSW Task Group including during meetings held on at least April 20, 2016, September 21, 2016, March 29, 2017;

- Mr. Bell and Mr. Suchecki proposing changes to NSF's certification policies during the private Industry Forum on September 21, 2016;

- Mr. Bell, as a Joint Committee member and vice-chair of the HSW Task Group, proposing that whether to include Treatment and Dispersal Systems in the proposed High Strength Standard was a concern after being directed by NSF and the Joint Committee on September 21, 2016 to include all technologies in the proposed standard;

- Mr. Suchecki's motion, as a Joint Committee member, to create a task group to create "a recommended test procedure" for Treatment and Dispersal Systems on September 20, 2017 despite the fact that he manufacturers a competing product and has no expertise with these systems;

- Dr. Heger's motion that the HSW Task Group resume work only related to Contained Systems on September 19, 2018;

- Dr. Heger's proposal, as chairperson of the HSW Task Group and Joint Committee member, that only Treatment and Dispersal System needed to be tested for clogging, and not Contained systems, during numerous meetings of the Joint Committee and HSW Task Group meetings, including the HSW Task Group meeting held on March 20, 2020; .

- Dr. Heger's suggestion, preparation, and direction to circulate a straw poll that suggested that Contained Systems and Treatment and Dispersal Systems should be required to meet different standards under the proposed high strength wastewater standard initially opened on December 6, 2019, withdrawn on December 13, 2019, revised and reopened on December 13, 2020;

- Dr. Heger's proposal for a second straw poll that requested a vote on whether Treatment and Dispersal Systems should be excluded from the proposed high strength wastewater standard despite being repeatedly told by the Joint Committee to include all systems under the proposed standard on March 20, 2020; and

- Preparation and distribution of official responses to comments made by participants in the standard-setting process including Dr. Heger's responses to comments on the HSW Task Group straw poll dated March 10, 2020.

124.   Said co-conspirators, set the agendas, responded to negative comments on behalf of NSF, prepared straw ballots which were circulated by NSF, and used the authority granted by NSF to benefit their employers or their own interests.

125.   NSF employees and said co-conspirators have proposed over 70% of the substantive motions voted on at Joint Committee meetings in the past 5 years, including all of the motions related to Proposed Standard 441 and all motions, save one, related to Treatment and Dispersal Systems despite making up only between eleven and fifteen percent of the Joint Committee.

126.   Said co-conspirators used their authority, or appearance of authority, to disparage Treatment and Dispersal Systems and take actions with the intended and actual result of excluding Treatment and Dispersal Systems from NSF/ANSI

Standard 40 and the HSW Standard, and, ultimately, the market, including controlling motions, controlling chairmanship of task groups, and controlling task group membership.

127.   Certain of said co-conspirators were in charge of the Industry Group and User Group which set commercial terms and policies of NSF. The co-conspirators used this position and the authority granted to them by NSF to exclude Treatment and Dispersal Systems from standards and, ultimately, the market.

128.   NSF was made aware of said co-conspirators actions on a several occasions and did not take any action to curtail the effort of said co-conspirators to use NSF's standard-setting process for commercial gain by excluding Treatment and Dispersal Systems from the standards and, therefore, the market.  Accordingly, NSF's failure to act to enforce its due process rules, resulted in its ratification of said co-conspirator's actions.

129.   Geomatrix has never requested special treatment or unfair standards to promote its products or technology.  Geomatrix has repeatedly petitioned NSF to enforce its due process rules and provide a fair process that treats all manufacturers the same.

## NSF, ITS SERVICES, AND ITS WRONGFUL ACTIONS

### A. NSF's Standard Setting Process and Antitrust Obligations

130.   NSF claims to serve the interests of the public and claims to demand the highest in ethical conduct from its professional staff. NSF's Mission and Values statements provide:

> NSF is dedicated to being the leading global provider of public health and safety based risk management solutions while serving the interests of all stakeholders, namely the public, the business community and government agencies . . . . When it comes to our people and the way we work, we possess seven core values. We demand the highest ethics and integrity from our professionals. We operate using sound scientific principles. We respect and care for each other. We promote personal and professional growth. We foster innovation and creativity. We demonstrate social and environmental responsibility. And finally, we are committed to winning and being the best.

www.nsf.org/about-nsf/mission-values-history

131.   NSF also promotes its strong controls on unfair competition in its code of ethics and touts its compliance with laws, rules, and regulations. The code contains, *inter* alia, the following provisions:

a.   "We seek to outperform our competition fairly and honestly. We seek competitive advantages through superior performance, both through ethical or legal business practices….engaging in conduct that would violate applicable antitrust laws, is prohibited . . . . No Covered person should take unfair advantage of anyone through…misrepresentation of material facts or any other intentional unfair-dealing practice."

b.   "NSF conducts all aspects of its business honestly and in compliance with all applicable laws. Violation of governing laws and regulations is unethical and subject both the individual involved and the Organization to significant risks of fines, penalties and damaged reputation."

www.nsf.org/about-nsf/code-ethics

132.   NSF conducts regular meetings of various standard-setting committees and task groups who are charged with creating, amending, or modifying current standards. Recognizing that the standard-setting process is at risk of anticompetitive behavior, NSF cautions against such behavior by having an employee read the following antitrust statement from NSF's Antitrust Guide at each meeting:

> Because this meeting involves representatives of competing businesses, it is important that I get everyone's agreement before we begin that the meeting will be conducted in full compliance with the antitrust laws. We must avoid any comment or action that encourages joint action by participating firms to restrict their competition. If any of you have any questions, I refer you to the NSF Antitrust Guide for the conduct of meetings.

NSF Antitrust Guide, page 13.

133.   NSF's Antitrust Guide, which is required to be invoked prior to all standard-setting meetings, demands that participants follow the rules and requirements set forth in the Antitrust Guide and it provides a mechanism for NSF to address participant's concerns should any anticompetitive or antitrust concerns arise. In this regard, the Antitrust Guide states:

   a. "Attendees should adhere to the following basic rules";

   b. "If in doubt about the propriety of any legal action, consult with NSF management or legal counsel before proceeding";

   c. "If issue of uncertain legal significance are likely to arise at a meeting, arrange for NSF legal counsel to be present. If, during a meeting, participants address a subject that you believe may present antitrust problems, you should object immediately and request that the subject be dropped. If discussion persists, you should insist that

the meeting be terminated and all participants leave the meeting place. If other participants persist in continuing the meeting, announce that you are leaving, and insist that your departure be recorded in the minutes, together with your stated reason for departing."

NSF Antitrust Guide, page 13.

134.    The NSF Antitrust Guide specifically acknowledges that standards can harm competition and cautions against creation and adoption of standards for anticompetitive purposes, including the following:

a.    "Despite these demonstrated benefits there are possible risks to standard-setting. For example, a competitor who has no part in preparing a product standard may suffer in the marketplace if his product does not conform to that standard."

b.    "Standards programs must not be used as devices to fix prices, reduce output, boycott competitors, or otherwise lessen competition. Standard setting activities may raise antitrust concerns when competitors are required to share competitive information with each other."

c.    "Standards should not limit the number and type of products, except for safety reasons. Standard setting activities may raise antitrust concern if they are intended to preclude the use of another competitor's product."

d.    "Where possible, development of performance standards should be favored over specification or design standards that might limit variety or quality. Standards setting activities may raise antitrust concern if they prevent innovation."

e.    "No collective action should be taken by meeting participants which might deny to a competitor (whether or not a participant in the NSF meeting) access to important information without prior consultation with NSF management or legal counsel."

48

    f.  "Standards should be kept current through periodic review and updating, in order to reflect changing technology."

    g.  Affected parties should be allowed to participate in the formulation of standards in a meaningful way."

    h.  "All listing, de-listing, and certification decisions ought to be the exclusive, unilateral province of NSF."

NSF Antitrust Guide, pages 16-17.

135.  NSF provides Joint Committee Members training regarding NSF policies and procedures. The NSF Joint Committee Member Training presentation does not make any reference to the Antitrust Guide.

136.  NSF must abide by antitrust standards in order to maintain its national accreditation with ANSI, which has adopted the following antitrust statement:

> ANSI nevertheless recognizes that [the standard setting process] must not be a vehicle for individuals or organizations to . . . engage in . . . anti-competitive behavior. ANSI's policy, therefore, is to take all appropriate measures to comply with U.S. anti-trust law and foreign competition laws and ANSI expects the same from its members and volunteers when acting on behalf of ANSI.

ANSI Antitrust Policy, www.ansi.org/publicstatements/ansi_antitrust_policy

137.  To maintain its ANSI accreditation, NSF must comply with ANSI Essential Requirements: Due Process Requirements for American National Standards.

138.  Upon information and belief, NSF created and published the Standards Development Policy to maintain its ANSI accreditation.

139. In its Standards Development Policy, NSF follows ANSI's Essential Requirements for Due Process which specifically addresses issues that have been found by courts to increase the risk of antitrust violations in the standard setting process. Specifically, these due process principles include openness, lack of dominance, and balance of interests. *See NSF International Standards Development and Maintenance Policies September 27, 2013; ANSI Essential Requirements: Due process requirements for American National Standards, January 2020*

140. ANSI's standard setting policy was established to limit antitrust violations by standard-setting organizations like NSF and participants in the standard setting process. However, as stated by ANSI's General Counsel, Amy Marasco, in testimony to the Federal Trade Commission on December 1, 1995, "[i]s the ANSI system foolproof? The answer in No." She further testified "we realize that proper procedures are of little value if they are not followed in practice."

141. NSF's Standards Development Policy recognizes that the standard-setting process "[s]hall not be dominated by a single interest category, individual, or organization. 'Dominance' shall mean a position or exercise of dominant authority, leadership, or influence by reason of superior leverage, strength, or representation to the exclusion of fair and equitable consideration of other viewpoints." Standards Development Policy, page 5.

142.   NSF's Standards Development Policy also requires that "[t]he J[oint] C[ommittee] shall have a balance of interests. Members from diverse interest categories shall be sought with the objective of balance . . . ." Standards Development Policy, page 5.

143.   NSF's Standards Development Policy establishes three categories of membership: User/Consumer, Industry, Public Health and Safety/Regulatory. However, both ANSI policy and the Standards Development Policy recognize that additional interest categories may be appropriate. Standards Development Policy, page 6.

144.   Geomatrix has made consistent efforts to inform NSF of the violations alleged herein and persuade NSF to follow the law, the ANSI guidance, NSF's Antitrust Guide, its Standards Development Policy, and its mission statement.

145.   Geomatrix has faced resistance from NSF employees, agents, apparent agents, and/or representatives and NSF's co-conspirators, who have worked in concert to limit the market for Geomatrix products and protect the market for NSF's more beneficial customers and their own interests without regard for scientific evidence and NSF's certification of GeoMat's compliance with the requirements of NSF/ANSI Standard 40, the requirements of NSF's Antitrust Guide and NSF's Standards Development Policy, NSF's Code of Ethics, the environment, or the public health.

146.   NSF has immense power in the wastewater industry. On information and belief, NSF markets its standards, including NSF/ANSI Standard 40, to federal and state regulatory agencies and lobbies such agencies to include its standards in state regulatory codes and statutes.

147.   NSF touts its influence in the regulatory community on its website:

> The regulatory community also benefits from NSF/ANSI 40 and other NSF wastewater standards. Recognizing that public health officials have the ultimate authority in approving wastewater treatment systems, we provide easy access to public listings of certified products, as well as direct access to product evaluation reports and data, complaint procedures for products or companies of concern, training materials and more. Federal, state and local agency representation on the standard's joint committee ensures that the interests of health officials are central to product certification.

www.nsf.org/services/by-industry/water-wastewater/onsite-wastewater/
residential-wastewater-treatment-systems

148.   State regulatory authorities routinely participate in NSF Joint Committee and task group meetings. State regulatory authorities routinely receive communications from NSF related to the content of its standards directly from NSF and through regulatory and trade associations such as the State Onsite Regulators Association ("SORA") and National Onsite Wastewater Recycling Association ("NOWRA"). Additionally, NSF markets its standards to state regulatory authorities at conferences of trade associations such as the Onsite Wastewater Mega-Conference hosted by NOWRA.

149.    The Joint Committee is comprised of public health/regulatory members, industry manufacturers, and users. Of the current 27 Joint Committee members, there are no manufacturers of Treatment and Dispersal Systems and at least six members are employed by manufacturers of Contained Systems.   The following members of the Joint Committee are employees of Contained Systems:

- James Bell – BioMicrobics, Inc.

- Ronald Suchecki – Hoot Systems, LLC

- Colin Bishop – Anua, Inc. (as stated above, Anua's product can be configured as a Contained System or Treatment and Dispersal System.)

- David Jumper – Pro Flo Aerobic Systems, Inc.

- Jim Meyer – Norweco, Inc.

- Kevin Sherman – SeptiTech, Inc. (SeptiTech is owned by BioMicrobics)

150.    Geomatrix representatives David Potts and Jason Henderson are listed on the current Joint Committee membership roster as "observers."  Between 2014 and the present, Geomatrix has participated in the Joint Committee meetings as "observers." David Potts is a voting member of several task groups and Jason Henderson participates as an observer on those task groups.

151.   Among the Joint Committee's responsibilities is consideration of submitted Issue Papers, which NSF defines as "a document to share items involving changes or an update to a standard, including a clear explanation as to why the change is proposed and the specific new wording . . . [of the] changes to the standard to be considered."  When an Issue Paper is submitted, the Joint Committee, acting as the agent of NSF, has control over whether the issue paper is added to the agenda and, upon motion and vote, over whether the paper is submitted to ballot, whether it should be assigned to an existing task group, assigned to a newly created task group, or tabled.

## B. Disparagement of NSF/ANSI Standard 40 Certification for Treatment and Dispersal Systems and GeoMat

152.   Almost immediately following certification of GeoMat under NSF/ANSI Standard 40, the co-conspirators, acting on behalf of their employers and as agent/apparent agents of NSF and NSF employees, agents, and/or representatives began to question the validity of the NSF/ANSI Standard 40 certifications of GeoMat and other Treatment and Dispersal Systems at NSF meetings. NSF, on its own, and through the Joint Committee and Task Groups, disseminated this information by publishing it to state regulatory agencies. Including:

- Mr. Suchecki's Issue Paper dated August 22, 2014 along with a PowerPoint presentation at the Joint Committee meeting on September 24, 2014 claiming, without evidence, that Treatment and

Dispersal Systems do not meet the requirements of NSF/ANSI Standard 40 and are unreliable, presented with the NSF logo only months after GeoMat received NSF/ANSI Standard 40 certification;

- Creation of the NSF/ANSI 40 Task Group based on Mr. Suchecki's recommendation that Treatment and Dispersal Systems "may require different ways to verify performance through testing" on September 24, 2014, only months after GeoMat received NSF/ANSI Standard 40 certification; and

- The suggestion, without evidence, by Mr. Suchecki that Treatment and Dispersal Systems are unreliable "in the field" at the Joint Committee meeting on September 24, 2014 only months after GeoMat received NSF/ANSI Standard 40 certification.

153.  NSF's publication of these false and defamatory statements by its participants began the process of eroding confidence in Treatment and Dispersal Systems by state regulatory authorities.

154.  Beginning in or about 2017, the Defendants, realizing that they could be more successful working together, conspired to further the objective of excluding Treatment and Dispersal Systems from the market through the standard-setting process.

155. The conspiracy began in earnest in 2017 when Mr. Williams, of NSF presented his issue paper (more fully described in Paragraphs 202 through 214) suggesting that Treatment and Dispersal Systems should be removed from NSF/ANSI Standard 40 and placed in a yet to be created standard. This Issue Paper was disseminated to state regulatory authorities with the appearance of support from NSF. It was presented and discussed at the Joint Committee meeting and assigned to the Open Bottom Technology Task Group for further consideration.

156. Despite being assigned to a Task Group, Mr. Williams's Issue Paper, was never discussed again. Mr. Williams presented the Issue Paper only to create uncertainty regarding Treatment and Dispersal Systems in the minds of regulatory authorities as he never requested that any action be taken on his Issue Paper.

157. At the same meeting, NSF Director of Standards Development, Janet Evans, stated that delay in the creation and finalization of Proposed Standard 441 was due to manufacturers of Treatment and Dispersal Systems failure to "bring[] content that can be balloted." Ms. Evans' actions are more fully detailed in Paragraphs 252 through 253 and 258 through 259.

158. During this meeting, Geomatrix, for the first time, became concerned that NSF was making effort to support the co-conspirator's efforts to exclude Treatment and Dispersal Systems from the market. Accordingly, Mr. Potts, made a

statement related to Geomatrix's antitrust concerns during this meeting. Mr. Potts'
statement is discussed in more detail in Paragraph 254 through 256.

159.   Since the Joint Committee meeting in September 2017, NSF has raised
concern with Treatment and Dispersal Systems at each of the following Joint
Committee meetings.   The concerns were related to Treatment and Dispersal
Systems under both NSF/ANSI Standard 40 and Proposed Standard 441.   These
concerns, expressed by NSF employees, appear to have the backing of NSF's
reputation, and have resulted in eroding regulatory confidence in Treatment and
Dispersal Systems.   These statements include, but are not limited to, the following:

- Requiring that Treatment and Dispersal Systems develop a method
  to ensure that the testing, for which they paid NSF, was accurate in
  order to be included in Proposed Standard 441;

- Ms. Steiner's statement that Treatment and Dispersal report may not
  be accurate and "there was room for improvement";

- Ms. Steiner's statement that NSF certification reports for Treatment
  and Dispersal Systems "could be updated, with the potential cost to
  the manufacturer";

- NSF's failure to approve funding for the test presented by the Open
  Cell Bottom Task Group pursuant to the direction of Ms. Evans on
  September 20, 2017 despite the Open Cell Bottom Task Group

presenting a test protocol study as directed and the Joint Committee recommending funding;

- Failing to defend Treatment & Dispersal Systems when it was stated by Dr. Heger and Mr. Bell that Treatment & Dispersal Systems should be precluded from Proposed Standard 441 due to not complying with Ms. Evans' ultimatum, despite knowing that the delay was due to NSF refusing to fund the proposed study;

- NSF's failure to enforce the Antitrust Guide, or take any affirmative action, when antitrust concerns were raised at Joint Committee meetings;

- Failing to admit that NSF refused to fund the study proposed by the Open Cell Bottom Task Group as directed by Ms. Evans during discussions at the Joint Committee meeting on September 18 and 19, 2019 and instead suggesting, by Ms. Steiner, that "the group simply adopt the worst possible case to avoid the costs of the test"; and

- Allowing Mr. Noble to present his issue paper on "Soil-Based treatment" despite detailed objection by Geomatrix and failure to defend its decision to certify Treatment and Dispersal Systems when it was stated by several participants that Treatment and Dispersal

Systems did not meet all of the requirements of NSF/ANSI Standard 40.

160.   Once Geomatrix received certification for GeoMat under NSF/ANSI Standard 40, it should have been able to obtain state regulatory approvals in states requiring NSF/ASNI Standard 40 certification. However, as NSF employees, agents, and/or representatives, the co-conspirators and agents/apparent agents of NSF, Joint Committee participants, and competitors intensified their coordinated criticism of the fact GeoMat and Treatment and Dispersal Systems, generally, they were able to receive certification; however, over time, Geomatrix experienced increasing difficulty in obtaining regulatory approval for GeoMat from state regulatory agencies that have adopted NSF/ANSI Standard 40.   These intensified actions include, but are not limited to, the actions detailed in Paragraphs 123, 154 through 159, and 177 through 195.   This intensified action resulted in an environment in the standard-setting process in which Treatment and Dispersal Systems were openly criticized at essentially every meeting of the Joint Committee and associated Task Groups between 2014 and the present.

161.   NFS made no effort to defend its certification of GeoMat under NSF/ANSI Standard 40, instead allowing—and in some instances helping—the inaccurate and unfounded criticisms to influence the approval process and devaluation of GeoMat's NSF/ANSI Standard 40 certification. NSF did not support

Geomatrix's and other Treatment and Dispersal systems defense of the validity of the testing and ultimate certification of these products.   NSF was complicit in supporting the devaluation of GeoMat and other Treatment and Dispersal Systems NSF/ANSI certification and ratified, by action and silence, the actions of its co-conspirators and agents/apparent agents.

162.   NSF is aware that users of wastewater treatment technology are losing confidence in the ability of Contained Systems to function as certified in the residential and commercial wastewater treatment markets and manufacturers of Contained Systems are losing market share to the disruptive technology of Treatment and Dispersal Systems.

163.   NSF has chosen to prioritize its business interest in protecting its relationship with manufacturers of Contained Systems to the determinant of other manufacturers, consumers, the environment, and public health in violation of its Antitrust Guide, its Code of Ethics, its Standards Development Policy, its obligations as an ANSI-accredited standard-setting organization, and the law.

164.   NSF has prioritized its business interest in pleasing manufacturers of Contained Systems over fulfilling its mission statement to "deliver confidence to consumers, assurances of performance to public health officials and market access for product manufactures in the onsite wastewater treatment industry."

165.   NSF has conspired with the Corporate Defendants and manufacturers of Contained Systems to exclude Treatment and Dispersal Systems from standards and ultimately the market or to make it difficult for Treatment and Dispersal Systems to compete in the market.

166.   NSF has allowed participants, acting with the actual or apparent authority of NSF, the take action to exclude Treatment and Dispersal Systems from the market through standard-setting process.

167.   NSF has adopted the terminology for Treatment and Dispersal Systems of its co-conspirators and agents/apparent agents.   Such terminology has increasingly negatively evolved over the years as these technologies have gained market strength.  The systems were initially referred to as "soil based systems."  The title was then changed to "open bottom systems" as NSF and the Contained System competitors discussed the "open bottom and top nature of [certain] systems."  Most recently, NSF's co-conspirators and agents/ apparent agents began referring to the technology as "Uncontained Systems", which terminology has been adopted by NSF.  On information and belief, this terminology was adopted and ratified by NSF, the Corporate Defendant, their co-conspirators and agents/apparent agents, based on the more negative connotation attached to the term "uncontained."

168.  NSF has allowed, and continues to allow, representatives of manufacturers of Contained Systems, including the Corporate Defendants, to dominate the wastewater technology standard-setting process.

169.  Mr. Bell served as both the Vice-Chair of the Joint Committee and Chairman of the High Strength Wastewater Task Group (discussed *infra*). Mr. Bell essentially ran the Wastewater Technology standard-setting process on behalf of NSF between 2010 and 2020, including serving as chair of the majority of task groups and initiating or seconding 50% of all votes taken by the Joint Committee during this period. Mr. Bell acted with NSF's actual/apparent authority and as its agent. At certain times, Mr. Bell, in addition to serving as Vice-Chair of the Joint Committee, at the same time also served as chair, co-chair, or vice-chair of the majority of the active task groups.

170.  Mr. Bell's dominance of the Joint Committee and various task groups violated NSF's ANSI obligations to avoid dominance during the standard development process. Relevant ANSI guidance states:

> The standards development process shall not be dominated by any single interest category, individual or organization. Dominance means a position or exercise of dominant authority, leadership, or influence by reason of superior leverage, strength, or representation to the exclusion of fair and equitable consideration of other viewpoints.

ANSI Essential Requirements: Due process requirements for American National Standards, January 2020, page 5

www.share.ansi.org/Shared%20Documents/Standards%20Activities/American%20
National%20Standards/Procedures,%20Guides,%20and%20Forms/2020_ANSI_Es
sential_Requirements.pdf

171.   Despite Mr. Bell's dominance, NSF continued to allow Mr. Bell to appoint himself as chair of task groups where he was able to control competition against his company's products and direct standards development.

172.   Since at least 2007, Mr. Bell has actively participated and led various task groups related to Treatment and Dispersal Systems despite having no expertise in this area and his well-known opposition to Treatment and Dispersal Systems. For example, in September 2007, Mr. Bell moved that the Joint Committee refrain from allowing Certification of the Presby Treatment and Dispersal System immediately following a vote by the Joint Committee allowing that exact certification.  Mr. Bell was one of only three Joint Committee members to vote against allowing Certification of the Presby Treatment and Dispersal System and his attempt to immediately reverse the decision of the Joint Committee was defeated.

173.   In October 2009, Mr. Bell presented a motion to the Joint Committee that the Bottomless Systems Task Group be reactivated to address "issues and question with technologies" and that "[the task group] be required to review NSF/ANSI Standard 40 language as it related to [Treatment and Dispersal Systems]."  Mr. Bell volunteered to chair the task group, the motion passed, and Mr. Bell was appointed chair.  Despite his obvious conflict of interest, NSF did not raise

concern with Mr. Bell's self-appointment.  NSF ratified Mr. Bell's control over the fate of Treatment and Dispersal Systems by allowing him to serve as Chair of the task group he proposed creating to evaluate these technologies.

174.   After Geomatrix, and others, including manufacturers of Contained Systems, began raising antitrust issues at Joint Committee and High Strength Wastewater Task Group meetings, Mr. Bell resigned as High Strength Wastewater Task Group Chair due to that fact that his company manufactures high strength wastewater systems at the September 23, 2015 Joint Committee meeting, but remained Vice-Chair and suggested Dr. Heger as a replacement to chair the task group.

175.   From at least 2007 to 2018, Mr. Bell dominated the Joint Committee and operated as NSF's agent as Vice-Chair of the Joint Committee and chair of numerous task groups.  In these positions, Mr. Bell was free to propose standard changes, propose and vote on motions for matters in which BioMicrobics has a commercial interest, create and chair task groups that control standards related to competitor's Treatment and Dispersal Systems, and respond to concerns voiced by participants on behalf of NSF. Despite his admitted conflict of interest, Mr. Bell continues to serve as Vice Chair of the Joint Committee and chair, co-chair, or vice-chair of several task groups.  During the most recent Joint Committee meeting, Mr. Bell presented over one third of the motions acted on by the Joint Committee.  Mr.

Bell is the dominant fixture of the NSF standard-setting process and it is well understood that he acts with authority of NSF.

176.   NSF took no action to ensure that its agent and co-conspirer Mr. Bell complied with its Antitrust Guide, NSF's mission statement, NSF's Standards Development Policy, ANSI policies, NSF's Code of Ethics. NSF allowed Mr. Bell to dominate the Joint Committee and to use NSF as a marketing tool and weapon to exclude competing products from standards and ultimately the market while acting as an agent for NSF.   Mr. Bell took, at least, the following actions to harm competitors:

- Using his position as Chairperson of the Industry Group beginning on September 20, 2007 to set certification policy and priorities for NSF and the Joint Committee;

- Initiating continuation of the  "Bottomless Systems" Task Group despite no issue papers being presented on or remaining open issues to purportedly address "issues and questions with [bottomless systems] that need to be address [sic]" and appointment of himself as chairperson, despite his obvious conflict of interest as a manufacturer of a competing product on October 28, 2009;

- Appointing himself as chairperson of the High Strength Wastewater Task Group on September 23, 2014;

- Using his position as Chairperson and Joint Committee member to pursue using the United States Environmental Protection Agency's ETV Protocol be the basis for a high strength despite NSF, in which BioMicrobics has significantly invested in directly, and upon information and belief already performed testing to get a head start in the market. Reactivating the "Open Bottom" Task Group and appointing himself as chairperson despite his employer selling a competing product, having no expertise in this area, and not providing "open bottom" products;

- Appointment of Sara Heger, who received funding from BioMicrobics related to the US-EPA ETV, as Chairperson of the High Strength Wastewater Task Group on September 24, 2014;

- Directing that the issue of whether NSF/ASNI Standard 40 should be divided into two sections to "differentiate between open bottom cell technology" be presented to the State Onsite Regulatory Association on September 24, 2014;

- Directing that the HSW Task Group take up "the question of whether or not to include bottomless systems in [the High Strength Wastewater] standard be taken back to the Joint Committee for a vote…" on March 2, 2016;

66

- Recommending the appointment of Dr. Heger as co-chair of the HSW Task Group despite having provided financing to her related to high strength wastewater and ETV and failing to disclose the funding;

- Mr., Bell has proposed or seconded fifty percent of all votes at Joint Committee meeting between 2016 and 2020;

- Using his position as Chairperson of the Industry forum to enact changes to NSF's certification policies during the private Industry Forum that benefited BioMicrobics; and

- Proposing that including Treatment and Dispersal Systems in the proposed High Strength Standard was a concern after being directed by NSF and the Joint Committee on September 21, 2016 to include all technologies in the proposed standard.

177.   In 2017, BioMicrobics, Mr. Bell, the other co-conspirators, and NSF entered into a conspiracy to further the Corporate Defendants' aim of excluding competition by Treatment and Dispersal Systems through the standard-setting process.  NSF conspired with Mr. Bell and Bio-Microbics in taking, at least, the following actions in an effort to further the conspiracy;

- Serve on the Open Cell Bottom Technology Task Group with no expertise on testing Treatment and Dispersal Systems and despite BioMicrobics well known opposition to such systems;

- Mr. Bell and Ms. Steiner indicating that testing and certification reports of Treatment and Dispersal Systems were not accurate.

- Mr. Bell's and Ms. Steiner's suggestion that Treatment and Dispersal Systems testing and certification reports need to be updated by NSF to provide accurate information;

- Mr. Bell's support, and second of, Dr. Heger's motion to exclude Treatment and Dispersal Systems from Proposed Standard 441; and

- Mr. Bell's support for the false position that Treatment and Dispersal Systems failed to complete the task assigned by Ms. Evan and should therefore be precluded from Proposed Standard 441.

178.    Due to its conspiracy with Mr. Bell and BioMicrobics, NSF did not take meaningful action when alerted to Mr. Bell's illegal behavior and continued to allow him to press forward with standards and other actions, including disparaging remarks, with the intent to exclude competitors from standards and ultimately the market.  NSF was aware of, and actively supported, Mr. Bell's intention to use the standard-setting process to exclude competing Treatment and Dispersal Products from standards and thus limit competition for his employer's products.

179.   Participants, other than Geomatrix, questioned Mr. Bell's dominance of the Joint Committee, including manufacturers of Contained Systems. NSF stated publicly that they found no issues with dominance on the Joint Committee at, at least, the September 2017 Joint Committee meeting but did not provide the factual or legal basis for its findings or the nature of the investigation to the complaining parties or to participants in the standards setting process.

180.   Employees of NSF have had private discussions with Mr. Bell, as recently as March 2020. The contents of these discussions have not been disclosed and the existence of these conversations was only recently disclosed on or about March 2020.

181.   On information and belief, these conversations have furthered the conspiracy to exclude Treatment and Dispersal Systems from approval under NSF/ANSI Standard 40 and the proposed high strength wastewater standard discussed *infra*.

182.   Mr. Bell's dominance is so engrained in the Joint Committee that while reporting on task group activity at the Joint Committee meeting on April 29, 2020, Mr. Suchecki stated that an issue assigned to his task group was "taken over by Jim Bell" so he had no report on that issue.  Neither the Joint Committee nor NSF personnel in attendance, including Theresa Bellis, Senior Global Managing Director, raised any concern with this violation of the Standards Development Policy.  Once

again, NSF made it clear that Mr. Bell acted with its authority in directing the standard-setting process.

183.   NSF has supported, and continues to support, Mr. Bell's dominance of the Joint Committee to further the conspiracy, including Mr. Bell's pursuit of BioMicrobics's agenda to change or promulgate standards that exclude competitors to the detriment of Geomatrix and other manufacturers of Treatment and Dispersal Systems.

184.   Mr. Bell continues to have significant influence on NSF, its employees, and participants in the standard setting process.

185.   BioMicrobics and Mr. Bell used Mr. Bell's authority in the standard-setting process to benefit themselves.  NSF has taken no meaningful action to curtail Mr. Bell's actions prior to September 2017 and has supported his use of the power and reputation of NSF to control the market through exclusion of Treatment and Dispersal Systems since September 2017.  Mr. Bell's actions include those set forth in Paragraphs 175 through 177.

186.  In addition to supporting BioMicrobics's and Mr. Bell's action individually and as its agent/apparent agent, beginning in 2017, NSF has conspired with Mr. Bell and BioMicrobics to exclude Treatment and Dispersal Systems from standards and ultimately the market or limit their ability to obtain regulatory

approvals for the commercial and financial benefit of NSF and its most lucrative customers, including BioMicrobics.

187.   BioMicrobics currently has two products with eleven models listed on NSF's product listing of NSF/ANSI Standard 40 Certified Product, one product with twelve models listed on NSF's product listing of NSF/ANSI Standard 350 Certified Products, and two products with eight models listed on NSF's listing of NSF/ANSI Standard 245 Certified Products.  Pleasing Mr. Bell and all the other manufacturers of contained systems is in the financial interest of NSF as they must compensate NSF for each listing annually.  There are approximately 67 Contained Systems and less than five Treatment and Dispersal Systems that have been certified by NSF to Standard 40.  NSF is choosing to feather its own bed in helping the far larger Contained Systems market segment as opposed to the relatively few Treatment and Dispersal Systems.

188. Since the time Geomatrix obtained NSF/ANSI Standard 40 Certification for GeoMat, NSF has allowed, supported, contributed, and conspired since 2017, with Mr. Bell and others to disparage Treatment and Dispersal Systems.

189. Geomatrix has made NSF aware on numerous occasions that disparagement of Treatment and Dispersal Systems by NSF, its agents, apparent agents, employees, and/or representatives, and other participants was and is causing Geomatrix economic injury.

190.   On or about August 22, 2014, Ron Suchecki—a member of the Joint Committee and General Manager of Hoot Systems (a manufacturer of Contained Systems)—submitted an Issue Paper to the Joint Committee asserting that Treatment and Dispersal Systems did not meet the requirements of NSF/ANSI Standard 40. This paper was submitted less than two months after NSF certified GeoMat under NSF/ANSI Standard 40.

191.   Mr. Suchecki submitted no meaningful scientific or factual evidence to support his claims because none exists.

192.   Mr. Suchecki did not submit a proposed change to the language of the standard as Mr. Powitz, the current Chair of the Joint Committee, states is required under NSF's Standards Development Policy for an Issue Paper to be presented.

193.   At the Joint Committee meeting on September 23, 2014, Mr. Suchecki presented  his unsupported claims that Treatment and Dispersal Systems do not function in the field in the same manner they function in testing and that "[m]any portions of the [NSF/ANSI Standard 40] cannot be directly followed [by Treatment and Dispersal Systems] . . . ." Although Mr. Suchecki's presentation was anticompetitive and violated NSF's Standards Developments Policy and Antitrust Guide, NSF published Mr. Suchecki's presentation, which had the appearance of an official NSF document, and his comments to state regulatory officials and made no attempt to prevent Mr. Suchecki and others from making such statements.  Neither

Mr. Suchecki nor his employer, Hoot Systems, manufacture Treatment and Dispersal Systems.   Mr. Suchecki does not have any expertise in the field of Treatment and Dispersal Systems.

194.   NSF made no effort to verify the truthfulness of Mr. Suchecki's claims before publishing them to state regulatory authorities. To this day, these statements have not been corrected or retracted.

195.   Beginning in 2017,  Mr. Suchecki and Hoot Systems began to actively conspire with NSF and the other Corporate Defendants in a combined effort to exclude Treatment and Dispersal Systems from standards and ultimately the market or make it more difficult for Treatment and Dispersal Systems to receive regulatory approval for the commercial and financial benefit of NSF and its most lucrative customers.  In support of this conspiracy, Mr. Suchecki took numerous actions to disparage and create uncertainty regarding Treatment and Dispersal Systems, including, but not limited to, the following:

- Proposing that the Joint Committee create an Open Bottom Task Group as a method to discredit the testing and certification of Treatment and Dispersal Systems in conjunction with Ms. Evans' ultimatum to Treatment and Dispersal Systems at the September 19, 2017 Joint Committee meeting;

- Submitting purported concerns with the Open Bottom Technology Task Group  via written submission on January 15, 2018 despite Hoot Systems not manufacturing a Treatment and Dispersal System and having no expertise in Treatment and Dispersal Systems or testing of the same;

- Reviewing and summarizing the confidential NSF/ANSI Standard reports of six Treatment and Dispersal Systems without permission of the manufacturers and publishing a summary of such through NSF's standard-setting processing;

- Making incorrect and false statement about testing reports in his summary of Treatment and Dispersal reports;

- Stating that Treatment and Dispersal Systems are unable to meet in field verification of odor, color, and turbidity of NSF/ANSI Standard 40 during the September 20, 2019 Joint Committee meeting;

- Taking the position that NSF/ANSI Standard 40 should be changed to exclude Treatment and Dispersal Systems and later taking the position that NSF/ANSI Standard 245 cannot be changed in a manner that would remove products previously certified under the

standard, including Hoot Systems' products during the Standard 245

Task Group meeting held December 10, 2020;

- Submitting an Issue Paper dated April 10, 2020 to continue claim of

  the conspiracy that Treatment and Dispersal Systems and the testing

  of those products was unreliable.   Specifically, the Issue Paper

  claimed that

  > Bottomless systems have been tested and approved without a
  > clear "standard method of collection" of effluent beneath the
  > treatment technology.   During the 2017 Joint Committee
  > Meeting a Task Group was created to make recommendation to
  > the JC on a test method that would ensure representative
  > sampling and analysis.   Their conclusions were reported to the
  > Joint Committee in 2018.   As a result of this report, there was a
  > motion by E. Roeder, second [sic] by K. Sherman which passed
  > 22 to 2 abstention (S. Steiner and G. Heufelder) to recommend
  > that NSF investigate funding the proposal as drafted by the Task
  > Group.

  He proceeded to recommend that

  > NSF proceed with funding the Version 3 of the report by the Task
  > Group.   This information is needed for the TG's [sic] of
  > 40,240,245,350,360 and 441 to proceed with their work.   It is the
  > author of the paper's opinion that NSF's inaction on the matter
  > has kept TG's [sic] of at least Standard 40 and 441 in a state of
  > gridlock;

  and

- Mr. Suchecki volunteered and was appointed Chairperson of the

  NSF/ANSI Standard 40 Task Group at the April 29, 2020 Joint

  Committee meeting.   This appointment gives Mr. Suchecki

significant control over issues and recommendation related to NSF/ANSI Standard 40.  Mr. Suchecki was appointed despite his repeated claims that Treatment and Dispersal System could not meet NSF/ANSI Standard 40.  Mr. Suchecki's appointment was in furtherance of the conspiracy to use the standard-setting process to limit competition from Treatment and Dispersal Systems.

196.  Hoot Systems currently has two products with 13 models listed on NSF's product listing of NSF/ANSI Standard 40 Certified Products and one product on NSF's listing of NSF/ANSI Standard 245 Certified Products.  Pleasing Mr. Suchecki and the other manufacturers of Contained Systems is to the financial benefit of NSF as Hoot Systems and the other manufacturers must compensate NSF for each listing annually.

197.  The Corporate Defendants made numerous attempts individually, prior to entering into the conspiracy, to cause concern and discredit Treatment and Dispersal Systems.

198.  During the Joint Committee meeting in September 2015, Mr. Bell proposed that NSF/ANSI Standard 40 be split into two parts to differentiate between Contained Systems and Treatment and Dispersal Systems.  Mr. Bell directed that this issue be taken up by the Standard 40 task group without motion or vote by the Joint Committee.

199.   During the Joint Committee meeting in September 2016, it was suggested by Mr. Bell that a large number of regulators involved in the Task Group indicated concern about Treatment and Dispersal Systems and that the Standard 40 task group was "trying to narrow the scope of what has some people concerned." This included testing methodologies and scaling of systems.

200.   Lee Rashkin, the then-President of Presby, responded to these suggestions stating: "Presby has done a lot of testing and provided some data to show that treatment levels are reliable and consistent; is there anything that shows testing is not sound the way it is? Anything that shows these systems are jeopardizing public health?"  There is no recorded response to Mr. Rashkins's questions.  Nevertheless, NSF published the statements by participants made at the September 2016 Joint Committee meeting about purported concerns about Treatment and Dispersal Systems without providing evidence that the testing was unsound or that Treatment and Dispersal Systems were jeopardizing the public health as requested by Mr. Rashkin.

201.   The efforts of the Corporate Defendants continued and were bolstered by the creation of the conspiracy in 2017 at which time NSF became involved in what had previously been individual actions by the Corporate Defendants and the acts became coordinated.

202.   On or about May 2, 2017, Steve Williams, a Specialist employed by NSF, submitted a Joint Committee Issue Paper that claimed certain technologies (specifically Treatment and Dispersal Systems that he refers to as "trench and mound products") including GeoMat, did not fit under NSF/ANSI Standard 40 and should not be entitled to such certification. Mr. Williams stated:

> [Treatment and Dispersal Systems] don't fit the template set up for testing traditional aerobic units very well. A new standard should be developed to give these systems a more fitting place to go. This would allow the [Joint Committee] to fully consider all test issues with these types of systems and set up the testing protocol that will more appropriately addresses them. The new standard should include rating for basic treatment (same effluent requirements as 40), nitrogen reduction (same effluent requirements as 245), and possibly water reuse effluent requirements.
>
> The new standard should include more details to assist certification agencies with guidelines for scale up.

203.   NSF published Mr. Williams' Issue Paper to numerous state and local regulatory authorities and experts including George Heufelder (Barnstable County, Massachusetts and MASSTC), Eberhard Roeder (Florida), Joelle Wirth, John Eliason, Dean Morin (Alberta), Denise Wright (Indiana), Robert Bastian, Steven Berkowitz (North Carolina), Ping Wang (Delaware), Jason Baumgartner (Delaware), Leah Boutilier (Nova Scotia), Marcia Degen (Virginia), Randy Freeby (Washington), Kevin Gould (New Brunswick), John Hayes (Delaware), Ryan Johnsen (Texas), James Kemper (California), Neal Shapiro (California), Derek Smith (Manitoba), and Amir Tabakh (California), Mr. Williams' statements

78

conflicted with NSF's prior certification decisions, NSF's agreements with Geomatrix, and the prior vote of the Joint Committee in September of 2012.

204.  Mr. Williams' statements directly conflict with representations made to Geomatrix by Tom Bruursema, NSF's former General Manager of Water and Wastewater set forth in Paragraphs 98 and 100. Mr. Williams' statement also conflicts with NSF historical practice and policy.

205.  Mr. Williams' Issue Paper and statements were presented at a time of escalating disparagement of Treatment and Dispersal Systems by the Corporate Defendants, other co-conspirators and manufacturers of Contained Systems and were presented in furtherance of the conspiracy to exclude Treatment and Dispersal Systems from NSF/ANSI Standard 40 and, ultimately, the market.

206.  Mr. Williams presented his Issue Paper at the September 2017 Joint Committee meeting, even after participants were reminded by Tom Bruursema— who had been fired by NSF in May 2015 but continued to participate on behalf of his new employers and clients— that "certification does not fall under the preview [sic] of the Joint Committee, but rather the Certification Counsel."

207.  Under Mr. Williams' proposal to remove Treatment and Dispersal Systems from NSF/ANSI Standard 40, Treatment and Dispersal Systems would be precluded from obtaining regulatory approval as onsite wastewater treatment system in the  states, set forth in Paragraph 78, that have accepted and adopted NSF/ANSI

Standard 40. Adoption and regulatory acceptance of the new standard proposed by Mr. Williams would take years, if regulatory adoption were ever to happen. As written, Mr. Williams' proposal would require manufacturers of Treatment and Dispersal Systems to spend significant dollars on this new test and then wait for NSF to get the new standard adopted by the states before they could conduct business in these states; this would likely result in these companies going out of business.

208.   NSF, Mr. Williams, the Corporate Defendants, and the co-conspirators must have been aware of the potential effects on the marketability of Treatment and Dispersal Systems at the time the proposal was made.

209.   NSF and Mr. Williams submitted the proposal to further the conspiracy to exclude Treatment and Dispersal Systems from NSF/ANSI Standard 40 and, ultimately, the market and/or to inhibit the ability of Treatment and Dispersal Systems to enter and compete in markets.

210.   As NSF's marketing information conveys, their support for a given product can be highly beneficial.  Conversely, it must therefore be equally certain that NSF's criticism of a given product would be inversely harmful.  If NSF's claim is that their Mark and support can make a product commercially successful, it must be equally true that in itself their criticism of a product could kill the commercial viability of a product.

211.   Upon information and belief, NSF made no attempt, before publishing Mr. Williams' claims to regulatory authorities, to verify their truthfulness or accuracy or evaluate the potential market impacts to NSF/ANSI Standard 40 certified Treatment and Dispersal Systems.

212.   Mr. William's Issue Paper was assigned by the Joint Committee, including the Corporate Defendants Mr. Bell and Mr. Suchecki who were voting members, to the Open Cell Bottom Task Group on which Mr. Bell was Co-Chair and Mr. Suchecki and Mr. Williams were voting members.

213.   During the Joint Committee meeting in September 2017, Mr. Bell—acting with actual or apparent authority of NSF as Joint Committee Vice-Chair and the chair of five of the ten active task groups—acknowledged that changing the requirements for certification could cause systems already certified under NSF/ANSI Standard 40 to lose their certification. He recognized that this loss of certification would be detrimental to the manufacturers of those systems. Despite this realization, he later proceeded to disparage Treatment and Dispersal Systems and suggested that NSF standards be modified related to those products, knowing full well the damage it would cause.

214.   Mr. Bell's public admission of the potential impact of the action proposed by Mr. Williams and his continued support of those actions indicate the intentional nature of his and NSF's efforts to exclude Treatment and Dispersal

Systems from the standards and, ultimately, the market or make it more difficult for Treatment and Dispersal Systems to obtain regulatory approvals, for the financial and commercial benefit of NSF and the manufacturers of Contained Systems.

215.   Mr. Bell operated as an agent of NSF and acted with NSF's authority, or at least apparent authority, by dominating the Joint Committee and serving as Chair of at least 50 percent of its active task groups. Yet Mr. Bell's concern was the business interests of his own company. By supporting Mr. Bell's actions, granting him actual or apparent authority, and through its own actions and inaction, NSF ratified Mr. Bell's actions and conspired with Mr. Bell to boycott or otherwise call into question the acceptance of Treatment and Dispersal Systems.

216.   During the same September 2017 meeting, Nicholas Noble— Government Relations Manager of Orenco Systems, a manufacturer of Contained Systems—informed NSF and participants that "who goes first is significant" in regard to the detrimental effects of excluding some products from a standard with the intention of adding them at a later date.  Upon information and belief, NSF was aware of the impact of Mr. William's issue paper and its disparagement of Treatment and Dispersal Systems and despite this, proceeded to further the conspiracy.

217.   During the same meeting on September 20 and 21, 2017, there were 16 motions presented to the Joint Committee.  Of those 16 motions, Jim Bell presented nine and Ron Suchecki presented three.  Between the two, they presented 12 of the

17 motions at the annual Joint Committee meeting.   Three of the remaining five motions were non-substantive (approving agenda, minutes, and adjournment) and Mr. Bell seconded the only other substantive motions. Additionally, Mr. Bell agreed to change his vote on a previous vote so that the issue could be moved forward.  Mr. Bell and Mr. Suchecki effectively had control of the Joint Committee.

218.   NSF and its participants are well aware that the first products certified under any new or altered standard would have a significant advantage in the market. Removing a disruptive technology from a standard under which it had already been certified could impair or even end a business but would further the conspirators' interests.

219.   Mr. Noble has been one of NSF's most outspoken critics of Treatment and Dispersal Systems and knows that if he can exclude or slow Treatment and Dispersal Systems from certification it will financially benefit his employer.  NSF has supported Mr. Noble's efforts to further the conspiracy by, *inter alia*, allowing him to present Issue Papers and make comments that disparage Treatment and Dispersal Systems, even though his efforts violate NSF's due process rules.

220.   Orenco Systems currently has 13 product models listed on NSF's product listing of NSF/ANSI Standard 40 Certified Products and one product on NSF's listing of NSF/ANSI Standard 245 Certified Products.  Conspiring with Mr. Noble, Orenco Systems and the other manufacturers of Contained Systems is in the

financial and commercial benefit of NSF as Orenco Systems and the other manufacturers must compensate NSF for each listing annually.

221.    Mr. Noble submitted a Joint Committee Issue Paper bearing the date September 19, 2019 creating the false impression that Treatment and Dispersal Systems could not be seen as equivalent to Contained Systems. In that paper, Mr. Noble stated:

> Our belief is that NSF Standard 40 was not solely intended to demonstrate a required level of treatment, but was also intended to establish protocols for wastewater treatment products that, through servicing and monitoring, demonstrate measurable reliability and sustainability . . . thus allowing reasonable dispersal reductions based on effluent quality and long-term loading rates.
>
> Our concerns are not with the testing of septic tank soil-based treatment systems under NSF Standard 40 protocol, or any other protocol, but with certifying them in a way that makes them appear to be an equivalent to ATU's [aerobic treatment units] and other serviceable advanced treatment technologies that can be monitored and maintained.

222.    NSF published Mr. Noble's Issue Paper to the participants in the Joint Committee, including numerous state and local regulatory authorities including, but not limited to, George Heufelder (Barnstable County, Massachusetts and MASSTC), Eberhard Roeder (Florida), Joelle Wirth, John Eliason, Dean Morin (Alberta), Denise Wright (Indiana), Robert Bastian, Steven Berkowitz (North Carolina), Ping Wang (Delaware), Jason Baumgartner (Delaware), Leah Boutilier (Nova Scotia), Marcia Degen (Virginia), Randy Freeby (Washington), Kevin Gould (New Brunswick), John Hayes (Delaware), Ryan Johnsen (Texas), James Kemper

(California), Neal Shapiro (California), Derek Smith (Manitoba), and Amir Tabakh (California),

223.   Upon receipt of Mr. Noble's Issue Paper by email dated September 17, 2019, Jason Henderson, General Counsel of Geomatrix, wrote to Julie Timmer, General Counsel of NSF, expressing concern about the anticompetitive nature of the Issue Paper and explained the damage it would cause to Geomatrix. Mr. Henderson stated, in part:

> It was my understanding that attempts by Orenco and others to put exclusions related to product design into NSF Standard 40 were put to bed last year after the involvement by counsel for NSF . . . .
>
> The testing to obtain NSF Standard 40 certification is rigorous and certainly measures "the performance of soil based treatment systems." If that is not the case, how can NSF Standard 40 have any credibility at all? It should be immediately evident to anyone reading this proposal that it is yet another attempt to use NSF standard to limit competition. There is simply no other way to understand Mr. Noble's proposal.
>
> As you are well aware, the process of getting a new standard adopted by a state is an extremely long, drawn out process. Once adopted it is a ticket to make money in a market. To retroactively exclude technologies from a standard is to entirely throw them out of the market. What could be more damaging or more limiting of competition? It would take a long time for any proposed standard to be adopted into the jurisdictions where NSF Standard 40 is already adopted. The "soil based treatment systems" would likely never have the opportunity to fully compete again in these markets for many years, if ever. Again, there is no documented evidence that these systems are not performing to the standards of NSF Standard 40; they simply present unwanted competition for manufacturers of ATUs.

This has to stop. It is necessary for NSF to take a stand against these anti-competitive attempts in order to protect the integrity of the NSF standard and be in compliance with the law.

224. NSF did not reply to Mr. Henderson's September 17, 2019 email and Mr. Noble's Issue Paper was presented at the next Joint Committee meeting despite violating NSF's due process policies. NSF's active failure to enforce its due process policies and Antitrust Guide, once again, furthered the conspiracy.

225. Upon information and belief, Mr. Noble has had conversations and agreed with NSF, its agents, and apparent agents, regarding excluding Treatment and Dispersal Systems from certification and diminishing the value of certifications granted to Treatment and Dispersal Systems.

226. Geomatrix again wrote to NSF's General Counsel and copied Robert Powitz, Chair of the Joint Committee, on December 6, 2019 expressing continued concern over the anticompetitive activities of NSF and its respective officers, agents, employees, or representatives. In this correspondence, Geomatrix requested that NSF take corrective actions to eliminate the continued anticompetitive activities that pervaded the Joint Committee. NSF had an obligation to take action according to its due process rules, Code of Ethics, and Antitrust Guide. But NSF, again, did not respond to this correspondence.

227. Geomatrix once again wrote to NSF's General Counsel on January 21, 2020 expressing continued concern for the anticompetitive activities of NSF and its

officers, agents, employees, or representatives. Geomatrix also explained how the continued disparagement of Treatment and Dispersal Systems had resulted in, and continued to cause, damages to the manufacturers of such systems and requested that NSF take steps to eliminate the continued disparagement and anticompetitive behavior of NSF employees and Joint Committee participants in accordance with the law and its own Antitrust Guide. NSF took no action in response to Geomatrix's letter.

228.   After Geomatrix and other manufacturers of Treatment and Dispersal Systems went through the process of obtaining NSF/ANSI Standard 40 at great expense, and after those systems were already certified, NSF allowed its agents and participants to use the standard-setting process to raise unfounded questions of whether Treatment and Dispersal Systems meet the criteria of NSF/ANSI Standard 40.

229.   Beginning in 2017, the Defendants entered into a conspiracy to collectively use the standard-setting process by initiating actions and discussion and providing a forum for disseminating such discussions and misinformation about Treatment and Dispersal Systems. The Defendants in concert disparaged Treatment and Dispersal Systems and falsely asserted that they did not fit within the NSF/ANSI Standard 40, giving the impression that these technologies did not adequately protect consumer health or the environment.

230.   The concerted action by NSF, through its employees and agents/apparent agents, and its co-conspirators to disparage Treatment and Dispersal Systems through the standard-setting process has had the intent and effect of enhancing and preserving the dominance of Contained Systems in the market for onsite treatment of residential and commercial wastewater, restraining competition and causing competitive injury to Geomatrix and other suppliers of Treatment and Dispersal Systems, reducing choice and increasing costs for consumers of such systems, and harming public health, safety and the environment.

231.   Upon information and belief, at least some of the co-conspirators are compensated by NSF to perform audits of certified products, including Treatment and Dispersal Systems.

### C. NSF's Creation of a High Strength Wastewater Standard

232.   There is currently no method for onsite wastewater treatment systems to be certified by NSF for treatment of high strength wastewater.

233.   While a specific definition of high strength wastewater is debated, it is typically understood to mean wastewater with a higher concentration of organic material than typical domestic wastewater.  High strength wastewater is often produced by facilities that engage in the processing of food such as restaurants, convenience stores, breweries, supermarkets, etc.

234.    At the NSF Joint Committee meeting on September 24, 2013, the Joint Committee created a new High Strength Wastewater Task Group ("HSW Task Group") charged with development of a new standard for high strength wastewater because "[r]estaurants should be addressed under a different standard than standard 40 as their effluent is very different."  The Joint Committee voted to consider creating a "high strength wastewater standard for commercial and residential systems." The proposed standard is currently referred to as NSF Standard 441. Neither the discussion nor the direction from the Joint Committee at that time addressed a difference between Contained Systems and Treatment and Dispersal Systems.

235.   The proposed high strength wastewater standard must be developed in the same manner as prior standards, where all technologies, regardless of configuration, are treated equally and tested to the same requirements, regardless of test methodology—an apples-to-apples test.

236.   The proposed high strength wastewater standard must be developed in accordance with NSF's Standards Development Policy including provisions covering dominance, openness, and balance of interests.

237. The HSW Task Group is comprised of 20 members, eight of whom represent Contained Manufacturers including Mr. Bell and Mr. Suchecki. Mr. Potts of Geomatrix, Dr. Heger, NSF employees, and regulators are also among the

members of the HSW Task Group. Certain members of the HSW Task Group are also members of the Joint Committee.  There are a number of observers who attend meetings of the HSW Task Group, including Mr. Noble.

238.   To date, with the exception of the motion to establish the HSW Task Group which was made by Eberhard Roeder and seconded by Dr. Heger, every motion presented to the Joint Committee on Standard 441 has been initiated by an NSF employee (Sharon Steiner) or a co-conspirator.

239.   On its face, the HSW Task Group is not balanced.  Only two members of the task group are manufacturers of Treatment and Dispersal Systems and, on information and belief, one of those manufacturers is unable to typically use its product to treat high strength wastewater.

240.   On information and belief, Dr. Heger is also biased towards Contained Systems as she specifically lectures on how to treat high strength wastewater using Contained Systems and performed work for NSF, which was funded by BioMicrobics, developing the EPA's Environmental Technology Verification ("EVT") testing protocol for restaurant wastewater.

241.   Several of the manufacturers of Contained Systems have conspired with NSF to use their membership and participation in the HSW Task Group to promote and promulgate NSF standards that have the purpose and effect of

eliminating certification for rival Treatment and Dispersal Systems and precluding them from participating in or eliminate their current activities in the relevant market.

242.   During the initial meeting of the HSW Task Group, Mr. Bell proposed that the EPA's defunct ETV testing protocol be used as the primary basis for the proposed standard. Certified systems "would have a grease tank and a settling tank and an ATU [aerobic treatment unit]; it could also have flow equalization." While the proposal asserted that "[t]he intent was not to restrict the innovative treatment by these requirements," as presented, these requirements would exclude Treatment and Dispersal Systems—the minority player in the market—from being certified to treat high strength wastewater because these products, like GeoMat and SoilAir, replace the need for an aerobic treatment unit and would therefore not qualify under Mr. Bell's proposal.

243.   The certification of Treatment and Dispersal Systems has been a topic of conversation at nearly every meeting of the HSW Task Group.

244.   After contentious HSW Task Group Meetings regarding exclusion of Treatment and Dispersal Systems from NSF Standard 441 on March 2, 2016 and April 20, 2016, NSF created and posted a PowerPoint presentation that, after discussing the standard setting protocol and Antitrust guide, included the conclusion that

> NSF is working to determine appropriate next steps related to the direction for the ETV protocol (Standard 441) so that this task group

can continue to move forward with its work. The task group will reconvene once this determination is made.

245. At the next meeting of the Joint Committee, in September 2016, participants were informed that

> NSF has made the decision that it would be in everyone's best interest for both technologies to be included in the High Strength task group work moving forward. With understanding that this will likely increase the timeline to publishing Standard 441 it is asked that the manufacturers of the newer technologies provide significant contribution and input to allow the task group to move forward productively.

246. Despite this direction from NSF, on March 29, 2017, Sharon Steiner, NSF's Business Unit Manager, lamented that a test plan for NSF Standard 441 had been close to completion for two years but manufacturers of Treatment and Dispersal Systems had concerns that the proposed test plan excluded their treatment technology.

247. MS. Steiner's comments were the first indication of NSF's interest in entering a conspiracy with its most lucrative customers to excluding Treatment and Dispersal Systems, including Geomatrix products.

248. At the same meeting Dr. Heger, the current HSW Task Group Chair, confirmed that current proposal would exclude Treatment and Dispersal Systems from certification. As set forth above, Dr. Heger has received funding from at least BioMicrobics for research and work related to high strength wastewater.

249.   While this meeting and the following meeting saw attendance and participation by manufacturers of Treatment and Dispersal Systems, due to the direction of NSF at the 2016 Joint Committee meeting, their input was limited to discussions related to the technical requirements of the standard, particularly confidence intervals and the exact constitution of high strength wastewater that would be covered.

250.   Aside from comments by Ms. Steiner, Dr. Heger, and manufacturers of Contained Systems, the meetings primarily focused on actual development of a standard.

251.   Despite doing exactly what was instructed by NSF at the 2016 meeting of the Joint Committee by working to move Standard 441 forward, during the Joint Committee Meeting on September 19, 2017, the Defendants accused manufacturers of Treatment and Dispersal Systems for holding up the standard setting process, insinuated that testing protocols previously used for Treatment and Dispersal Systems under NSF/ANSI Standard 40 were unreliable, and made a demand that Treatment and Dispersal Systems develop language regarding Treatment and Dispersal Systems or be precluded from Standard 441.

252.   The following is NSF's summary of Ms. Evans' direction at the September 2017 meeting of the Joint Committee:

In 2016 the group sought clarity from the JC as to whether the intent was creating a standard for contained or uncontained units. The JC decided the group was to look at both types of systems...

J. Evans explained that she has reviewed the recent history of the group, and that the concerns about balance and dominance were investigated. At this point in time, NSF does not feel there is dominance in the TG. She added that NSF always seeks balance in all levels of the Standards Development process.   She continued, noting that while all manufacturers had a voice at the table, they were also responsible for bringing content that could be balloted.  As this group has struggled with little progress on this particular issue, she suggested a 6 month [sic] for language to be created regarding the uncontained technologies in question. If content regarding these technologies cannot be created in 6 months, the Standard will move forward with the contained systems. She reminded the group that the Standard is in Continuous Maintenance, meaning that revision can be made at any time, and that language regarding these technologies can always be added at a later date. She added that this notification would be distributed to the entire group to include those not in attendance.

J. King sought clarification that the uncontained technologies would be excluded from certification if language was not developed in 6 months for the Standard, J. Evans said that was correct....

D. Potts asked that if in 6 months language can't be developed, would contained systems move forward and Treatment and Dispersal Systems would not. J. Evans answered that this was correct, but that the Standard is under Continuous Maintenance, so Treatment and Dispersal Systems could be included at a later time. D. Potts states that he felt this was restraining. J. Evans explained the goal was to move forward to fulfill an established need for a Standard in the marketplace . . . .

253.   Ms. Evans' statements and direction to Treatment and Dispersal systems was in conflict to NSF's statement and direction at the 2016 Joint Committee meeting which recognized that all technologies must be included in the standard despite the likely extended timeline.  Ms. Evans' statements that Treatment

and Dispersal Systems were the cause of the delay in promulgating the standard was untrue and not supported by the facts.

254.   In response, on September 21, 2017, Mr. Potts of Geomatrix read a statement into the record expressing his concern with the development of NSF Standard 441 and the exclusion of Treatment and Dispersal Systems. The statement included the following language:

> A group of established competitors are being affected by disruptive new technologies that are often cheaper to install, operate and maintain, that often perform at high levels and are often more reliable; these technologies are gaining an increasing market share. These established competitors are effectively disadvantaging, or in some cases, eliminating these disruptive technologies from the marketplace through changes to these standards. Don't mistake these actions for simply trying to help the general public; these actions will effectively limit competition and help the larger more established companies maintain or increase their market share….

> Yesterday it was said that the standard setting process is taking too long. Much of this time is spent maintaining a level playing field. Countless hours were spent trying to exclude Treatment and Dispersal Systems only to have NSF opine that this in fact could be an antitrust issue. Now it has been determined that one segment of an industry can have 6 months to get in line or they will be left behind. Antitrust law does not somehow go away if things are complicated and take time . . . .

255.   Mr. Potts emailed his September 21, 2017 statement to Ms. Steiner and Ms. Timmer, General Counsel of NSF, as well as Kevan Lawlor, CEO of NSF, and Theresa Bellish, Senior Global Managing Director of NSF. None of the recipients responded.

256.   Rather than include Mr. Potts' complete statement in the minutes, NSF merely referenced that he made a statement. The September 21, 2017 meeting minutes stated:

> At the beginning of day 2, D. Potts read a statement regarding Anti-Trust concerns. L. Rashkin seconded D. Potts' comments, and asked for clarification on the question put to the TG created yesterday. J. King noted that the HSW issue affected Standard 40.

257.   Mr. Potts, Mr. Rashkin, and Mr. King represented three of the four manufacturers of Treatment and Dispersal Systems at the time.

258.   Ms. Evans' demands were made one year after NSF had directed the task group to include all technologies in NSF Standard 441 and acknowledged the need for an extended timeline.  There was no delay in this process by manufacturers of Treatment and Dispersal Systems during this period and the only time issues were raised about Treatment and Dispersal Systems during this period were by NSF employees and its agents.  Ms. Evans' actions can only be explained by NSF's entrance into a conspiracy with the Corporate Defendants and co-conspirators to use the standard-setting process to exclude Treatment and Dispersal Systems from the market.

259.   Ms. Evans' demands are indicative of NSF's attempts to further the conspiracy to exclude Treatment and Dispersal Systems from NSF Standards and the market.

260.   NSF's entrance into the conspiracy is clearly illustrated by its public statement of fairness and balance followed by reversal of those statements despite Treatment and Dispersal Systems doing everything that was required of them, while NSF's more lucrative customers had no requirements with which to comply but were working individually to harm Treatment and Dispersal Systems.

261.   Pursuant to the direction of Ms. Evans, the Task Group on Open Bottom Cell Technology was created by vote of the Joint Committee presented by Mr. Suchecki. While not a simple task, after several meetings, the Task Group on Open Bottom Cell Technology developed a proposed study that would enable establishment of a test protocol to assist with the development of NSF Standard 441.

262.   The Task Group on Open Bottom Cell Technology presented the proposed study to NSF personnel for approval and funding prior to the September 2018 Joint Committee meeting. During the September 2018 Joint Committee meeting, the Joint Committee voted unanimously in favor of recommending that NSF fund the proposed study. But, despite averaging nearly $20,000,000 in excess income each year, NSF has not approved the study and has not provided funding for the study.

263.   Geomatrix and several other parties on the Task Group worked diligently to complete the task assigned by Ms. Evans and were ultimately successful in developing a test study protocol.  NSF then failed to implement or fund the test.

NSF's actions were in furtherance of Defendants' conspiracy to exclude Treatment and Dispersal Systems from Standard 441 and the market.

264.    There were no meetings of the HSW Task Group in 2018.

265.    At the September 2018 Joint Committee Meeting, Dr. Heger, the HSW Task Group Chair, presented a motion to resume work on Standard 441 focusing on Contained Systems only based primarily on NSF's failure to approve and fund the test protocol presented by the Task Group on Open Bottom Cell Technology.  The minutes reflect her statements as follows:

> At the 2017 Meeting, the Open Cell Bottom TG was given 6 months to develop language.  After 6 months, the HSW group would resume work, either incorporating the Open Cell Bottom Technology if language has been provided or adding Open Cell Bottom in a later revision.  As Open Cell Bottom Technology group is still seeking a resolution, she proposed that the HSW Standard work resume, focusing on closed-box technology, and incorporate Open Cell Bottom Technology language once it was drafted.

266.    Dr. Heger's motion was seconded by Jim Bell.

267.    Geomatrix representatives objected to the motion since it was not in accordance with NSF direction from earlier meetings, a violation of NSF's Antitrust Guide, and a violation of antitrust law.

268.    Ms. Steiner, in support of the conspiracy, supported the Motion and stated that the motion did not, as recorded in the minutes, "exclude" technologies, but rather only "moved forward with aerobic treatment technology."

269.   After heated discussions involving Geomatrix and the Defendants, the motion was tabled until NSF legal counsel could be present. Upon information and belief, the motion was never publicly addressed by NSF legal counsel and Geomatrix was not informed of the outcome of the legal review. But once again, NSF published these comments to numerous regulatory authorities in the Joint Committee meeting minutes.

270.   Following the September meeting of the Joint Committee, Jason Henderson, General Counsel for Geomatrix, requested a copy of the meeting tapes from Julie Timmer, General Counsel of NSF. Ms. Timmer replied by email dated October 25, 2018, "I am sorry, but recordings are only used to put together the meeting minute report and are not distributed."

271.   On information and belief, NSF does not want to provide Geomatrix with copies of the meeting tapes because they would show the true extent of NSF's anticompetitive actions and the actions of its co-conspirators that are not accurately reflected in meeting minutes.

272.   No meetings of the HSW Task Group were held between the meetings of the joint Committee in 2018 and 2019.

273.   On September 18, 2019 at the Joint Committee Annual Meeting, Dr. Heger, again, requested that work resume on proposed NSF Standard 441 and placed

blame for the delay on manufacturers of Treatment and Dispersal Systems.  As recorded in the minutes, Dr. Heger stated:

> S. Heger began by reviewing where the Task Group had left off.  This group was waiting on the Open Cell Bottom technology task group to develop a test procedure before it could resume development of NSF 441.  The OCBT group has not completed this task, so the HSW group may resume activity.

Dr. Heger was well aware that the Open Cell Bottom Technology Task group had presented a proposed testing protocol to NSF for approval and any delay was on the part of her co-conspirator, NSF, not manufacturers of Treatment and Dispersal Systems.

274.   Instead of correcting Dr. Heger's false statements, Ms. Steiner moved that the HSW Task Group resume work that was to incorporate both Contained Systems and Treatment and Dispersal Systems. The motion was passed.

275.   These events are indicative of the mechanisms of NSF's conspiracy with the co-conspirators in that NSF employees and agents/apparent agents, in this case Ms. Steiner, publicly make statements of fairness and inclusion while supporting false and disparaging statements of their co-conspirators and actions that further to aim continued disparagement and ultimately market exclusion of Treatment and Dispersal Systems.

276.   Continuing with the development of the NSF Standard 441 pursuant to the Joint Committee vote, NSF held a HSW Task group meeting on November 14,

2019. Prior to that meeting Mr. Potts provided Dr. Heger a peer reviewed study titled *Column Studies of Soil Clogging in a Slowly Permeable Soil as a Function of Effluent Quality*, *Supra*, to facilitate a discussion of clogging related to high strength wastewater.

277.   During the HSW Task Group Meeting on November 14, 2019, Mr. Potts raised the study and Dr. Heger, as recorded in the minutes, "stated that clogging was not part of the pass/fail criteria in other [wastewater treatment] standards." In dismissing the presented scientific evidence, Dr. Heger also stated that, based on her experience, Contained Systems do not have a problem clogging.

278.   Despite claiming that clogging was not to be part of the proposed standard, NSF circulated a straw poll to the HSW Task Group on December 6, 2019. The straw poll provided the following options regarding the proposed NSF Standard 441:

   a.  Contained systems only test to discharge standard
   b.  Treatment and Dispersal Systems tested in lined cell for effluent quality and ponding
   c.  All systems must test for effluent quality and ponding

279.   This straw poll contradicts Dr. Heger's statement that leach field clogging is not part of the pass/fail criteria.  The only options related to Treatment and Dispersal Systems include testing ponding to due to alleged concerns about leach field clogging.  As Dr. Heger stated, "clogging [is] not part of the pass/fail

criteria", yet NSF and Dr. Heger are suggesting that Treatment and Dispersal Systems should still be tested for clogging as part of the pass/fail criteria while Contained Systems should not be subject to this requirement.

280. This straw poll was yet another example of NSF and its co-conspirators furthering the objective of the conspiracy by suggesting that Treatment and Dispersal Systems require additional testing and are not as reliable as Contained Systems, thus disparaging and limiting the ability of Treatment and Dispersal Systems to compete in the market.

281. NSF subsequently edited the straw polls without notice to include only the two following options:

a. Contained systems only test to discharge standard & Treatment and Dispersal Systems test in lined cell for effluent quality and ponding
b. All systems must test for effluent quality and ponding

282. This revision, again, furthered the objective of NSF and its co-conspirators to distinguish between Contained Systems and Treatment and Dispersal Systems and disparage Treatment and Dispersal Systems by suggesting that Treatment and Dispersal Systems required additional evaluation criteria.

283. There is no legitimate reason to test Treatment and Dispersal Systems for clogging yet not test Contained Systems for clogging. By proposing a double standard, Dr. Heger and NSF were disparaging Treatment and Dispersal Systems

and suggesting that they clog more frequently than Contained Systems in furtherance of the conspiracy.

284.   After receiving the straw poll, Geomatrix wrote to Ms. Timmer of NSF expressing concern that NSF drafted and circulated the straw poll that was a violation of its Antitrust Guide and the law.  Ms. Timmer did not respond.

285.   Option A received 11 votes and Option B received 6 votes.

286.   In addition to the 17 votes, numerous comments were made in response to the straw poll. The comments included the following from manufacturers of Contained Systems:

    a.   "Combined treatment and dispersal will always represent a challenge in terms of developing a standard testing approach. Because these systems claim treatment performance/performance level, testing and sampling shall be performed on these systems to assess and verify their claims as any other systems. However, their performance could be significantly impacted by the so call [sic] "final dispersal" component of their concept because it is not fully independent. Thus in such a case they have to be tested for what they are and soil saturation with potential ponding is part of the equation." Submitted by Marie-Christine Belanger, Premier Tech.

    b.   "Before I am 100% comfortable with Treatment and Dispersal Systems testing in a lined cell I would like to see that the test methodology represents how the system(s) processes and installations are deployed in the field." Submitted by co-conspirator, Nicholas Noble, Orenco Systems, Inc.

287.   Premier Tech currently has eight products and 49 models listed on NSF's product listing of NSF/ANSI Standard 40 Certified Products and two product and ten models on NSF's listing of NSF/ANSI Standard 245 Certified Products.

Pleasing Ms. Belanger and Premier Tech is in the financial and commercial interest of NSF as Premier Tech must compensate NSF for its listings and audits annually.

288.   Several commenters, including some regulatory authorities, expressed concern over the attempts to suggest Treatment and Dispersal Systems could not perform effectively and to add additional restrictions to Treatment and Dispersal Systems.

289.   George Huefelder, Director of MASSTC, Barnstable County Massachusetts regulatory authority, and an expert in the field of testing septic products to NSF standards, commented "I don't see any reason why all systems should not be tested in an identical manner."

290.   A. Dr. Robert Rubin, a national leader in water quality and wastewater management from North Carolina State University, commented that a "test protocol should be developed to allow testing of any system purporting to treat high strength wastewater."

291.   Mr. Potts submitted the following comment:

It is imperative that all systems are tested in an identical manner. NSF Standard 40 already has a provision mandating liquid level monitoring. The liquid level in a device should be determined by the manufacturer of the technology, not by committee members that are competitors in the industry. In all systems, all that matters is if the liquid level is below the alarm set point. Distinguishing between systems based on design element is a direct violation of NSF and ANSI policies and guidelines and Federal antitrust law.

292.   On March 18, 2020 NSF circulated a letter signed by Dr. Heger on behalf of NSF. The letter's stated purpose was to "take time to address some of the comments received on the straw ballot. The comments suggest that "the longevity of uncontained systems receiving HSW is of concern for many regulators across the US. The time needed to address this longevity in this standard is an item for discussion."

293.   In this March 18, 2020 letter, Dr. Heger omitted any concern for longevity of Contained Systems and simply disparaged the longevity of Treatment and Dispersal Systems citing no evidence.

294.   In response to Mr. Potts' comment, Dr. Heger stated:

The language being developed is for proposed standard 441, not standard 40. The balanced group (consisting of industry, public health, and users) will determine the requirements of the standard. Differently designed systems may raise different health and safety concerns, and thus may require different testing methodologies. For example, in the Drinking Water Treatment Units standards, a squeeze bottle type filter will be tested differently than a faucet filter.

295.   When Geomatrix inquired about Dr. Heger's response to Mr. Potts' comment, Dr. Heger stated that Sharon Steiner of NSF drafted this response and further follow-up should be directed to NSF.

296.   Both Dr. Heger and Ms. Steiner are aware that the principal requirement of a standard is standardization.  While differing products might need a differing test setup, ultimately the benchmark, or standard that they are all compared to must be

the identical.  If this is not the case, then it is not a standard, but rather the epitome of a double standard.

297.   NSF has not been able to cite any example of a standard that differs based on product design.  There are many different products that NSF certifies; however, all are compared to an identical standard.

298.   In fact, NSF does not have any existing standards that differ based on product design.  While some standards establish different testing procedures for different products when necessary due to product design, no standard requires a certain technology to test to requirements beyond the requirements of other technologies.

299.   Dr. Heger and Ms. Steiner intentionally conflated testing protocol and requirements of the standard in an effort to further the objectives of the conspiracy by confusing testing protocol and the requirements of the proposed standard by relying on the testing protocol of an irrelevant water filter standard in which all products, regardless of testing protocol, must meet the same requirements of the standard.

300.   NSF published its March 18, 2020 letter to state regulatory authorities.

301.   Despite the fact that the letter references regulatory needs, the letter, signed by Dr. Heger and drafted by NSF, did not address the comments set forth above by independent experts in the field.

302.  There is no scientific evidence to support Dr. Heger and Ms. Steiner's proposal to excuse Contained Systems from testing for clogging under proposed Standard 441, while requiring Treatment and Dispersal Systems to undergo testing for clogging. NSF and its co-conspirators are attempting to further the conspiracy and, thus,  hindering the advancement of science, by not allowing innovative products to prove through directly comparative scientific testing that they are able to treat wastewater and prevent clogging as well or better than established treatment systems.

303.  Similarly, if ponding is an issue with high strength wastewater, it is an issue for all systems that treat high strength wastewater and testing must be applied equally to all products. NSF's decision to even pursue this straw poll, and support of Dr. Heger's plan and response, that suggests ponding is a concern only for Treatment and Dispersal Systems and creates the appearance that Treatment and Dispersal Systems are problematic compared to Contained Systems.  The proposal of a need for a double standard is intended to handicap Treatment and Dispersal Systems and will also negatively affect consumers by denying them an apple-to-apples comparison in furtherance of the conspiracy.

304.  A fair, apples-to-apples, test could easily be developed and performed, which would evaluate competing technologies under a fair and clearly defined

standard. But this is precisely what the coconspirators and NSF want to stop from happening.

305.  If a level playing field was created through an apples-to-apples test, there should be no objection to the proposed Standard 441 and this entire debate could be eliminated once and for all. If NSF and its coconspirators were certain Treatment and Dispersal Systems could not pass an apples-to-apples test, the obvious course of action would be to allow Treatment and Dispersal Systems to test and fail the test. The resistance to such a simple and fair solution on the part of NSF, its agents, apparent agent, employees and/or representatives and Co-Conspirators shows that NSF Standard 441 is being used by interested parties for commercial benefit and an attempt to exclude Treatment and Dispersal Systems from competing in the relevant market in furtherance of the conspiracy.

306. NSF should adopt an apples-to-apples test and give Treatment and Dispersal Systems the opportunity to prove they can perform as well or better than Contained Systems. The threat not to do so disparages Treatment and Dispersal Systems and discourages their acceptance by regulators and customers which only serves the purposes of NSF and its coconspirators.

307.  Upon information and belief, NSF's behavior is an attempt to further the conspiracy to exclude Treatment and Dispersal Systems from the market and

damage the reputation of Treatment and Dispersal Systems by raising questions about their ability to treat all wastewater, including high strength wastewater.

308. Treatment and Dispersal Systems easily passed NSF/ANSI Standard 40 testing. NSF and manufacturers of Contained Systems, including the co-conspirators, are aware of how Treatment and Dispersal Systems perform in the field and their desirability to consumers due to performance and cost. NSF and the co-conspirators are unwilling to risk similar results under Standard 441. Again, NSF has chosen to support its most lucrative customer base over fairness, science, and protection of public health.

309. On March 20, 2020, a meeting of the HSW Task Group was held via telephone. A member of the committee suggested that due to low attendance and other more pressing concerns with the COVID-19 pandemic the meeting be adjourned. Dr. Heger and Sharon Steiner together decided not to adjourn the meeting because NSF Standard 441 supposedly needed to move forward before the April 2020 Joint Committee meeting.

310. During the meeting on March 20, 2020, in furtherance of the conspiracy, Dr. Heger proposed a second straw ballot that would seek approval to completely eliminate Treatment and Dispersal Systems from the proposed NSF Standard 441, stating that she always "envisioned two tracks" for these systems. In response to a proposal that Standard 441 address treatment of high strength

wastewater and all dispersal issues be addressed by NSF/ANSI Standard 240, Dr. Heger proposed that both treatment and dispersal certification for Treatment and Dispersal Systems be moved under NSF/ANSI Standard 240 so that Standard 441 could focus only on Contained Systems.  Dr. Heger and NSF were aware that NSF Standard 240 has only been adopted by a single state, that it does not certify systems for wastewater treatment capabilities, that it only applies to dispersal of wastewater for gravelless products, and that not a single manufacturer has been certified under NSF/ANSI Standard 240.

311.   Dr. Heger made her proposal with full knowledge that NSF and the Joint Committee had directed on multiple occasion that the HSW Task Group only move forward with a standard that included all technologies.

312.   NSF employees in attendance at the meeting, Sharon Steiner and Jason Snider, did not object to Dr. Heger's proposal.  In fact, Ms. Steiner agreed to draft the straw ballot and determine how best to distribute it to the widest possible audience, including as many regulators as possible.

313.   During the same meeting, Mr. Bell of BioMicrobics admitted that he had ex-parte meetings with NSF personnel to discuss NSF standards and the overlap between standards.   On information and belief, these conversations are in furtherance of the conspiracy to make it more difficult for Treatment and Dispersal

Systems to obtain regulatory approval and exclude Treatment and Dispersal Systems from the market whether for treatment of residential or high strength wastewater.

314. Despite the efforts of Geomatrix, Dr. Heger and NSF determined that a second straw poll would be submitted that would seek approval to completely exclude Treatment and Dispersal Systems from the proposed NSF Standard 441 and include them in the unrelated NSF/ANSI Standard 240 which has been adopted by a single state and to which no products have been certified.

315. In furtherance of the conspiracy, these statements were again made in the presence of state regulatory authorities and NSF employees supported Dr. Heger's position.

316. NSF did not discuss NSF Standard 441 at the April 2020 meeting of the Joint Committee after being made aware that Geomatrix was considering filing this action and subsequent scheduled meetings of the HSW Task Group have been purportedly cancelled due to "scheduling conflicts." The proposed second straw ballot has not been circulated publicly.

317. NSF is aware that its and its participants' disparaging statements about Treatment and Dispersal Systems are untrue.

318. NSF, the Corporate Defendant, and NSF's committee and task group participants are aware of the issues that have caused high strength wastewater generators to cease using Contained Systems when state regulations allow and turn

to Treatment and Dispersal and SoilAir Systems. Contained Systems are at significant risk of losing market share to more effective and less expensive Treatment and Dispersal Systems and SoilAir.

319.   By proposing to exclude Treatment and Dispersal Systems and SoilAir from NSF Standard 441, NSF is handicapping Geomatrix and other manufacturers of Treatment and Dispersal Systems, bestowing an unfair benefit on Contained Systems in the market, reducing choice and increasing costs for consumers of onsite high strength wastewater treatment systems, and negatively affecting health, safety, and the environment.  NSF and its co-conspirators are using the HSW Task Group as a method to disparage Treatment and Dispersal Systems to further their conspiracy.

320.   NSF and the co-conspirators are aware of the capabilities of the technologies of Geomatrix. They are aware that Geomatrix is using its technology to solve problems that NSF/ANSI Standard 40 certified Contained Systems are causing in the field. Yet, they are determined to exclude Geomatrix's products from NSF/ANSI Standard 40 and the proposed Standard 441 and do not even want to allow the products to be tested side by side and apple-to-apples against Contained Systems to prove their capabilities.

321.   NSF and the co-conspirators are aware that Geomatrix's products can effectively treat and disperse high strength wastewater.  However, during meetings

of the HSW Task Group, NSF and the co-conspirators have dismissed any suggestion that Geomatrix products, including Treatment and Dispersal Products, can effectively treat and distribute high strength wastewater. Defendants have refused to examine the actual evidence, of which they are aware, of the performance of Treatment and Dispersal Systems or of the repeated failure of Contained Systems and have moved relentlessly forward with the false narrative that Contained Systems work and Treatment and Dispersal Systems cannot.

322. Customer choice is a strong indicator of the effectiveness of a technology. As demonstrated in Paragraphs 322-325, Customers are increasingly using Geomatrix's products to treat and disperse high strength wastewater and to repair a failure or ensure proper function of high strength wastewater systems, including those that incorporate Contained Systems. This change in the market is harmful to the Corporate Defendants and is a strong indication of the effectiveness of Treatment and Dispersal Systems and the motivation for Contained Systems to use their influence in the standard setting process to exclude them from the proposed standard.

323. Geomatrix has been using its products to treat and disperse high strength wastewater for many years. GST and SoilAir have been, and are currently, used on high strength wastewater systems effectively. In fact, a number of companies use Geomatrix products wherever regulations allow. If regulations

require a Contained System on a high strength wastewater system, a number of companies voluntarily use SoilAir to ensure that the Contained System will not cause the leach field to clog.

324.   Despite Defendant's claims that Treatment and Dispersal Systems are unable to effectively treat and disperse high strength wastewater without significant concerns about performance and clogging, Geomatrix products, including GST and SoilAir, have been routinely used for high strength wastewater systems.  Examples of projects on which Geomatrix products have been used for high strength wastewater systems include, but are not limited to, the following:

- GST and SoilAir were installed in December 2016 on a new Dunkin Donuts store in Middlefield, Connecticut.  Since then, the system has never utilized more than 50% of the leaching system capacity; and

- GST and SoilAir were installed in April 2004 as a replacement leaching system at the Penny Lane Pub restaurant in Old Saybrook, Connecticut.  Since then, the system has never utilized more than 50% of the leaching system capacity.

325.   Additionally, Defendants are aware that Geomatrix products, GST and SoilAir have been used to repair/rejuvenate, including without replacement, high

strength wastewater systems that have previously failed.  Examples of this include, but are not limited to the following:

- The first SoilAir system was installed in or about October 1998 on the septic system serving the Blooming Grove Hunting and Fishing Club. This system serves the club house, restaurant, and associated cottages.  When this project was undertaken, the area over the leaching system was completely ponded and in failure.  SoilAir was added to the system and within a few weeks the leaching system ponding levels were significantly reduced.   The Pennsylvania Department of Environmental Protection  and local Sewage Enforcement Officer visited the site and found the system performing properly. This ultimately avoided the club having to install a replacement system at a cost of in excess of $500,000.  The system is still working properly today over 20 years later;

- After repeated attempts to fix chronic leach field clogging, failures, and constant pumping, SoilAir was added to the onsite wastewater system at the New Colony Diner in Monroe Connecticut in April 2003. The system was able to operate on less than 50% of the leaching system capacity for many years only pumping of the grease trap and septic tank were required.  This was reportedly considered

by the Connecticut Department of Public Health to be the worst system in the state.  A structural failure of the pump tank occurred and effectively shut the restaurant down.  This, combined with a sale of the business, resulted in a rebuild of the entire system due to concerns over additional structural failure of the septic system components.  Since this work was completed, the system has operated on approximately 50% of the leaching system capacity;

- Bokum Center is a strip mall with a number of stores in it. There are two systems at the Center that incorporate SoilAir.  The first serves the Hong Kong Chinese Restaurant.  This type of restaurant is the epitome of a challenging project in the onsite septic business due to the extremely high strength nature of the wastewater discharged from the facility.  The second system on this site serves the former IGA supermarket.  These systems were outfitted with SoilAir in or about March 4, 2004 to repair chronic leach field failure requiring constant pumping.  Since installation of SoilAir, the systems have worked for many years without any problems other than blower replacement and no pumping other than grease trap and septic tanks has been necessary;

- The Griswold Inn is the oldest continually operated inn/restaurant in America.  This system had been in failure for many years and required constant pumping to function.  SoilAir was added in or about August 2018 and about half of the concrete galleries were replaced due to structural degradation due to age.  The other half of the system was rejuvenated with SoilAir.  Now the system functions properly and pumping is limited to the grease trap and septic tank;

- SoilAir was installed in March 2014 at the existing failing wastewater system at Burger King restaurant in Old Saybrook, Connecticut to remedy repeated failures over several years.  Since then, the system has never utilized more than approximately 40-60% of the leaching system capacity; historically, without SoilAir, 100% was insufficient to prevent failure;

- In or about August 2019. SoilAir was installed on the existing failing wastewater system at Dunkin Donuts store in Madison, Connecticut to remedy repeated failures of the dry wells and concrete galleries.  The drywells were replaced with GST and the existing galleries were rejuvenated with SoilAir. Since then, the system has never utilized more than 50% of the leaching system capacity;

before installation of SoilAir, 100% was insufficient to prevent failure; and

- In July 2017 SoilAir was installed on the Cumberland Farms in Madison, Connecticut after the existing system failed. SoilAir was added to the existing failing leaching system and no additional leaching system was constructed. Since then, the system has never utilized more than 50% of the leaching system capacity; before SoilAir, 100% was insufficient to prevent failure.

326. Importantly, despite their baseless claims about Uncontained Systems, the Defendants are aware that Geomatrix's products have been used to replace or repair failing Contained Systems, including systems manufactured by the Corporate Defendants, on high strength wastewater projects. Examples include, but are not limited to, the following:

- On or about May 2, 2019, SoilAir was installed on a wastewater leaching system served by a Contained System Manufactured by Defendant Hoot Systems at the RaceTrac convenience store in Plant City, Florida. Geomatrix was retained to install SoilAir on this system due to the fact that it had clogged the leach field and it was in failure. Since the installation of SoilAir on the existing leach field, the system has never utilized more than 50% of the leaching

system capacity; before SoilAir, 100% was insufficient to prevent failure;

- In or about June 2012, Geomatrix installed SoilAir on a wastewater leaching system served by a Norweco Contained System at a 99 Restaurant in Andover Massachusetts.  Prior to the installation of SoilAir, the Norweco Contained System has clogged and failed the leach field within approximately two years of installation.  SoilAir was added to the existing leaching system for several months, after which time it was removed because the leaching system had been operating properly for this time interval that SoilAir was implemented.  The leaching system functioned for two more years after removal of SoilAir and then again failed.  The system owner is now having the Norweco Contained System removed and is installing a permanent SoilAir system;

- In or about September 2015, a leaching system served by a BioMicrobics Contained System failed at a 99 Restaurant in Mashpee, Massachusetts. The BioMicrobics Contained System had clogged the leach field.  A SoilAir system was installed on the existing leach field. Although the pressure distribution system orifices, downstream of the BioMicrobics unit have clogged on a

few occasions with sludge, the leaching system has operated on 50% of capacity, when previously 100% was insufficient; and

- Geomatrix has been engaged to fix a failing onsite wastewater system, consisting of a Nibbler and an Advantex Contained Systems that discharge to a bottomless sand filter ("BSF"), due to a historic failure at a Cumberland Farms convenience store in Johnston, Rhode Island. Because of their experience with SoilAir on many other sites, the system owner has chosen to remove the Nibbler and Advantex Contained Systems and replace them with SoilAir and GST.

327. Upon information and belief, failing to abide by its Standards Development Policy and the Antitrust Guide, NSF, and Dr. Heger have been working on a draft NSF Standard 441 that effectively precludes Treatment and Dispersal Systems from certification.

328. An apples-to-apples test can easily be developed to determine the ability of any technology to treat high strength wastewater.

329. NSF's actions in publishing to regulators, and others, discussions of a proposed NSF Standard 441 that would preclude certification of Treatment and Dispersal Systems improperly and unfairly disparages Treatment and Dispersal

Systems and impairs their marketability.  Such statements have been used to further the conspiracy.

330.   NSF's action with respect to the promulgation of an NSF Standard 441 that would preclude certification of Treatment and Dispersal Systems violates Section 2(a) of NSF's Antitrust Guide, which provides, in relevant part that "standards programs must not be used as devices to . . . boycott competitors, or otherwise lessen competition."

331.   The attempted exclusion of Treatment and Dispersal Systems from NSF Standard 441 is handicapping Geomatrix and other manufacturers of Treatment and Dispersal Systems, conferring an unfair benefit on Contained Systems, including the co-conspirators, in the market, reducing choice and increasing costs for consumers of onsite wastewater treatment systems, and negatively affect public health, safety and the environment.

## LIABILITY OF NSF FOR THE ACTION OF ITS AGENTS/APPARENT AGENTS

332.   NSF through its employees, agents, and apparent agents directly agreed to and participated in the conspiracy.

333.   NSF is also responsible for misconduct committed by its members vested with and acting under the actual or apparent authority of NSF, including the co-conspirators.

334. The anticompetitive and unlawful collusive actions of the co-conspirators described herein, were committed with and under the authority or apparent authority of NSF.

335. NSF is responsible for monitoring and enforcing compliance with its and ANSI's due process rules.

336. On numerous occasions, Geomatrix alerted NSF of the co-conspirators' anticompetitive activities occurring within the Joint Committee and associated Task Groups. Geomatrix did so through letters, electronic mail, and statements at Joint Committee and Task Group meetings. Despite this notice, NSF ignored Geomatrix's complaints, took no meaningful actions to investigate or remedy these violations, and permitted the co-conspirators to continue violating NSF and ANSI due process rules and thereby continue the conspiracy.

337. By its failure to monitor and enforce NSF and ANSI due process rules, and to respond to Geomatrix's specific complaints concerning violation of NSF and ANSI due process rules, NSF has, at least, acquiesced in, is responsible for, and is complicit in, the abuse of authority and anticompetitive conduct by Jim Bell, Ron Suchecki, Nick Noble, and Sara Heger, each of whom was cloaked in authority to act on behalf of NSF and use the reputation of NSF to further the conspiracy through their dominance positions as members of the Joint Committee and leadership positions on Task Groups. By its failure to act, NSF has authorized and ratified the

anticompetitive conduct of the co-conspirators and has joined in and become parties to their combination and conspiracy.

338.   As set forth herein, unless NSF acts promptly to remedy the continuing anticompetitive effects of the actions of its employees and the co-conspirators, in which it acquiesced and ratified, there remains a grave risk that any implementation of a High Strength Wastewater Standard, will unlawfully exclude from the market or place unlawful restriction on Treatment and Dispersal Systems in violation of due process and antitrust law.

### NSF's Pattern of Closed Meetings, Backdoor Dealings, and Unfair Trade Practices

339.  NSF has been accused of self-dealing, pursuing the commercial interests of its customers, and conflicts of interest in the standard setting process in connection with other industries in which it sets standards. *See, e.g.,* www.clubindustry.com/commercial-clubs/nsf-health-and-fitness-facilities-standard-withdrawn;www.apnews.com/febd833b45904e04a0aac1ba101460b3/Conflict-of-interest-concerns-may-slow-fight-against-disease.

340.   On or about May 10, 2018, NSF organized a conference call, at the request of a Joint Committee member, with select manufacturers to discuss joint action to defeat a proposed regulatory change in Florida. Geomatrix was not one of the select manufacturers invited to participate on the conference call. Geomatrix

representatives, informed of the existence of the conference call by one of the selected manufacturers, dialed into the conference call.

341.   Upon joining the conference call, Geomatrix announced its presence. It became immediately clear that the purpose of the call was a joint action by NSF, Joint Committee members, and certain manufacturers to protect market share by defeating a regulatory change and thus excluding from the market a new, nonproprietary, and less expensive technology developed and proposed by the State of Florida. The State of Florida invested in this development effort to find a technology that could more reliably, and cost effectively, treat nitrogen than the commonly utilized Contained Systems.

342.   Geomatrix stated on the conference call that it was an improper joint action and promptly left the call. Geomatrix reported its concerns to NSF.

343.   NSF, through Ms. Steiner, informed Geomatrix that it organized the May 10, 2018 call at the request of a Joint Committee Member, Roxanne Groover. The call included manufacturers of propriety wastewater treatment systems to discuss a joint response to a pending regulation that would allow competition from non-proprietary wastewater systems in the same market segment.

344.   Upon information and belief, NSF maintains an "Industry Group" of wastewater technology manufacturers.   NSF also maintains a "Regulatory/User Group" for regulators, users, and non-manufacturer participants.

345.   The Industry Group meets, at least, prior to each meeting of the Joint Committee.  NSF employees attend the Industry Group and make presentations and respond to questions.  The Industry Group sets the goals for manufacturers and other industry members for the upcoming year.  The industry group also sets aspects of certification policy for NSF.

346.   Prior to 2017, the Industry Group would provide a summary of its meeting at that meeting of the Joint Committee and that summary was included in the meeting summary.  However, in 2017, NSF appears to have ceased allowing summaries of this secret group at the meeting of the Joint Committee.

347.   Upon information and belief, the industry group ceased providing meeting summaries in furtherance of concealing the conspiracy between NSF and the co-conspirators.

348.   Upon information and belief, NSF invites manufacturers with a certified product to the Industry Group.  This group is primarily made up of manufacturers of Contained Systems.  The group has been chaired by Jim Bell and Ron Suchecki.  Non-invited manufacturers are not informed of the meeting and allowed to attend.  The meeting is not open to participation by non-industry members or uninvited industry members.

349.   Requests by Geomatrix for information on the selection and constitution of the group's membership and meeting summaries have been ignored or refused by NSF.

350.   On information and belief, NSF and the Industry Group have jointly worked to further the conspiracy to exclude Treatment and Dispersal Systems from the market through disparagement and exclusion from Standards.

## COUNT I
## ANTITRUST VIOLATIONS
## (15 U.S.C. §§ 1, 2)
## (AGAINST ALL DEFENDANTS)

351.   Geomatrix realleges the preceding Paragraphs as if fully set forth herein.

352.   The relevant product market for the purpose of Count I is the sale of products for onsite treatment of residential and commercial wastewater. Treatment of wastewater prior to dispersal into the environment, under certain circumstances, is required by federal and state law. Users cannot substitute municipal treatment for onsite treatment systems because onsite treatment systems are installed in areas where municipal wastewater systems are generally unavailable. Users cannot reasonably substitute traditional septic systems for Contained or Treatment and Dispersal Systems when conditions and regulations require treatment of wastewater prior to dispersal.

353.   The relevant geographic market is the United States.

354.   On information and belief, there are at least 41 manufacturers of Contained Systems that collectively sell in excess of 90% of devices for treatment of residential and commercial onsite wastewater in the United States and the vast majority of systems for onsite high strength wastewater treatment in the United States. The same manufacturers make up the majority of companies that seek NSF certification of wastewater treatment products.

355.   GeoMat is one of five Treatment and Dispersal Systems that has successfully passed NSF/ANSI Standard 40 testing and received certification from NSF.

356.   Geomatrix's products are able to both treat and disperse water, are low in profile, and take up less space than traditional methodologies. Geomatrix's products cost less to consumers than the products of Contained Systems and their dispersal component and do not require the same extensive maintenance and an additional leach field.  Because of their patented design, Geomatrix systems can be placed high in the soil profile where there is more oxygen leading to better performance.

357.   GeoMat, specifically, better contacts and spreads out the wastewater to the underlying soil or sand. The total installed cost, and continuing maintenance costs, is also less than Contained Systems and associated leach fields and because of their superior performance, as described *supra*, they are disruptive entrants into the

relevant market, threatening to decrease the market share of manufacturers of Contained Systems.

358.   Geomatrix thus competes in the relevant product market—as a minority player—against approximately 41 manufacturers of Contained Systems, many of whom have multiple Contained Systems, that have obtained NSF/ANSI Standard 40 certification.

359.   There are currently three Treatment and Dispersal Systems listed as certified by NSF under NSF/ANSI Standard 40 that are sold by two manufacturers. One Treatment and Dispersal System manufacturer, Infiltrator Water Technologies, LLC ("Infiltrator"), recently acquired Presby. Infiltrator was subsequently purchased by Advanced Drainage Systems. This consolidation has resulted in the loss of members on the NSF committees that manufacture Treatment and Dispersal Systems and has created further imbalance and stacked the deck in favor of the manufacturers of Contained Systems.

360.   The products at issue are in and a part of interstate commerce, make extensive use of the instrumentalities of interstate commerce, and substantially affect interstate commerce. Any restraint of trade in the relevant market, including the restraints specifically alleged in this complaint, directly and substantially restrain and affect interstate commerce

361.   The conduct of the Defendants described above, and in particular their disparagement of Treatment and Dispersal Systems for onsite residential and commercial wastewater treatment and denial that they are or can properly be certified under NSF/ANSI Standard 40 and that they are unable to effectively treat high strength wastewater, constitutes a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, in that the effect is a group boycott and concerted refusal to deal directed against Geomatrix and other existing and potential suppliers of Treatment and Dispersal Systems and other innovative technologies yet to be developed.

362.   In the alternative, the conduct of the Defendants as described above, specifically their disparagement of Treatment and Dispersal Systems for onsite residential and commercial wastewater treatment and denial that they are or can properly be certified under NSF/ANSI Standard 40 or reliably treat high strength wastewater, constitutes a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 2 of the Sherman Act, 15 U.S.C. § 2, under the "quick look" rule of reason because Defendants have market power in the relevant market and their conduct creates unjustifiable barriers to entry, restricts innovation and consumer choice, unreasonably restrains trade and competition in the relevant market by excluding more efficient, less expensive products, and denies consumers access to these more efficient, less expensive alternatives, causing customers to pay higher

prices for less efficient alternatives, and harming public health, safety and the environment.

363.   In the further alternative, the conduct of the Defendants as described above, specifically their disparagement of Treatment and Dispersal Systems and denial that they are or can properly be certified under NSF Standard 40 or reliably treat high strength wastewater, constitutes a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 2 of the Sherman Act, 15 U.S.C. § 2, under the rule of reason because Defendants have market power in the relevant market and their conduct creates unjustifiable barriers to entry, restricts innovation and consumer choice, unreasonably restrains trade and competition in the relevant market by excluding more efficient, less expensive products, and denies consumers access to these more efficient, less expensive alternatives, causing customers to pay higher prices for less efficient alternatives, and harming public health, safety and the environment.

364.   As a direct and proximate result of the unlawful conduct of the Defendants, Geomatrix has been unable to enter new markets, experienced significant delay and legal fees in obtaining state approvals, suffered loss of market, and damage to its ability to sell its products in the relevant market.

365.   As a direct and proximate result of the unlawful conduct of Defendants, Geomatrix has been damaged, continues to suffer substantial damages, and is entitled to an injunction, treble damages, attorneys' fees, and costs.

## COUNT II
## UNFAIR COMPETITION
## (15 U.S.C § 1125)
## (AGAINST NSF INTERNATIONAL)

366.   Geomatrix realleges the preceding Paragraphs as if fully set forth herein.

367.   Defendant NSF made and/or published false and/or misleading claims, including but not limited to the following:

a.   Publishing marketing material claiming the NSF provides a fair and open process for standards-setting;

b.   Publishing marketing material claiming that products certified under NSF/ANSI Standard 40 would have a superior market position;

c.   Informing Geomatrix that it abides by the Standards Development Process and Antitrust Guide;

d.   Creating and publishing an issue paper stating that Treatment and Dispersal Systems did not fit under NSF/ANSI Standard 40;

e.   Attempting to exclude Geomatrix from the market through false statements;

f.  Directing manufacturers of Treatment and Dispersal Systems to create a testing protocol when such protocols had previously been approved by NSF and certifications had been granted;

g.  Refusing to fund a testing protocol created by manufacturers of Treatment and Dispersal Systems after directing that such testing protocol must be created to avoid exclusion under NSF Standard 441;

h.  Organizing and facilitating the High Strength Wastewater Task Group and allowing it to move forward with a standard that excludes Treatment and Dispersal Systems and SoilAir;

i.  Making public statements that require NSF Standard 441 to incorporate all technologies and subsequently placing blame for delay in the standard setting process on Geomatrix and manufacturers of Treatment and Dispersal Systems and stating that they will be excluded under the Standard;

j.  Publishing untrue and unverified claims by its employees, agents, apparent agents, and participants that Treatment and Dispersal Systems did not meet the requirements of NSF/ANSI Standard 40 and are unable to reliably treat high strength wastewater;

k. Providing a forum for its employees and participants to disparage Treatment and Dispersal Systems and publishing those untrue statements to regulatory authorities and Geomatrix's customers and potential customers;

l. Allowing, enabling, and assisting manufacturers of Contained Systems to use its standard-setting process to spread false and misleading information about Treatment and Dispersal Systems;

m. Using its standard-setting process for its commercial benefit and commercial benefit of its most beneficial customers by excluding or limiting competition despite advertising the fairness, openness, and non-commercial purpose of the standard-setting process; and

n. Allowing, enabling, and assisting manufacturers of Contained Systems to use its standard-setting process as a means to exclude or limit the ability of Geomatrix and other manufacturers of Treatment and Dispersal Systems to enter the market and/or effectively compete while advertising its process as fair, open, and non-commercial.

368. Defendant made and/or published the false and/or misleading statements in connection with the commercial nature of its business.

369.   Defendant's statements misrepresent the nature, quality, and/or characteristics of the products of Geomatrix and the certification obtained by Geomatrix from NSF.

370.   Defendant's statements and actions misrepresent the nature, quality, and/or characteristics of its own services.

371.   Defendant's misconduct is unlawful, immoral, unethical, oppressive, unscrupulous, and offends public policy.

372.   Geomatrix demanded in writing that NSF cease and desist its false and/or misleading claims and the publication of false and misleading claims in the forum provided by NSF.

373.   Defendant has refused to cease its unfair competition and refused to address the false and/or misleading claims.

374.   As a direct and proximate result of Defendant's making and publication of false/misleading claims, Geomatrix has been damaged, continues to suffer damages, and is entitled to an injunction and monetary damages, including but not limited to damage control expenses.

**COUNT III**
**UNFAIR COMPETITION**
**(15 U.S.C § 1125)**
**(AGAINST BIOMICROBICS, JAMES BELL, HOOT SYSTEMS,**
**AND RONALD SUCHECKI)**

375.   Geomatrix realleges the preceding Paragraphs as if fully set forth herein.

376.   Defendants BioMicrobics, James Bell, Hoot Systems, and Ronald Suchecki made and/or published false and/or misleading claims, including but not limited to the following:

a. Stating the Contained Systems are superior to Treatment & Dispersal Systems;

b. Stating that Treatment and Dispersal Systems should not be eligible for certification under NSF/ANSI Standard 40;

c. Intimating that Treatment and Dispersal Systems cause clogging when used to treat high strength wastewater;

d. Submitting issue papers to the Joint Committee designed to disparage Treatment and Dispersal Systems technology;

e. Making statements in Joint Committee and Task Group meetings disparaging Treatment and Dispersal Systems;

f. Creating task groups to address so called issues with Treatment and Dispersal systems;

g. Serving in leadership positions on task groups related to Treatment and Dispersal systems and using such positions to cause harm to Treatment and Dispersal Systems; and

h. Have consistently referred to Treatment and Dispersal Systems, including Geomatrix products, as "uncontained systems" in an effort to diminish confidence in those technologies.

377. Defendants made and/or published the false and/or misleading statements and took these illegal actions in connection with the commercial nature of their business.

378. Defendants' statements misrepresent the nature, quality, and/or characteristics of the products of Geomatrix and the certification obtained by Geomatrix from NSF.

379. Defendants' statements and actions misrepresent the nature, quality, and/or characteristics of its own services.

380. Defendants' misconduct is unlawful, immoral, unethical, oppressive, unscrupulous, and offends public policy.

381. Geomatrix has demanded that Defendants' cease their unlawful activity.

382. Defendants have refused to cease their unfair competition and refused to address the false and/or misleading claims.

383. As a direct and proximate result of Defendants' actions, Geomatrix has been damaged, continues to suffer damages, and is entitled to an injunction and monetary damages, including but not limited to damage control expenses.

## COUNT IV
## UNFAIR COMPETITION
## (MICHIGAN COMMON LAW)
## (AGAINST ALL DEFENDANTS)

384.   Geomatrix realleges the preceding Paragraphs as if fully set forth herein.

385.   Defendants' misconduct as set forth in the preceding Paragraphs amounts to unfair competition in violation of the common law, including but not limited to its publication of false and/or misleading claims as alleged in Paragraph 367 (a) through (n) and Paragraph 376 (a) through (h).

386.   Defendants' misconduct is unlawful, unfair, immoral, unethical, oppressive, deceptive, unscrupulous, and offends public policy.

387.   Defendants' misconduct has been and continues to be potentially and/or actually deceptive and confusing to the public and constitutes a fraud on the public.

388.   The deceptive quality of Defendants' misconduct is clear, and deception and confusion were and are the natural and probable results of its misconduct.

389.   As a direct and proximate result of Defendants' making and publication of false and/or misleading claims and NSF's allowing participants to use the NSF standard-setting process to attempt to create standards meant to stifle competition, Geomatrix has lost trade opportunity and has been otherwise damaged, continues to

suffer damages, and is entitled to an injunction and monetary damages, including but not limited to damage control expenses.

## COUNT V
## MICHIGAN CONSUMER PROTECTION ACT
## (MCL § 445.901 *et seq.*)
## (AGAINST NSF INTERNATIONAL)

390.   Geomatrix realleges the preceding Paragraphs as if fully set forth herein.

391.   Defendant NSF's misconduct as set forth in the preceding Paragraphs amounts to unfair competition in violation of Michigan Consumer Protection Act, including but not limited to its publication of false and/or misleading statements as alleged in Paragraph 367 (a) through (n).

392.   NSF has made and published false and/or misleading statements as they pertain to NSF's own decisions, rules, procedures, and services and Geomatrix's products, including but not limited to its publication of false and/or misleading statements as alleged in Paragraph 367 (a) through (n).

393.   NSF has published false and/or misleading statements of others to state regulatory authorities who make decisions whether to allow installation of the products of Geomatrix in their states, with knowledge that the statements were false and/or misleading.

394.    NSF's false and/or misleading statements disparaged the goods, service, business and/or reputations of Geomatrix by making and publicizing all of the statements set forth above.

395.    NSF's false and/or misleading statements improperly represent Contained Systems as superior to those of Geomatrix, suggest that Geomatrix does not provide quality products and suggest that Geomatrix's product do not meet the NSF/ANSI Standard 40 under which it was certified.

396.    NSF's false and/or misleading statements have a likelihood of causing public confusion and have caused actual confusion as to Geomatrix and its products.

397.    NSF has itself, and has allowed competitors of Geomatrix, to use the standard-setting process to limit the ability of Geomatrix to compete in the market.

398.    NSF's misconduct, including but not limited to its publication of false and/or misleading statements and its publication of false and/or misleading statements of others, was and is unfair, unconscionable, and/or deceptive.

399.    NSF's misconduct, including but not limited to its publication of false and/or misleading statements and its publication of false and/or misleading statements of others, took place and were made in conduct of trade or commerce and constitutes unfair and deceptive trade practices under the Michigan Consumer Protection Act (MCL § 445.901 *et seq.*)

400.   As a direct and proximate result of NSFs misconduct,  its false and/or misleading statements, and its allowance of participants to use the standard-setting process for anticompetitive purposes, Geomatrix has been damaged and irreparably harmed, continues to suffer substantial damages and irreparable injury, and is entitled to an injunction and monetary damages, including but not limited to damage control expenses, under the Michigan Consumer Protection Act (MCL § 445.901 *et seq.*)

## COUNT VI
## MICHIGAN CONSUMER PROTECTION ACT
### (MCL § 445.901 *et seq.*)
### (AGAINST BIOMICROBICS, JAMES BELL,
### HOOT SYSTEMS, AND RONALD SUCHECKI)

401.   Geomatrix realleges the preceding Paragraphs as if fully set forth herein.

402.   Defendants' misconduct as set forth in the preceding Paragraphs amounts to unfair competition in violation of Michigan Consumer Protection Act, including but not limited to its publication of false and/or misleading statements as alleged in Paragraph 376 (a) through (h).

403.   Defendants' have made and published false and/or misleading statements as they pertain to Geomatrix's products, including but not limited to their publication of false and/or misleading statements as alleged in Paragraph 376 (a) through (h).

404.   Defendants' false and/or misleading statements disparaged the goods, service, business and/or reputations of Geomatrix by making and publicizing all of the statements set forth above.

405.   Defendants' false and/or misleading statements improperly represent Contained Systems as superior to those of Geomatrix, suggest that Geomatrix does not provide quality products and suggest that Geomatrix's product do not meet the NSF/ANSI Standard 40 under which it was certified.

406.   Defendants' false and/or misleading statements have a likelihood of causing public confusion and have caused actual confusion as to Geomatrix and its products.

407.   Defendants have used the standard-setting process to limit the ability of Geomatrix to compete in the market.

408.   Defendants' misconduct, including but not limited to its publication of false and/or misleading statements and its publication of false and/or misleading statements of others, was and is unfair, unconscionable, and/or deceptive.

409.   Defendants' misconduct, including but not limited to its publication of false and/or misleading statements and its publication of false and/or misleading statements of others, took place and were made in conduct of trade or commerce and constitutes unfair and deceptive trade practices under the Michigan Consumer Protection Act (MCL § 445.901 *et seq.*)

410.   As a direct and proximate result of Defendants' misconduct,  its false and/or misleading statements, and their use the standard-setting process for anticompetitive purposes, Geomatrix has been damaged and irreparably harmed, continues to suffer substantial damages and irreparable injury, and is entitled to an injunction and monetary damages, including but not limited to damage control expenses, under the Michigan Consumer Protection Act (MCL § 445.901 *et seq.*)

**COUNT VII**
**BUSINESS DEFAMATION/INJURIOUS FALSEHOOD/**
**PRODUCT DISPARAGEMENT**
**(AGAINST ALL DEFENDANTS)**

411.   Geomatrix realleges the preceding Paragraphs as if fully set forth herein.

412.   Defendants have made and published false, misleading, derogatory, disparaging, and defamatory statements regarding the nature, quality, and/or characteristics of Geomatrix, its wastewater treatment products, and the certification obtained by Geomatrix from NSF, such statements being set forth in the preceding Paragraphs.

413.   Defendants' false, misleading, derogatory, disparaging, and defamatory statements include, but are not limited to, the following: that NSF provides a fair and open process for standard-setting, that products certified under NSF/ANSI Standard 40 would have a superior market position, that NSF abides by the Standards

Development Process and Antitrust Guide, that Treatment and Dispersal Systems did not fit under NSF/ANSI Standard 40, that Treatment and Dispersal Systems such as Geomatrix's wastewater treatment systems did not meet the requirements of NSF/ANSI Standard 40 or did not fit under NSF/ANSI Standard 40 and are unable to reliably treat high strength wastewater, that Geomatrix and other manufacturers of Treatment and Dispersal Systems were to blame for delay in the standard-setting process, and that Treatment and Dispersal Systems would be excluded under NSF Standard 441.

414. Defendants made and published false, misleading, derogatory, disparaging, and defamatory statements regarding the nature, quality, and/or characteristics of Geomatrix, its wastewater treatment products, and the certification obtained by Geomatrix from NSF, with knowledge that the statements were false, misleading, derogatory, disparaging, and defamatory, or with reckless disregard as to their truth or falsity.

415. Defendants have published false, misleading, derogatory, disparaging, and defamatory statements pertaining to the products of Geomatrix made by others with knowledge that the statements were false, misleading, derogatory, disparaging, and defamatory, or with reckless disregard as to their truth or falsity. The false misleading, derogatory, disparaging, and defamatory statements pertaining to the products of Geomatrix made by others and published by Defendants include, but are

not limited to, the following: papers stating that Treatment and Dispersal Systems did not fit under NSF/ANSI Standard 40, claims by its employees, agents, participants, and Geomatrix's competitors that Treatment and Dispersal Systems did not meet the requirements of NSF/ANSI Standard 40 and are unable to reliably treat high strength wastewater, statements by manufacturers of Contained Systems spread via NSF's standard-setting process.

416.   Defendants' false, misleading, derogatory, disparaging, and defamatory statements regarding the products of Geomatrix amount to defamation *per se*.

417.   Defendants' publication of false, misleading, derogatory, disparaging, and defamatory statements of others that Defendant knew were false, misleading, and/or defamatory amounts to defamation *per se*.

418.   Defendants' false, misleading, derogatory, disparaging, and defamatory statements regarding the products of Geomatrix were made with actual malice because they were made by Defendants with full knowledge of their false nature or with reckless disregard to whether the statements were true when made and were intended to damage Geomatrix to the benefit of the Defendants.

419.   Alternatively, Defendants made and/or distributed these false, misleading, derogatory, disparaging, and defamatory statements regarding the products of Geomatrix with negligence.

420.   Defendants made and/or distributed these false, misleading, derogatory, disparaging, and defamatory statements regarding the products of Geomatrix with the intent to harm Geomatrix's economic interests, or Defendants recognized or should have recognized that the statements were likely to harm Geomatrix's economic interests.

421.   As a direct and proximate result of Defendants' false, misleading, derogatory, disparaging, and defamatory statements, Geomatrix has suffered actual damages, including pecuniary damages, and has been irreparably harmed, continues to suffer substantial damages and irreparable injury, and is entitled to an injunction and monetary damages.

422.   As a direct and proximate result of Defendants' publication of knowingly false, misleading, derogatory, disparaging, and defamatory statements of others, Geomatrix has suffered actual damages, including  pecuniary damages, and has been irreparably harmed, continues to suffer substantial damages and irreparable injury, and is entitled to an injunction and monetary damages.

**COUNT VIII**
**FRAUD/MISREPRESENTATION**
**(AGAINST NSF INTERNATIONAL)**

423.   Geomatrix realleges the preceding Paragraphs as if fully set forth herein.

424.   Defendant has made and published false and/or misleading statements regarding, among other things, the nature, quality, and characteristics of NSF's services, NSF's own decisions, rules, and procedures, and the nature, quality, and/or characteristics of the products of Geomatrix and the certification obtained by Geomatrix from NSF, such allegations being set forth in, at least, Paragraphs 155 through 157, 159 (a) and (b), 201 through 213, 246 through 247, 252, 253, 268, and 292 through 296.

425.   Defendants' false and/or misleading statements include, but are not limited to, the following: that NSF provides a fair and open process for standard-setting, that products certified under NSF/ANSI Standard 40 would have a superior market position, that NSF abides by the Standards Development Process and Antitrust Guide, that Treatment and Dispersal Systems did not fit under NSF/ANSI Standard 40, that Treatment and Dispersal Systems such as Geomatrix's wastewater treatment systems  did not meet the requirements of NSF/ANSI Standard 40 and are unable to reliably treat high strength wastewater, that Geomatrix and other manufacturers of Treatment and Dispersal Systems were to blame for delay in the standard-setting process, and that Treatment and Dispersal Systems would be excluded under NSF Standard 441 as set forth in, at least, Paragraphs 155 through 157, 159 (a) and (b), 201 through 213, 246 through 247, 252, 253, 268, and 292 through 296

426. Defendant has also published false and/or misleading statements of others, including but not limited to publication of such statements to state regulatory authorities who make decisions whether to allow installation of the products of Geomatrix in their states, with knowledge that the statements were false and/or misleading, such allegations being set forth in the preceding Paragraphs, including at least, Paragraphs 176, 177, 193 through 195, 265, 273, and 292 through 296.

427. Defendant either knew its representations and the statements of others were false or made its representations and published the false and/or misleading statements of others negligently and recklessly without knowledge of their truth with the intent to deceive and mislead Geomatrix and to induce Geomatrix to take actions that would prevent Geomatrix from entering the marketplace and competing and/or refrain from taking actions that would have allowed it to enter the marketplace and compete.

428. Geomatrix reasonably and justifiably relied on Defendant's false representations to its detriment, including by participating in NSF's standard-setting process and providing NSF with information regarding Geomatrix's wastewater treatment systems.

429. Defendant also failed to disclose material information to Geomatrix regarding the nature, quality, and characteristics of NSF's services, such allegations being set forth in the preceding Paragraphs.

430.   Among other things, Defendant failed to disclose that its process for standard-setting was not fair and open, that products certified under NSF/ANSI Standard 40 would not have a superior market position, and that NSF does not abide by the Standards Development Process and Antitrust Guide.

431.   Defendant had a duty to disclose the material information to Geomatrix by virtue of, among other things, NSF's position as a marketplace gatekeeper, setting quality standards for and certifying products sold in the water and wastewater management industries that are incorporated by many states into statutes, codes, regulations, or mandatory technical guidance standards such that the standards operate as barriers to entry in such states.

432.   Defendant failed to disclose the material information described with the intent to deceive and mislead Geomatrix and to induce Geomatrix to take actions that would prevent Geomatrix from entering the marketplace and competing and/or refrain from taking actions that would have allowed it to enter the marketplace and compete.

433.   Defendant's failure to disclose the material information was misleading to Geomatrix because, among other things, its disclosure would have revealed to Geomatrix that Defendants were engaged in an effort to prevent Geomatrix from entering the marketplace and competing.

434.   Geomatrix reasonably and justifiably relied on Defendant's failure to disclose the material information to Geomatrix's detriment, including by taking actions that would prevent Geomatrix from entering the marketplace and competing and/or refrain from taking actions that would have allowed it to enter the marketplace and compete.

435.   As a direct and proximate result of Defendant's false and/or misleading statements, its publication of the false and/or misleading statements of others, and its failure to disclose material information, Geomatrix has been damaged and irreparably harmed, continues to suffer substantial damages and irreparable injury, and is entitled to an injunction and monetary relief.

## COUNT IX
## INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
### (AGAINST ALL DEFENDANTS)

436.   Geomatrix realleges the preceding Paragraphs as if fully set forth herein.

437.   Geomatrix had a reasonable business expectancy of obtaining business from customers in states that have adopted NSF/ANSI Standard 40 by statute or code. These customers were interested in Geomatrix's products and services as a source for their wastewater treatment and management needs. Given the expressions of interest, Geomatrix's sales efforts with these customers, Geomatrix's superior product offerings, Geomatrix's high consumer satisfaction, and the fact that

Geomatrix's products are alternatives to Contained Systems—NSF's primary customers—there is a high likelihood that Geomatrix would have obtained substantial business from these prospective customers but for NSF's interference, and, at the very least, a reasonable likelihood that Geomatrix would have established ongoing relationships with these customers.

438.   Defendants are aware of these relationships and expectancies.

439.   Defendants knowingly, willfully, and wrongfully interfered with Geomatrix's prospective economic relationship with such customers without privilege or justification through the acts described above. Defendants' wrongful conduct consisted of anticompetitive and disparaging statements made without evidence that resulted in interference with Geomatrix's prospective customers.

440.   Defendants' actions as described above constitute unlawful conduct. NSF has acted anticompetitively, improperly, and unethically. Defendants' anticompetitive conduct was malicious, unjustified, and improper.

441.   Defendants' intentional and improper interference has damaged Geomatrix.

442.   Defendants' actions, as described above, have also seriously harmed Geomatrix's reputation and goodwill and have thereby substantially interfered with Geomatrix's expectancies and business relationships.

443.   As a direct and proximate result of Defendants' actions, Geomatrix has been damaged and irreparable harm, continues to suffer substantial damages and irreparable injury, and is entitled to an injunction and monetary relief.

## COUNT X
## PROMISSORY ESTOPPEL - ANTITRUST GUIDE
### (AGAINST NSF INTERNATIONAL)

444.   Geomatrix realleges the preceding Paragraphs as if fully set forth.

445.   Defendant drafted and published its Antitrust Guide and invokes the provisions therein before meetings of the Joint Committee and HSW Task Group.

446.   Defendant and participants at these meetings are obliged to follow the provisions of the Antitrust Guide in order to participate in these meetings.

447.   Defendant's failure to abide by or enforce the Antitrust Guide constitutes of a breach of its obligations.

448.   Defendant has breached, or allowed others to breach, at least the following provisions of the Antitrust Guide:

a. C.1.(e) No collective action should be taken by meeting participants which might deny to a competitor (whether or not a participant in the NSF meeting) access to important information without prior consultation with NSF management or legal counsel.

b. C.2.(a) Standards programs must not be used as devices to fix prices, reduce output, boycott competitors, or otherwise lessen competition. Standard setting activities may raise antitrust concerns when competitors are required to share competitive information with each other.

c. C.2.(b) Where possible, development of performance standards should be favored over specification or design standards that might limit variety or quality. Standard setting activities may raise antitrust concerns if they prevent innovation.

d. C.2.(c) Standards should be kept current through periodic review and updating, in order to reflect changing technology.

e. C.2.(d) Affected parties should be allowed the participate in the formulation of standards in a meaningful manner.

f. C.2.(e) Standards should not limit the number and type of products, except for safety reasons. Standard setting activities may raise antitrust concern if they are intended to preclude the use of another competitor's product.

g. C.2.(i) All listing, de-listing, and certification decisions ought to be the exclusive, unilateral province of NSF.

449. By publishing and continually referencing its Antitrust Guide, Defendant promised Geomatrix that it would abide by and enforce the Antitrust Guide.

450. Defendant should have expected that its promise would induce reliance by Geomatrix and that Geomatrix would change its position in reliance on Defendant's promise.

451. Geomatrix had a reasonable expectation that Defendant would follow its Antitrust Guide in promulgation of NSF standards and operation of the Joint Committee and HSW Task Group.

452.   Geomatrix relied on Defendant's promise and representations by the conduct alleged herein and has been injured by changing its position in reliance on Defendant's promises.

453.   Injustice to Geomatrix can be avoided only by enforcing Defendant's promise.

454.   As a direct and proximate cause of Defendant's actions, Geomatrix has been damaged and irreparable harm, continues to suffer substantial damages and irreparable injury, and is entitled to an injunction and monetary relief.

**COUNT XI**
**PROMISSORY ESTOPPEL – STANDARDS DEVELOPMENT POLICY**
**(AGAINST NSF INTERNATIONAL)**

455.   Geomatrix realleges the preceding Paragraphs as if fully set forth.

456.   Defendant drafted and published its Standards Development Policy and claims to abide by it in advertising.

457.   Defendant and participants at its meetings are obliged to follow the provisions of the Standards Development policy in the standard setting process.

458.   Defendant's failure to abide by and enforce the Standards Development Policy constitutes of a breach of its obligations.

459.   Defendant has breached at least the following provisions of the Standards Development Policy:

a.   2. Openness;

b.  3. Committee Structure;

c.  4. Membership;

d.  6. Communications;

e.  7. Meetings;

f.  8. Balloting; and

g.  13.  Commercial terms and conditions.

460.   By publishing and continually referencing its Standards Development Policy, Defendant promised Geomatrix that it would abide by the Standards Development Policy.

461.   Defendant should have expected that its promise would induce reliance by Geomatrix and that Geomatrix would change its position in reliance on Defendant's promise.

462.   Geomatrix had a reasonable expectation that Defendant would follow its Standards Development Policy in promulgation of NSF standards and operation of the Joint Committee and HSW Task Group.

463.   Geomatrix relied on Defendant's promise and representations by the conduct alleged herein and has been injured by changing its position in reliance on Defendant's promises.

464.   Injustice to Geomatrix can be avoided only by enforcing Defendant's promise.

465.   As a direct and proximate cause of Defendant's actions, Geomatrix has been damaged and irreparable harm, continues to suffer substantial damages and irreparable injury, and is entitled to an injunction and monetary relief.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff, Geomatrix, LLC, respectfully requests the following relief:

A. A judgement that Defendants are liable to Geomatrix for the violations of antitrust law alleged by Plaintiff;

B. A judgement that Defendants are liable to Geomatrix for unfair competition under 11 U.S.C § 1125;

C. A judgement that Defendants are liable to Geomatrix for common law unfair competition;

D. A judgement that Defendants are liable to Geomatrix for violations of Michigan's Consumer Protection Act;

E. A judgement that Defendants are liable to Geomatrix for defamation, injurious falsehood, and product disparagement;

F. A judgement that Defendant NSF International is liable to Geomatrix for fraud and misrepresentation;

G. A judgement that Defendants are liable to Geomatrix for interference with prospective economic advantage;

H. A judgement that Defendant NSF International is liable to Geomatrix for violation of its Antitrust Guide under the doctrine of promissory estoppel;

I. A judgement that Defendant NSF International is liable to Geomatrix for violation of its Standards Development Policy under the doctrine of promissory estoppel;

J. An award of damages as a result of the foregoing, including but not limited to damage control expenses;

K. An injunction preventing Defendants from engaging in standards-setting activities related to onsite wastewater technology;

L. An injunction preventing Defendants from engaging in all standards-setting activities that improperly discriminate against certain products, including Treatment and Dispersal Systems, and other innovative technologies, or otherwise violate NSF's Antitrust Guide or antitrust law;

M. An injunction preventing Defendants from making and/or publishing false and/or misleading statements regarding Geomatrix and/or its products;

N. An award of such actual damages, trebled, as Geomatrix proves itself to have sustained and the jury shall find;

O. An award of such additional damages to which it may be entitled, including but not limited to exemplary damages, as the jury shall find appropriate for Defendants' interference with Geomatrix prospective business advantage;

P. An award of such additional damages to which it may be entitled, including but not limited to exemplary damages, as the jury shall find appropriate for Defendant's publication of false and misleading statements about itself and Geomatrix's products;

Q. An award of its costs of suit, including its reasonable attorneys' fees, as provided by 15 U.S.C. §§ 15, 26 and/or MCL § 445.911;

R. A judgement that this case is exceptional and an award to Geomatrix its costs of suit, including its reasonable attorneys' fees, as provided by 15 U.S.C. § 1117; and

S. An award of such other and further relief to which Geomatrix may be entitled and to which the Court finds to be just and appropriate.

## JURY DEMAND

Geomatrix, LLC demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Respectfully submitted,

**THE MILLER LAW FIRM, P.C.**

By: */s/ Kevin F. O'Shea*
E. Powell Miller (P39487)
Kevin F. O'Shea (P40586)
950 W. University Dr., Suite 300
Rochester, Michigan 48307
(248) 841-2200
epm@millerlawpc.com
kfo@millerlawpc.com

*Attorneys for Plaintiff*

Dated: December 18, 2020