**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

_____

GEOMATRIX, LLC,

                Plaintiff,

v.                                           Case No. 20-13331

NSF INTERNATIONAL,
BIOMICROBICS, INC.,
HOOT SYSTEMS, LLC,
and JAMES BELL,

                Defendants.
_____/

**OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS[1]**

      Plaintiff Geomatrix, LLC has filed an extensive complaint alleging that

Defendants colluded to restrain competition in violation of the Sherman Act and

engaged in unfair competition in the market for "onsite wastewater treatment systems,"

colloquially referred to as septic systems. (ECF No. 24.) Plaintiff also asserts a number

of related claims under Michigan law. Before the court is Defendants' joint motion to

dismiss this action in its entirety pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6). The

court has reviewed the record and does not find a hearing to be necessary. E.D. Mich.

LR 7.1(f)(2). For the reasons provided below, the court will grant Defendants' motions

(ECF Nos. 30, 31), and dismiss Plaintiff's Amended Complaint in its entirety.

---

[1] This order vacates and supplants an earlier version which was entered in error.  This
version corrects a minor docketing issue.

## I.  BACKGROUND[2]

Plaintiff Geomatix is a manufacturer and supplier of onsite wastewater treatment and dispersal products in the commercial and residential markets. Defendants BioMicrobics, Inc. and Hoot Systems, LLC are competitors that also manufacture onsite wastewater systems.

Defendant NSF International, based in Ann Arbor, Michigan, is a non-profit organization accredited by the American National Standards Institute ("ANSI") to set quality standards for several industries and certifies many of the onsite wastewater products brought into commerce. While NSF is not a governmental organization, many of NSF's standards are adopted into federal and state laws. NSF standards are developed through a voluntary consensus process, and it has long developed standards for onsite wastewater treatment. NSF's wastewater standards are created and overseen by its "Joint Committee on Wastewater Technology," and both NSF employees and employees of product manufacturers sit on the committee.

Defendant James Bell, an employee of Defendant BioMicrobics, served as Vice-Chair of the Joint Committee and as chairman of the High-Strength Wastewater Task Group—a subcommittee charged with the development of a new standard for high-strength wastewater. Plaintiff alleges that "Bell essentially ran the Wastewater Technology standard-setting process on behalf of NSF between 2010 and 2020." (ECF No. 24, PageID.435.)

---

[2]  Facts are taken from Plaintiff's Amended Complaint (ECF No. 24) unless otherwise noted.

To understand the allegations in the complaint, a brief overview of onsite wastewater technology is required. Traditional, residential and commercial onsite wastewater systems are comprised of a septic tank and a drain field or "leaching" system, which is installed in native soil or sand. The septic tank separates water constituents by density; septic tank effluent then runs to a drain field where it contacts soil or sand, where microorganisms are present to provide treatment before dispersing treated water back into the environment. However, due to increasing environmental regulations and other constraints, customers are increasingly turning to more advanced technologies to ensure sewage is thoroughly treated before it reenters the water table.

According to Plaintiff, customers who need more advanced treatment systems generally have two main opinions. The first is an "aerobic treatment unit" known as an "ATU," or "Contained System," which generally consists of a tank of water with aeration devices or various saturated and unsaturated media that more thoroughly treats the water before it is released into the drain field. In other words, a contained system works more like a mini-municipal wastewater treatment plant, cleaning the water within a controlled environment before its release. According to Plaintiff, the majority of its competitors produce contained systems.

The second option for consumers is "Treatment and Dispersal" systems, also known as "Open Bottom" systems, which operate much more like a traditional septic system, only in place of a traditional drain field. They employ more advanced dispersal devices which allow in oxygen (thereby increasing the growth of microorganisms) and provide additional filtration media allowing the effluent to be effectively cleaned as it leaches back into the ground. Plaintiff largely produces treatment and disposal systems,

including its "GeoMat," "GST," and "SoilAir" systems. Collectively, Plaintiff's offerings cover a wide swath of the onsite treatment market, from residential systems to "high-strength" commercial applications for businesses like restaurants.

Plaintiff alleges that its treatment and disposal systems are both cheaper to install and operate than contained systems. But much like the late 19th-century "war of the currents,"[3] which pitted Thomas Edison's direct current (DC) against the more efficient alternating current (AC) standard advanced by his upstart competitors George Westinghouse and Nikola Tesla, Plaintiff asserts that some of its competitors have resorted to spreading misinformation about safety and efficacy of treatment and disposal technology to preserve market share for their inferior products. This being the 21st century, however, instead of resorting to absurd public displays to shape popular opinion, Plaintiff avers that its revivals engaged in a stealth campaign, enlisting an obscure standard-setting organization (here, NSF) to convince state regulators to effectively bar its cheaper products from the market.

Plaintiff's allegations are factually complex, but the gist is, beginning in 2017, that "BioMicrobics, Mr. Bell, the other Co-conspirators, and NSF entered into a conspiracy to further the Corporate Defendants' efforts to exclude competition by Treatment and Dispersal Systems through the standard setting process." (ECF No. 24, PageID.440.) Each manufacturer pays NSF annually to renew the "listing" for each wastewater products it has certified under its standards. So, Plaintiff theorizes that NSF participated in the conspiracy to protect its own revenue since the majority of the products it certified

---

[3]    *See* Allison Lantero, *The War of the Currents: AC vs. DC Power*, Dep't of Energy (Nov. 18, 2014), https://www.energy.gov/articles/war-currents-ac-vs-dc-power.

are contained systems. (ECF No. 24, PageID.444 ("There are approximately 67 Contained Systems and less than five Treatment and Dispersal Systems that have been certified by NSF Standard 40.").) To effectuate this scheme, Plaintiff asserts that Defendants conspired to have the Wastewater Joint Committee (the NSF committee overseeing wastewater certification) appoint Defendant Bell and other conspirators to key sub-committees or "Task Groups" to collectively rewrite and propose new NSF standards.

This alleged conspiracy utilized multiple means to achieve its objectives. First, Plaintiff alleges that Defendants "disparage[d]" its GeoMat product, a Treatment and Dispersal System that has already been certified under the existing rules of NSF Standard 40— which applies to "wastewater treatment systems having rated treatment capacities between . . . (400 gal/day) and . . . (1500 gal/day)." (*Id.*, PageID. 405, 427.) In doing so, they allegedly  (1) raised concerns about the efficacy of Treatment and Dispersal Systems at each Joint Committee meeting, (2) adopted the disparaging term "uncontained" system to refer to its products, (3) allowed working grounds to "dominate" committees, and (4) published an issue-paper authored by an NSF employee "suggesting that Treatment and Dispersal Systems should be removed from NSF Standard 40 and placed in a yet to be created standard." (*Id.*, PageID.428.) According to Plaintiff, "NSF's publication of these false and defamatory statements by its participants began the process of eroding confidence in Treatment and Dispersal Systems by state regulatory authorities." Plaintiff states NSF published issue papers and other information critical of its products to state regulators around the country. Because "NSF conspired with the Co-conspirators to raise questions of the legitimacy of

the certifications granted to Treatment and Dispersal Systems," Plaintiff asserts that it was "unable to receive approvals in most states" for GeoMat in states that had adopted statutes and regulations "requiring NSF Standard 40 certification" for onsite wastewater systems. (*Id.*, PageID.432.)

Second, Plaintiff alleges that the conspirators worked to ensure a new NSF standard for certifying high-strength wastewater ("Standard 441") would not allow for the inclusion of treatment and disposal systems. While NSF has not officially adopted a version of Standard 441, Plaintiff asserts that Defendants have taken steps, including failing to fund a study of high-strength treatment and disposal systems, and circulating a "straw poll to the HSW Task Group" about excluding the products from the final version of the standard. (*Id.*, PageID.474.)

Plaintiff alleges that its business was severely impacted by Defendants' conspiracy and seeks both damages and injunctive relief. Plaintiff brings a total of eleven claims against Defendants on both federal law, state statute, and Michigan common law. Plaintiff asserts this court has jurisdiction over this action on both federal question and diversity grounds. *See* 28 U.S.C. §§ 1331, 1332, 1367. Defendants, through their two motions to dismiss (ECF Nos. 30, 31), collectively move to dismiss Plaintiff's Amended Complaint in its entirety.

## II.  STANDARD

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of a complaint for failure to state a claim upon which relief may be granted. Under the Rule, the court construes the complaint in the light most favorable to plaintiff and accepts all well-pleaded factual allegations as true. *Barber v. Miller*, 809 F.3d 840, 843 (6th Cir. 2015).

6

Federal Rule of Civil Procedure 8 requires a plaintiff to present in the complaint "a short and plain statement of the claim showing that the pleader is entitled to relief." A complaint must provide sufficient facts to "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that defendant acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). "To state a valid claim, a complaint must contain either direct or inferential allegations respecting all the material elements to sustain recovery under some viable legal theory." *Boland v. Holder*, 682 F.3d 531, 534 (6th Cir. 2012) (emphasis removed) (citing *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007)). Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

In reviewing a motion to dismiss, the court may consider "any exhibits attached [to the complaint], public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the

Complaint and are central to the claims contained therein." *Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008).

The court must also dismiss claims over which it lacks subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). Motions to dismiss under Rule 12(b)(1) attack jurisdiction in two different ways. A facial attack questions the sufficiency of the pleading. *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007). If the allegations, when accepted as true, establish a federal claim, then the district court has jurisdiction. *Id*. The second type of jurisdiction challenge under Rule 12(b)(1) is a factual attack. The court must evaluate conflicting evidence and arrive at the factual predicate that subject matter jurisdiction does or does not exist. *Id*. "In the case of a factual attack, a court has broad discretion with respect to what evidence to consider in deciding whether subject matter jurisdiction exists, including evidence outside of the pleadings, and has the power to weigh the evidence and determine the effect of that evidence on the court's authority to hear the case." *Cartwright v. Garner*, 751 F.3d 752, 759–60 (6th Cir. 2014). In a factual attack, the plaintiff bears the burden of establishing that subject matter jurisdiction exists. *Id.*

## III. DISCUSSION

### A.  Antitrust Claim

To state a claim under Section 1 of the Sherman Act, 15 U.S.C. § 1, a plaintiff must allege facts taken as true, showing that defendants (1) entered a combination or conspiracy, (2) that harmed competition, and (3) that his injury flowed from this anticompetitive harm. *In re S.E. Milk Antitrust Litig.*, 739 F.3d 262, 269-70 (6th Cir. 2014).

In Count I, Plaintiff asserts all Defendants violated Section 1 when, beginning in September 2017, they collectively "conspire[d] to restrain competition in the relevant markets for onsite wastewater treatment systems." (ECF No. 24, PageID.511 ¶382.) Specifically, Plaintiff contends that Defendants (1) "attempt[ed] [to] exclu[de] Treatment and Dispersal Systems" from future versions of NSF Standards 40 and 441, and (2) "devalue[ed]" existing "NSF [Standard 40] certifications of Treatment and Dispersal Technologies" through a coordinated campaign of "disparagement" that "was not and could not have been the product of coincidence or mere parallel conduct." (*Id.*, PageID.512 ¶383.) Plaintiff explains that "the majority of states have incorporated NSF standards into their codes," so if future versions of the "NSF standards for onsite wastewater treatment do not permit testing of Treatment and Dispersal technologies, companies like Geomatrix will be eliminated from the onsite wastewater treatment markets." (*Id.,* PageID.393, 514.) Further, the Amended Complaint alleges that the Defendants' disparagement of treatment and disposal technologies during NSF committee meetings and in published documents "acted to block Geomatrix from obtaining approvals in the majority of states that have adopted [the existing version] NSF Standard 40." (*See id.*, PageID.432, 515 ("[A]s NSF conspired with the Co-conspirators to raise questions of the legitimacy of the certifications [already] granted to [residential] Treatment and Dispersal Systems, [Plaintiff's products] were unable to receive approvals in most states.").)

Defendants' briefings assert multiple arguments supporting dismissal of Plaintiff's Section 1 Sherman Act claim. In the main, Defendants argue that Plaintiff lacks standing to assert an antitrust claim for two interrelated reasons. First, Defendants state that

"Geomatrix is challenging *potential* future testing criteria that may never be implemented—whether under the existing Standard 40 or *potential* Standard 441" that is too contingent on future events to be ripe for consideration. (ECF No.40, PageID.590.) Second, Defendants argue that Plaintiff "has mooted the claims it raises against NSF here because its purported 'injury in fact' [was] 'self-inflicted'" when Plaintiff "intentionally withdrew from its existing Standard 40 certification" in 2018 and stopped paying annual fees to NSF to maintain such certifications. (*Id.*, PageID.593.)

Alternatively, Defendants argue that even if Plaintiff has Article III standing to assert its antitrust claim, the alleged claim is still barred by *Noerr-Pennington* doctrine, which immunizes attempts at petitioning the government for relief from antitrust liability on First Amendment grounds. (*Id.*, PageID.95-96.) Because the "First Amended Complaint confirms" that Plaintiff's ability to sell their treatment and disposal systems in a given state is dependent upon state regulations and their "'preceptive codes or rules,'" Defendants reason that Plaintiff's "alleged 'injury' is traceable to the governmental action, *not* any NSF certification decisions." (*Id.*, PageID.596.) And Defendants also argue that Plaintiff's antitrust claim is barred by the statute of limitations, since at least some of the alleged anticompetitive conduct began years ago. (*See id.*, PageID.598 ("Geomatrix's allegations confirm that its antitrust claim accrued over five years ago.").)

When "Defendants move for dismissal on numerous grounds, [the] court must first address standing issues" since "[s]ubject matter jurisdiction is a 'threshold matter' which a court must determine before proceeding to the merits." *Chennette v. Porch.com, Inc.*, 484 F. Supp. 3d 912, 913 (D. Idaho 2020) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998)); *see also J.P. v. Taft,* No. 2:04-CV-

692, 2005 WL 2405993, at *8 (S.D. Ohio Sept. 29, 2005) ("When a claim has been rendered moot or a plaintiff lacks standing, a federal court is deprived of jurisdiction to hear the case.") (citing *Baker v. Carr*, 369 U.S. 186, 204 (1962); *Church of Scientology of California v. United States*, 506 U.S. 9, 12 (1992)).

To establish Article III standing, a plaintiff must show "(1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likel[ihood]' that the injury 'will be redressed by a favorable decision.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157-58 (2014) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). An alleged injury cannot "result[] from the independent action of some third party not before the court." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976). And a claim is not "amenable to . . . the judicial process," *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998), "when it is filed too early (making it unripe)" or "filed too late (making it moot)," *Warshak v. United States*, 532 F.3d 521, 525 (6th Cir. 2008) (en banc).

Ripeness asks two questions. First: "Does the claim arise in a concrete factual context and concern a dispute that is likely to come to pass?" *OverDrive Inc. v. Open E-Book F.*, 986 F.3d 954, 957-58 (6th Cir. 2021) (quotations and alternations omitted). "A claim is not ripe if it turns on 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Id.* at 958 (quoting *Trump v. New York*, —— U.S. ——, 141 S. Ct. 530, 535 (2020) (per curiam)). Second: "What is 'the hardship to the parties of withholding court consideration'? *Id.* (quoting *Warshak v. United States*, 532 F.3d 521, 525 (6th Cir. 2008) (en banc)). If the answer to either of these questions is "no," the claim is not judiciable. *Id.*

Likewise, "a plaintiff cannot create an injury by taking precautionary measures against a speculative fear." *Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 865 (6th Cir. 2020). Standing requires that an injury that "is 'fairly ... trace[able] to the challenged action of the defendant,' not some 'independent action of some third party.'" *Garland v. Orlans, PC*, 999 F.3d 432, 441 (6th Cir. 2021) (quoting *Lujan*, 504 U.S. at 560) (citations omitted). An injury that is self-inflicted cannot establish standing under Article III because "[a] self-inflicted injury, by definition, is not traceable to anyone but the plaintiff." *Buchholz*, 946 F.3d at 866.

To start, Defendants have made a strong argument that Plaintiff cannot base its claims on alleged damages it *might* incur *if* future versions of NSF Standards 40 & 441 exclude Treatment and Dispersal systems, like those manufactured by Plaintiff. Plaintiff's complaint alleges that NSF standard-setting sub-committees—whose membership includes representatives of Plaintiff's competitors—have discussed, debated, and published "issue papers" regarding the prospect of subjecting treatment and disposal systems to disparate rules. However, the court finds that any injuries that *could* flow from the official adoption of the modified NFS standards are not currently ripe for adjudication. None of the facts alleged in the complaint indicate that a unified proposal to change NFS's onsite wastewater treatment standards exists. (*See, e.g.*, ECF No. 24, PageID.484 ("The proposed second [poll] straw ballot [regarding how to proceed with developing NSF Standard 441] has not been circulated publicly").) There is no indication that the new *potential* standards' implementation is "certainly impending." *See Volvo N. Am. Corp. v. Men's Int'l Pro. Tennis Council*, 857 F.2d 55, 63 (2d Cir. 1988). Nor have such proposed standards "been finalized and submitted for the

ballot." *See Plant Oil Powered Diesel Fuel Sys., Inc. v. ExxonMobil Corp.*, 801 F. Supp. 2d 1163, 1183 (D.N.M. 2011). Consequently, the court concludes that any potential injuries flowing from these *possible* new NSF standards *if* they are adopted are not yet ripe for review. *See OverDrive,* 986 F.3d at 958 ("*If* and *when* do not a ripe controversy make."). "In the event that these rules are adopted, [Plaintiff], of course, [is] free to reinstitute [its] challenges" on such grounds. *See Volvo N. Am. Corp.*, 857 F.2d at 65 (citing Wright, Miller & Cooper § 3532.1, at 137).

But, as Plaintiff notes in its response brief, its Amended Complaint *also* alleges that Defendant's actions "have already caused significant damage to" Plaintiff by "devalu[ing]" the existing NSF Standard 40 certification it has obtained for its GeoMat wastewater systems. (*See* ECF No. 35, PageID.788.) For purposes of a standing analysis, this "disparagement" injury is distinct from the other injuries alleged by Plaintiff in its complaint because the injury is alleged to have already occurred, so it cannot suffer from the same ripeness concerns as the potential injuries discussed above. (*See, e.g.*, ECF No. 24, PageID.432 ¶ 153 ("[A]s NSF conspired with the Co-conspirators to raise questions of the legitimacy of the certifications granted to Treatment and Dispersal Systems, they were unable to receive approvals in most states. . . . Geomatrix has experienced increasing difficulty in obtaining regulatory approval for GeoMat from state regulatory agencies that have adopted. . . Standard 40 due to NSF and its Co-conspirators' actions to exclude [T&D systems] from the market.").) However, a ripe injury alone does not make a cognizable claim. Even assuming that Defendants conspired to "devalue" the existing NSF Standard 40 certifications through a coordinated campaign of "disparagement," thereby discouraging regulatory approval of

GeoMat systems, the court finds that such conduct is protected by the *Noerr-Pennington* doctrine. Consequently, Plaintiff has failed to allege any facts that can form the basis of a viable antitrust claim.

The *Noerr–Pennington* doctrine—named for the two Supreme Court cases from which it originated—protects parties from antitrust liability for organizing to exercise their First Amendment right to "petition the Government for a redress of grievances." U.S. Const. amend. I; *Knology, Inc. v. Insight Comms. Co.*, 393 F.3d 656, 658 (6th Cir. 2004). In *Noerr*, a group of railroad companies lobbied for legislation that would impede the ability of trucking companies to compete for their freight business. *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 129 (1961). The trucking companies sued under the Sherman Act, but the Supreme Court held that "the Sherman Act does not prohibit. . . persons from associating. . . in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly." *Id.* at 136-37. "The Court reasoned that when an antitrust-plaintiff's injury is proximately caused by the government, the government's action constitutes a supervening cause that breaks the chain of causation between an antitrust-defendant's action and any anticompetitive effect." *Massachusetts Sch. of L. at Andover, Inc. v. Am. Bar Ass'n*, 937 F. Supp. 435, 439 (E.D. Pa. 1996), *aff'd*, 107 F.3d 1026 (3d Cir. 1997).

In *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508 (1972)*,* the Court clarified that the "right to petition" protection delineated in *Noerr* generally extends to administrative and judicial proceedings, as well as to efforts to influence legislative and executive action. "Thus, the *Noerr–Pennington* Doctrine prevents liability for

conduct aimed at influencing decision-making by the government." *Racetech, LLC v. Kentucky Downs, LLC*, 169 F. Supp. 3d 709, 715 (W.D. Ky. 2016). (citations omitted). And "the bad intent or anticompetitive motivation of private actors seeking government action is irrelevant to the application of *Noerr–Pennington*." *See VIBO Corp. v. Conway*, 669 F.3d 675, 684 (6th Cir. 2012) (citation omitted); *see also Schachar v. Am. Acad. of Ophthalmology, Inc.,* 870 F.2d 397, 400 (7th Cir. 1989) ("If [a professional association's] statements should be false or misleading or incomplete or just plain mistaken, the remedy is not antitrust litigation but more speech—the marketplace of ideas."). To determine whether the immunity applies, a court must ask:

> (1) what is the harm that the plaintiff alleges it suffered?; and, (2) is that harm the proximate result of governmental action or private conduct? If the harm results from governmental action, no antitrust liability will lie. Moreover, if the plaintiff alleges two harms, one the proximate result of private conduct and the other the result of governmental action, no liability will attach to the private conduct if the harm associated with that conduct is merely incidental to the harm associated with the governmental action.

*Massachusetts Sch. of L. at Andover*, 937 F. Supp. at 439-40 (citing *Noerr*, 365 U.S. at 143).

Here, Defendants argue that the present case is analogous to *Massachusetts Sch. of L. at Andover* where *Noerr* immunity applied. (*See* ECF No. 30, PageID.596.) The court largely agrees. In *Massachusetts Sch. of L*, the district court rejected an unaccredited law school's argument that it had suffered an antitrust injury because the American Bar Association refused to accredit the school, which in turn barred its students from sitting for the bar exam in a number of states. *Massachusetts Sch. of L. at Andover*, 107 F.3d at 1032 (citing 937 F. Supp. at 441-46). Instead, "[t]he court held [the plaintiff] did not suffer a cognizable antitrust injury; any disadvantage it incurred was attributable to the decision by the individual states to preclude graduates of

15

unaccredited schools from taking bar examinations, and such injury cannot be the basis for antitrust liability under [*Noerr*]." *Id.* The court noted, "to the extent that the unaccredited status creates a stigma which injures [plaintiff], *Noerr* precludes recovery for the injury because it is 'incidental to the primary, protected injury resulting from governmental decisions to preclude [the law school's] graduates from taking certain bar examinations.'" *Id.* (quoting *Noerr*, 365 U.S. at 442). The Third Circuit affirmed this holding. *See id.*

In its response brief, Plaintiff relies almost exclusively on *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492 (1988), a case where the Supreme Court found that *Noerr* immunity did not shield the defendants' anticompetitive conduct within the National Fire Protection Association from antitrust scrutiny. (*See* ECF No. 35, PageID.791-92.) In *Massachusetts Sch. of L. at Andover*, the Third Circuit summarized *Allied Tube* as follows:

> In *Allied Tube*, a producer of electrical conduit sought approval of its product from the National Fire Protection Association for inclusion of the product in the Association's National Electrical Code. A substantial number of state and local governments adopted the code virtually without change. To be included in the code, all that was required was a majority vote of the members present at the annual meeting of the Association. To prevent approval of the electrical conduit at question in the case, competitors of the producer stacked the annual meeting with persons who pledged to vote against approval. On the facts in *Allied Tube* the Court held that *the code developed by the defendants had a force in the marketplace independent of any government adoption (or petitioning for such adoption) in that there was a conspiracy among manufacturers, distributors, and consumers not to trade in products not approved by the code*. Further, the Court held that the application of *Noerr* immunity depends 'on the context and nature of the ... activity,' and found the challenged conduct to be 'the type of commercial activity that has traditionally had its validity determined by the antitrust laws.' That was so, the Court reasoned, because the activity of which the producer complained involved the dubious commercial practices of economically

interested actors that had an impact on the political process; it was not political activity that had an impact on commerce.

107 F.3d at 1037 (citing 486 U.S. at 503-05, 507) (emphasis added and citations omitted).

*Allied Tube* might be more squarely on point in the present case if NSF was alleged to have already enacted new discriminatory versions of its onsite wastewater treatment standards, but again that is not the situation here, at least not currently. Rather, the court has already found that the only injury potentially ripe for adjudication is the alleged "devalue[ation]" of the NSF Standard 40 certification that Plaintiff had already obtained for its GeoMat wastewater systems. (*See* ECF No. 35, PageID.788.) The allegations supporting this injury explicitly assert that Defendants colluded to devalue the existing NSF certifications through a public relation campaign specifically targeted at *state regulatory agencies* and their officials:

- NSF has immense power in the wastewater industry. NSF markets its standards, including NSF/ANSI Standard 40, to federal and state regulatory agencies and lobbies such agencies to include its standards in state regulatory codes and statutes. (ECF No. 24, PageID.424 ¶ 139.)

- State regulatory authorities routinely receive communications from NSF related to the content of its standards directly from NSF. (*Id.*, PageID. 425 ¶ 141.)

- [F]ollowing certification of GeoMat under NSF/ANSI Standard 40, the Co-conspirators . . . and NSF employees [and] agents. . . began to question the validity of the NSF/ANSI Standard 40 certifications of GeoMat and other Treatment and Dispersal Systems at NSF meetings. NSF, on its own and through the Joint Committee and Task Groups, disseminated this information by publishing it to state regulatory agencies. (*Id.*, PageID.427 ¶ 145.)

- Mr. Williams presented the Issue Paper. . . using NSF's influence to create uncertainty regarding Treatment and Dispersal Systems in the minds of regulatory authorities with the Co-conspirators. (*Id.*, PageID.429 ¶ 149.)

- NSF published Mr. Williams' Issue Paper to numerous state and local regulatory authorities and experts, including [those in] . . . Massachusetts[,] Florida[,] Alberta[,] Indiana[,] North Carolina [,] Delaware [,] Delaware[,] Nova Scotia[,] Virginia[,] Washington[,] New Brunswick [,] Delaware[,] Texas [,] California. (*Id,* PageID.532 ¶458.)

Based on these allegations, it is clear that Defendants' conduct constitutes petitioning as "such activity is no more indirect than the public relations campaign held to be petitioning in *Neorr*." [4] *See Massachusetts Sch. of L. at Andover,* 107 F.3d at 1038. The present case is factually distinguishable from the *Allied Tube* decision, where the Court found that lobbying government officials was not the only significant means through which the defendants' anticompetitive actions restrained competition. In fact, the holding on which *Allied Tube* was expressly based was the assumption that the plaintiff in that case "'did not seek redress for any injury arising from the adoption of the [Code] by the various governments.'" *See* 486 U.S. at 498 n.2 (quoting 817 F.2d 938, 941, n.3 (1987)). Here, by contrast, the public relations campaign is alleged to have been specifically targeted at state officials who then made an independent decision to not authorize the use of GeoMat wastewater systems despite their official certification by

---

[4]     The court notes that *Noerr–Pennington* immunity is subject to a limited *sham* exception. It "encompasses situations in which persons use the governmental process—as opposed to the outcome of that process—as an anticompetitive weapon. . . . A 'sham' situation involves a defendant whose activities are not genuinely aimed at procuring favorable government action at all," as opposed to "one who genuinely seeks to achieve his governmental result, but does so through improper means." *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 380 (1991) (quotations omitted) (emphasis original). An example of sham conduct is "filing . . . frivolous objections to the license application of a competitor, with no expectation of achieving denial of the license but simply in order to impose expense and delay." *Id.* But in the present case, Plaintiff's complaint contains no allegations suggesting that the sham exception should apply. And "[c]ourts in the Sixth Circuit have routinely dismissed claims under. . . *Noerr-Pennington*" where the plaintiff did not adequately plead that the sham exception applied. *See Ashley Furniture Indus., Inc. v. Am. Signature, Inc.,* No. 2:11-cv-427, 2015 WL 12999664, at *4 (S.D. Ohio Mar. 12, 2015) (collecting cases).

NSF. The proximate cause of the harm alleged here is state agencies' independent decision regarding the approval of its products, not Defendants' false claims.[5] And, to the extent that Defendants' alleged petitioning influenced these state officials' independent decision-making process, *Noerr* clearly immunizes such speech. Therefore, the court concludes that "*Noerr* immunity is proper in this case because the [Defendants allegedly] engaged in petitioning activity, and [any] stigma injury which [Plaintiff] suffered was incidental to that activity." *See id.*

In sum, Plaintiff has failed to plead a plausible antitrust claim because it has alleged no viable injuries. First, to the extent Plaintiff claims it *may* be injured *if* NSF officially proposes and adopts new wastewater treatment standards that exclude Plaintiff's products, such an injury is not yet ripe for adjudication.[6] Second, the court finds Defendants' alleged disparaging public relations campaign, specifically targeted at discrediting Plaintiff's technology in the eyes of state regulators, is protected by the *Noerr–Pennington* immunity.

---

[5]     To be sure, the lack of proximate causation alone may be enough to undercut Plaintiff's antitrust claim. *See, e.g., Anesthesia Assocs. of Ann Arbor, PLLC v. Blue Cross Blue Shield of Michigan,* --- F.Supp.3d ---, No. 20-12916, 2022 WL 994658, at *9 (E.D. Mich. Mar. 31, 2022) (Berg, J.) (dismissing an antitrust claim "[b]ecause [plaintiff] has failed to plead facts that indicate its alleged injury was the result of [the defendant's] anticompetitive conduct, rather than some other consequence of [defendant]'s actions, the court cannot reasonably infer the existence of proximate cause"). The court provides a more through discussion of the proximate causation issues in Section III.B.

[6]     The court notes it is unclear if such a claim will ever be ripe for adjudication given that in 2018 Plaintiff stopped seeking or renewing NSF certifications.

## B.  Lanham Act Claims

Plaintiff next asserts that Defendants' alleged conduct violated Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) by engaging in false advertising. Plaintiff brings two claims under the Lanham Act, neither of which can survive a motion to dismiss.

Count II brings a claim against only Defendant NSF and alleges that NSF "made and/or published false and/or misleading claims" that "misrepresent the nature, quality, and/or characteristics of [NFS's] own services." (ECF No. 24, PageID.516, 19.) Some of the alleged misstatements include: deceptively marketing that "NSF provides a fair and open process for standards-setting;" falsely informing Plaintiff "that it abides by the Standards Development Process and Antitrust Guide;" "publishing an issue paper stating that Treatment and Dispersal Systems did not fit under NSF/ANSI Standard 40;" "[m]aking public statements that require NSF Standard 441 to incorporate all technologies and subsequently placing blame for the delay in the standard-setting process on Geomatrix." (*Id.*)

Count III brings a separate unfair competition claim against alleged co-conspirators Biomicrobics, James Bell, and Hoot Systems, alleging that Defendants used their roles in the standard setting process "to disparage and preclude Geomatrix products from the market." (ECF No. 24, PageID.516-22). The complaint lists a number of statements and alleges that Defendants "made and/or published false and/or misleading claims" since September 2017; Plaintiff claims these statements misrepresented "the nature" of their respective products. (*Id.*)

20

While the Lanham Act is generally thought of as governing trademark disputes, its text leads to wider applicability as it also creates a federal cause of action for unfair competition, including false advertising. Section 1125 (a) provides:

"(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a). The Supreme Court has noted that "Section 1125(a) thus creates two distinct bases of liability: false association, §1125(a)(1)(A), and false advertising, § 1125(a)(1)(B)." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 122 (2014). A key distinction between these two claims, and an apparent point of misunderstanding in the present action, is that a likelihood of confusion analysis is required only for a false association claim asserted under §1125(a)(1)(A). Such a claim "is typically brought in cases in which one party makes a false designation that is likely to cause confusion or to deceive a consumer as to the origin of that party's goods or services." *Serv. Jewelry Repair, Inc. v. Cumulus Broad., LLC*, 145 F. Supp. 3d 737, 745 n.4 (M.D. Tenn. 2015).

21

By contrast, "[t]o state a cause of action for false or misleading advertisement [or commercial disparagement] under 15 U.S.C. § 1125(a)(1)(B), a plaintiff must establish that: '1) the defendant has made false or misleading statements of fact concerning his own product or another's; 2) the statement actually or tends to deceive a substantial portion of the intended audience; 3) the statement is material in that it will likely influence the deceived consumer's purchasing decisions; 4) the advertisements were introduced into interstate commerce; and 5) there is some causal link between the challenged statements and harm to the plaintiff.'" *Champion Lab'ys, Inc. v. Parker-Hannifin Corp.*, 616 F. Supp. 2d 684, 692 (E.D. Mich. 2009) (quoting *American Council of Certified Podiatric Physicians and Surgeons v. American Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 613-614 (6th Cir.1999) (citations omitted)).

While Plaintiff's Amended Complaint does not provide precise labels for its Lanham Act claims, because Plaintiff does not allege confusion between competing products occurred, the court concludes that Plaintiff has asserted claims only under 15 U.S.C. § 1125(a)(1)(B).

In *Lexmark*, the Supreme Court clarified the analytical framework for deciding a party's standing to maintain a Lanham Act false advertising claim. 572 U.S. at 129. First, a court considering a false advertising claim must determine whether the plaintiff's "interests fall within the zone of interests protected by the law invoked." *Id.* (internal citations omitted). And although the zone of interests test is "not especially demanding," the plaintiff must still "allege an injury to a commercial interest in reputation or sales." *Id.* Moreover, certain types of claims are excluded:

> A customer who is hoodwinked into purchasing a disappointing product may well have an injury-in-fact cognizable under Article III, but he cannot

22

invoke the protection of the Lanham Act—a conclusion reached by every Circuit to consider the question. Even a business misled by a supplier into purchasing an inferior product is, like consumers generally, not under the Act's aegis.

*Id.* (internal citations omitted).

Second, a proximate cause requirement that must be satisfied for an injury to be cognizable under the Act. *Id.* at 132-33. The plaintiff must show proximate cause which imposes a more stringent test than Article III standing alone, that by contrast, "requires only that the plaintiff's injury be fairly traceable to the defendant's conduct." *Id.* at 134 n.6.

[A] plaintiff suing under § 1125(a) ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff.

*Id.* at 133-34. While the Court in *Lexmark* found a false advertising claim could survive a motion to dismiss in the "relatively unique [factual] circumstances" of the case, the Court cautioned that "'stretch[ing] proximate causation' 'beyond the first step'" of the casual chain was often inadvisable. *Id.* at 139-40 (quoting *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 271-72, (1992); *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 458-59 (2006)) ("[T]he reason for that general tendency is that there ordinarily is a 'discontinuity' between the injury to the direct victim and the injury to the indirect victim, so that the latter is not surely attributable to the former (and thus also to the defendant's conduct), but might instead have resulted from 'any number of [other] reasons'").

Here, both of Plaintiff's Lanham Act claims run aground on proximate cause requirement for statutory standing test laid out in *Lexmark*.[7] Each count ends with an

---

[7]     While Defendants do not raise this argument, the court also notes that Count II, which asserts an unfair competition claim against *only NSF*, also fails the "zone of

identical recitation that "[a]s a direct and proximate result of Defendants' [false and misleading claims], Geomatrix has been damaged." (ECF No. 24, PageID.519-22, ¶¶ 405, 415.) Such a description of the injury caused by Defendants' false advertisement/statements is clearly conclusory and insufficient to establish a viable claim. *See Iqbal*, 556 U.S. at 678.

But even reading Plaintiff's Amended Complaint liberally and assuming that Plaintiff is asserting that Defendants' false statements injured Plaintiff—by "rais[ing] questions [regarding the] of the legitimacy" about NSF's certification of GeoMat products—the court still finds no facts alleged are sufficient to establish the proximate cause required for a claim under § 1125(a).[8] (*See id.*, PageID.432 ¶ 153.) Put simply, "it is impossible to trace a straight line" from Defendants' alleged conspiracy to disparage GeoMat by questioning their effectiveness and environmental impact (the illegal conduct) to Plaintiff's inability to sell its GeoMat products in various states (the injury). *See Gen. Motors, LLC v. FCA US, LLC*, 44 F.4th 548, 560 (6th Cir. 2022). Plaintiff theorizes that Defendants' coordinated negative campaign caused state regulators to view the efficacy of GeoMat products with suspicion, thereby causing the regulators to

---

interests inquiry" delineated in *Lexmark*. Considering background facts alleged in the Amended Complaint, it is clear that Plaintiff has utilized NSF as supplier of testing and certification services. For instance, Plaintiff states that it was "compensate[ing] NSF. . . annually" for certification of its wastewater products based on false representations and advertising. (*See* ECF No. 24, PageID.444.) Therefore, Plaintiff's claim in Count II is most analogous to a complaint by a consumer who was "misled . . . into purchasing an inferior product" by false advertising, so "like consumers generally," it lacks statutory standing to assert § 1125(a) claim against NSF. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014).

[8]     To be clear, based on the court's holding in Section III.A—that *potential* injuries flowing from unadopted future version of the NSF certification standards are not currently ripe for adjudication under Article III— the court's § 1125(a) proximate cause analysis does not consider such *potential* injuries.

withhold approval. But it is undisputed that *actual cause* of Plaintiff's inability to sell its GeoMat products in an unspecified number of states was the independent decision of each state's environmental regulators not to approve the products for sale. Given the extenuated causal chain laid out in the complaint, it would be quite "difficult" to "ascertain the amount of. . . damages attributable to" Plaintiff's alleged disparagement, "as distinct from other, independent, factors." *See Anza*, 547 U.S. at 458 (quotation omitted). For instance, state regulators could have independently concluded that Plaintiff's GeoMat product poses environmental risks, the bureaucracy could simply be even "slow[er] to allow new technologies" than Plaintiff anticipated (*see* ECF No. 24, PageID.410), or it could be a combination of factors. In any event, it seems certain that each state's regulatory process is driven by a unique combination of internal and external variables that would make it impossible to determine if the cause is attributable to Defendants. Because Plaintiff has failed to provide a viable proximate causation theory sufficiently linking Defendants' purported unlawful activity under § 1125(a) to an alleged injury, the court concludes that both Counts II & III must be dismissed.[9]

---

[9] Defendants' briefings also argue that the *Noerr–Pennington* doctrine should apply to Plaintiff's claims under Section 43(a) of the Lanham Act. While the court tends to agree that logic behind the doctrine, based in First Amendment principles, could also apply to the Lanham Act claims, at this time the court will abstain from addressing this issue which implicates constitutional principles because it has already concluded that Plaintiff has otherwise failed to plead a viable unfair competition claim. *See Citizens United v. Federal Election Commission*, 558 U.S. 310, 373 (2010) (Roberts, J., concurring) ("Because the stakes are so high, our standard practice is to refrain from addressing constitutional questions except when necessary to rule on particular claims before us."). The Supreme Court has not addressed the issue, and the court could not locate an on point Sixth Circuit precedent. *See*, *e.g.*, *EcoDisc Tech. AG v. DVD Format/Logo Licensing Corp.*, 711 F. Supp. 2d 1074, 1084 (C.D. Cal. 2010); *Santana Prods. v. Bobrick Washroom Equipment, Inc.*, 401 F.3d 123, 135 (3d Cir. 2005) ("We will not address at this time the *Noerr/Pennington* doctrine's applicability to Lanham Act claims because we conclude that [plaintiff]'s Lanham Act claim is barred by laches.").

### C.  Common Law Unfair Competition

Plaintiff next asserts a claim (Count IV) for unfair competition in violation of the

Michigan common law that explicitly incorporates the same allegations laid out in

Plaintiffs' Lanham Act claims. In related contexts, this court has previously noted that

"the test for relief under Michigan common law for unfair competition. . . is identical to

the test under the Lanham Act." *See Lorillard Tobacco Co. v. Zoom Enterprises, Inc.,*

No. 10-13985, 2011 WL 3664351, at *9 (E.D. Mich. Aug. 18, 2011) (Cook, J.) (citing

*Carson v. Here's Johnny Portable Toilets, Inc.*, 698 F.2d 831 (6th Cir.1983)). Plaintiff

has presented no argument that convinces the court that Plaintiff's state law unfair

competition claim would not fail for the same reasons enumerated above.

### D.  Michigan Common Law Business Tort Claims

Plaintiff next asserts three Michigan common law business tort claims against

Defendants. First, Plaintiff asserts that all Defendants engaged in "business

defamation/injurious falsehood" (Count VII) [10] by making and publishing false and

defamatory statements "regarding the nature, quality, and/or characteristics of

Geomatrix, its wastewater treatment products, and the certification obtained by

Geomatrix from NSF." (ECF No. 24, PageID.528.) Second, Plaintiff brings a claim of

Fraud/Misrepresentation (Count VIII) against Defendant NSF because it "published" a

copy of an issue paper—"falsely" questioning the efficacy and serviceability of treatment

---

[10]     What Plaintiff alternatively titles "Product Disparagement" in its Amended
Complaint fits within the tort of malicious falsehood. *See* Edward H. Pappas *et al.*,
*Michigan Business Torts* ch 7.25 (ICLE 2d ed 2003)
https://www.icle.org/modules/books/chapter.aspx?lib=litigation&book=2003555640&cha
pter=7 (last updated 09/02/2022).

and disposal systems—presented to the Joint Committee on wastewater management by forwarding it to numerous "state and local regulatory authorities." (*Id.*, PageID.531-32.) Third, Plaintiff asserts a claim of "Interference with Prospective Economic Advantage" (Count IX) against all Defendants because their alleged "anticompetitive and disparaging statements made without evidence" prevented its products from gaining state regulatory approval, thereby blocking Plaintiff from "obtaining business from customers in states that have adopted NSF/ANSI Standard 40." (*Id.*, PageID.537-38.)

Defendants' responsive briefing contains arguments addressing the intricacies of each asserted cause of action, and they also assert that all three claims are barred by *Noerr-Pennington* immunity.

"While *Noerr–Pennington* has traditionally applied to antitrust claims, courts have expanded use of the doctrine to encompass state law tort claims that arise from government action." *In re Dr. Reddy's Lab'ys, Ltd.*, No. 01-10102, 2002 WL 31059289, at *13 (S.D.N.Y. Sept. 13, 2002); *see also In re IBP Confidential Business Docs. Lit.,* 755 F.2d 1300, 1312-1313 (8th Cir.1985) (discussing contours of *Noerr–Pennington* doctrine as applied to defamation and other state law claims); *In re Am. Continental Corp./Lincoln Savings & Loan Sec. Lit.*, 102 F.3d 1524, 1538 n.15 (9th Cir.1996) (collecting cases), *rev'd on other grounds*, 523 U.S. 26 (1996).

At least two published decisions of the Michigan Court of Appeals have explicitly held that *Noerr* immunity applied to Michigan torts claims. First, in *Azzar v. Primebank* the court found that the defendants, a bank and its board of trustees, were immune "from tort liability for intentionally misrepresenting facts to the [Federal Home Loan Bank

Board]," when they filed a petition opposing the plaintiffs' request for a federal waiver that would have allowed plaintiffs to acquire a large share of the bank's stock. 198 Mich. App. 512, 517-18, 499 N.W.2d 793, 796 (1993) ("Because plaintiffs may easily allege that defendants knowingly and maliciously made false accusations, protecting such knowingly and maliciously made allegations provides breathing space for the First Amendment right to petition the government."). Significantly, the court found that "the *Noerr–Pennington* doctrine is a principle of constitutional law that bars litigation arising from injuries received as a consequence of First Amendment petitioning activity, *regardless of the underlying cause of action* asserted by the plaintiffs." *Id.* (emphasis added). Likewise, in *J & J Const. Co. v. Bricklayers & Allied Craftsmen*, the court held that *Noerr* bared a plaintiff's claim for tortious interference with a business relationship or expectancy. 245 Mich. App. 722, 732, 631 N.W.2d 42, 47 (2001), *rev'd on other grounds*, 468 Mich. 722, 664 N.W.2d 728 (2003).

In the present case, the same essential factual allegations form the basis of Plaintiff's antitrust conspiracy claim and its Michigan tort law claims. If the conspiracy transpired as alleged, Defendants' speech fits the definition of petitioning that is protected by the First Amendment. *See Massachusetts Sch. of L. at Andover*, 107 F.3d at 1038. And, as the court has already explained at length in Section III.A, *supra*, the campaign of disparagement laid out in Plaintiff's Amended Complaint, allegedly aimed at discouraging state regulators from approving GeoMat systems despite their official certification by NSF, falls within the gamut of conduct protected by *Noerr* because Plaintiff's injury flowed directly through the government officials' actions. Further, neither Plaintiff's complaint nor its responsive briefing contains any indication that Defendants

28

conduct would fall within the "sham" exception to *Noerr* immunity. Therefore, based on the holdings of *Azzar* and *J & J Const.*, Plaintiff's fraud/misrepresentation (Count VIII) and interference with prospective economic advantage (Count XI) claims are both barred by *Noerr–Pennington* under Michigan law. *See* 499 N.W.2d at 796; 631 N.W.2d at 47.

Plaintiff's business defamation/injurious falsehood claim (Count VII) must also be dismissed. The court acknowledges that some have questioned *Noerr's* applicability in the context of defamation claims, *see, e.g., Rondigo, LLC v. Twp. of Richmond*, No. 08-10432, 2012 WL 1021726, at *4 (E.D. Mich. Mar. 27, 2012) (Rosen, J.). But the court does not endeavor to resolve the issue here, because it finds that Plaintiff's business defamation allegations are also clearly barred by Michigan's one-year statute of limitations, *see* Mich. Comp. Laws § 600.5805. Further, Plaintiff has also failed to plead a viable defamation/malicious falsehood claim because the "allegedly defamatory statement[s]" were not "published of and concerning the plaintiff itself." *LBI Invs., Inc. v. Lexington Int'l, LLC*, No. 05-74387, 2007 WL 1013011, at *3 (E.D. Mich. Mar. 30, 2007) (Cox, J.) (rejecting a business defamation claim "because the only two statements at issue reference the infringing Photonic products, and make no reference to [the plaintiff]); *see also* 53 C.J.S. *Libel and Slander; Injurious Falsehood* § 314 ("The elements of a business disparagement claim are publication with malice of disparaging and false words which cause special damages. The statement must concern the plaintiff's business or products . . . ."). The allegedly defamatory statements/writings

referred to all treatment and disposal systems, not just Plaintiff's GeoMat product,[11] therefore, the alleged conduct is not sufficient to support either business defamation or product disparagement claim.

In sum, all three of Plaintiff's Michigan business common law tort claims must be dismissed.

### E.  Michigan Consumer Protection Act Claims

Next, Plaintiff asserts claims under Michigan's Consumer Protection Act ("MCPA"), which prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce," Mich. Comp. Laws § 445.903(1). The MCPA applies to 'goods, property, or service [used] primarily for personal, family, or household purposes." Mich. Comp. Laws § 445.902(g). "The MCPA 'does not apply to purchases that are primarily for business purposes.'" *Progressive Distribution Servs., Inc. v. United Parcel Serv., Inc.*, 186 F. Supp. 3d 741, 756 (W.D. Mich. 2016) (quoting *Slobin v. Henry Ford Health Care*, 469 Mich. 211, 216, 666 N.W.2d 632, 634 (2003)).

Plaintiff brings two parallel claims under the MCPA. The first (Count V), alleges that Defendant NSF's misconduct "amounts to unfair competition in violation of the [MCPA]." (ECF No. 24, PageID.523.) The claim cites "NSFs misconduct, its false and/or misleading statements, and its allowance of participants to use the standard-setting process for anticompetitive purposes." (*Id.*, PageID.524-25.) The second, (Count VI) brings a very similar MCPA claim against the three other Defendants. It alleges that "Defendants' false and/or misleading statements have a likelihood of causing public

---

[11]     Plaintiff's complaint discusses at least two other manufacturers of treatment and disposal systems that participated in NSF. (*See* ECF No. 24, PageID.463.)

confusion and have caused actual confusion as to Geomatrix and its products," and that "Defendants have used the standard-setting process to limit the ability of Geomatrix to compete in the commercial and residential markets" thereby violating the MCPA. (*Id.*, PageID.527.)

The court finds that Plaintiff's MPCA claim fails for two primary reasons. First, the MCPA claims are also barred by *Noerr-Pennington* immunity. There is no apparent reason why Michigan courts would not extend *Noerr* immunity to claims under the MCPA. For instance, in *DirecTV, Inc. v. Milliman*, this court previously found that a defendant's counterclaim based on the MCPA was barred by *Noerr* immunity. No. 02-74829, 2003 WL 23892683, at *7 (E.D. Mich. Aug. 26, 2003) (Cohn, J.); *see also Azzar*, 499 N.W.2d at 796 (noting that "the *Noerr–Pennington*. . . bars litigation arising from injuries received as a consequence of First Amendment petitioning activity, *regardless of the underlying cause of action asserted by the plaintiffs*") (emphasis added).

Second, the court finds that Plaintiff cannot assert a claim under the MCPA because the services provided by professional standards organizations are not themselves "goods, property, or service [used] primarily for personal, family, or household purposes." M.C.L. § 445.902(g). Instead, such services are purchased by businesses that utilize them to advantage their commercial interests. Therefore, Plaintiff has not alleged a viable claim under the MPCA. *See, e.g.*, *Lauderdale v. Wells Fargo Home Mortg.*, 552 F. App'x 566, 573 (6th Cir. 2014) (holding that the MCPA did not apply to a former homeowner's claim since physically "secur[ing]" a recently foreclosed residential property was "not a service for a personal, family, or household purpose"). Consequently, the court dismisses both Count V & VI.

31

### F.  Promissory Estoppel

Finally, Plaintiff brings two promissory estoppel claims against Defendant NSF. Plaintiff asserts that it reasonably relied on NSF's "clear and definite promise" that it would "abide and enforce" the standards laid out in both NSF's published Antitrust Guide (Count X) and Standards Development Policy (Count XI). (*See* ECF No. 24, PageID.538-42.) In support, Plaintiff cites seven subsections in the Antitrust Guide prohibiting certain conduct during the operation of NSF joint committees and task groups, including collective action to restrict information, using NSF standards to fix prices, and excluding affected parties from meaningful participation in the formulation of standards. (*Id.*, PageID.539-40 ¶ 483.) Further, Plaintiff alleges that NSF breached implicit promises in sections of its "Standards Development Policy" relating to openness, committee structure, membership, communications, meetings, balloting, and commercial terms and conditions. (*Id.*, PageID.541-42 ¶ 491.)

Defendant NSF argues that Plaintiff's "reliance on general statements in NSF's publications does not plausibly plead a 'clear and definite' promise made by NSF to Geomatrix as a matter of law" because such general statements "do not constitute promises made to" Plaintiff. (ECF No. 30, PageID.620.) The court agrees.

"Under Michigan law, courts will enforce a clear and definite promise under this doctrine if the promisee or a third party reasonably relied on the promise and injustice can only be avoided by its enforcement." *DBI Invs., LLC v. Blavin*, 617 F. App'x 374, 385-86 (6th Cir. 2015) (citing *State Bank of Standish v. Curry*, 442 Mich. 76, 500 N.W.2d 104, 107 (1993)). "[T]he reliance interest protected by [promissory estoppel] is *reasonable* reliance, and reliance is reasonable only if it is induced by an actual

32

promise." *Curry*, 500 N.W.2d at 107 (quotation marks and citations omitted). Thus, "the *sine qua non* of the theory of promissory estoppel is that the promise be clear and definite." *Id.* at 108.

Applying Michigan law, the Sixth Circuit rejected a promissory estoppel claim in *Blavin*, holding that an investment advisor's general statements "about 'strictly adher[ing] to [ ] stated long-term investment principles' or maintaining 'an unwavering focus on long-term intrinsic value' express an investment philosophy but do not make a *clear and definite* commitment to make any particular investment decision in a certain way." *Blavin*, 617 F. App'x at 385-86. Similarly, courts in other jurisdictions have denied promissory estoppel claims based on written corporate policies because the promises at issue were not sufficiently definitive. *See Norman v. Tradewinds Airlines, Inc.*, 286 F. Supp. 2d 575, 593 (M.D.N.C. 2003) (holding that the cited terms of an employee handbook lacked the "definiteness in duration" required "to assert a claim for promissory estoppel" because the handbook also provided any of its provisions "may be revised from time to time as dictated by the operational needs of the company"); *Winkler v. Bowlmor AMF*, 207 F. Supp. 3d 1185, 1191 (D. Colo. 2016) (rejecting a promissory estoppel claim based a company's failure to follow its standalone progressive disciplinary policy because the plaintiff's status as an at-will employee meant, that "this seemingly mandatory procedure only takes effect if the company has chosen to follow the progressive discipline procedures"). And at least one court has rejected a promissory estoppel claim based on a competitor's alleged violations of a standard-setting organization's written rules. *See Hynix Semiconductor Inc. v. Rambus Inc.*, 441 F. Supp. 2d 1066, 1074 (N.D. Cal. 2006) (finding that "there was no clear and

unambiguous promise by Rambus that it would abide by the [standard setting organization's] rules" so the plaintiff "not have a viable promissory estoppel claim").

Here the court finds, as a matter of law, that provisions cited from both the Antitrust Guide and Standards Development Policy do not constitute definitive promises that support a claim for promissory estoppel. Reviewing the provisions[12] cited by Plaintiff, they lay out NSF's expectations—at varying levels of generality—for how committee members and businesses participating in NSF standard-setting processes are supposed to behave. There is no indication that NSF guarantees that there would never be violations of these policies or even that every violation would be quickly punished.

Further, even if, *arguendo*, some part of the documents did constitute a sufficiently definitive promise to enforce its terms, Plaintiff still has not pled a viable promissory estoppel claim. Plaintiff's complaint contains no factual pleading suggesting that it utilized any part of the multi-level appeals process explicitly laid out in the Standards Development Policy that provides a forum for addressing "objections" to alleged violations of NSF policies. (ECF No. 30-3, PageID.649.) The court finds that Plaintiff cannot reasonably claim "detrimental reliance," based on NSF alleged failure to enforce its own rules when Plaintiff itself did not follow the proper procedure—explicitly laid out in the same document Plaintiff cites—for seeking enforcement action. Consequently, both promissory estoppel claims must be dismissed.

---

[12]   Defendant NSF has attached the full "NSF International Standards development and maintenance policies" (ECF No. 30-3, PageID.630), as an exhibit to its response brief, which is permissible because the documents are central to the promissory estoppel claims. *See Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008).

## IV. CONCLUSION

For the reasons explained above, the court finds that Plaintiff's complaint should be dismissed in its entirety. Accordingly,

IT IS ORDERED that Defendant NSF's "Motion to Dismiss Plaintiff's First Amended Complaint" (ECF No. 30) is GRANTED.

IT IS ORDERED that Defendant Hoot's, Microbics's, and James Bell's joinders to the Motion to Dismiss (ECF No. 31 & 32) are GRANTED.

IT IS FURTHER ORDERED that Defendant NSF's "Motion to Dismiss" (ECF No. 18), Plaintiff's initial complaint is DENIED AS MOOT.


s/Robert H. Cleland         /
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  September 21, 2022

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, September 21, 2022, by electronic and/or ordinary mail.

s/Lisa Wagner         /
Case Manager and Deputy Clerk
(810) 292-6522

S:\Cleland\Cleland\JUDGE'S DESK\C1 ORDERS\20-13331.GEOMATRIX.MTD.AAB.chd.docx