# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | 100 EAST FIFTH STREET, ROOM 540 | |
|---|---|---|
| Deborah S. Hunt | POTTER STEWART U.S. COURTHOUSE | Tel. (513) 564-7000 |
| Clerk | CINCINNATI, OHIO 45202-3988 | www.ca6.uscourts.gov |

Filed: September 12, 2023

Mr. Devon Paul Allard
Mr. E. Powell Miller
Mr. Kevin F. O'Shea
Mr. Daniel L. Ravitz
Miller Law Firm
950 W. University Drive, Suite 300
Rochester, MI 48307

Mr. William Stewart Cook
Mr. Matthew Justin High
Wilson Elser
17197 N. Laurel Park Drive, Suite 201
Livonia, MI 48152

Mr. Fred K. Herrmann
Mr. Matthew Powell
Kerr, Russell & Weber
500 Woodward Avenue, Suite 2500
Detroit, MI 48226

Mr. Jonathan F. Karmo
Mr. Patrick Michael McCarthy
Howard & Howard
450 W. Fourth Street
Royal Oak, MI 48067

Re: Case No. 22-1947, *Geomatrix, LLC v. NSF Intl, et al.*
Originating Case No. : 3:20-cv-13331

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's published opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Deborah S. Hunt, Clerk

Laurie A Weitendorf
Deputy Clerk

cc:  Ms. Kinikia D. Essix

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0213p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

GEOMATRIX, LLC,

                                *Plaintiff-Appellant*,

      *v.*

NSF INTERNATIONAL; BIOMICROBICS, INCORPORATED;
HOOT SYSTEMS, LLC; JAMES BELL,

                             *Defendants-Appellees.*

No. 22-1947

———————————

Appeal from the United States District Court for the Eastern District of Michigan at Port Huron.
No. 3:20-cv-13331—Robert H. Cleland, District Judge.

Argued: July 26, 2023

Decided and Filed: September 12, 2023

Before: McKEAGUE, GRIFFIN, and MURPHY, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Devon P. Allard, Daniel L. Ravitz, THE MILLER LAW FIRM, P.C., Rochester, Michigan, for Appellant. Patrick M. McCarthy, HOWARD & HOWARD ATTORNEYS PLLC, Royal Oak, Michigan, for Appellee NSF International. **ON BRIEF:** Devon P. Allard, E. Powell Miller, Kevin F. O'Shea, THE MILLER LAW FIRM, P.C., Rochester, Michigan, for Appellant. Patrick M. McCarthy, Jonathan F. Karmo, HOWARD & HOWARD ATTORNEYS PLLC, Royal Oak, Michigan, for Appellee NSF International. William S. Cook, Matthew J. High, WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP, Livonia, Michigan, for Appellees BioMicrobics and James Bell. Fred K. Herrmann, Matthew L. Powell, KERR, RUSSELL AND WEBER, PLC, Detroit, Michigan, for Appellee Hoot Systems, LLC.

      GRIFFIN, J., delivered the opinion of the court in which McKEAGUE, J., joined and MURPHY, J., joined in part. MURPHY, J. (pp. 27–29), delivered a separate concurring opinion.

———————————

**OPINION**

———————————

GRIFFIN, Circuit Judge.

Plaintiff Geomatrix sells a septic system that substantially differs from those sold by its competitors.  It asserts defendants, those competitors and NSF International (the primary standard-setting organization for the wastewater product industry), conspired to exclude its unique system from the marketplace.  The district court dismissed Geomatrix's claims on several grounds, including the *Noerr-Pennington* doctrine and for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  We agree that dismissal is proper and affirm.

I.

Commonly known as septic systems, "onsite wastewater treatment and dispersal products" contain both a septic tank and a drain field.  The tank isolates and contains the sewage, and the remaining wastewater flows through a drain field, where microorganisms treat the water.  According to Geomatrix, customers largely have two options for private septic systems—aerobic treatment units (known as "contained systems"), or soil-based/open-bottom treatment systems ("Treatment and Disposal Systems," or "T&D systems").  In a contained system, the septic tank has aeration devices that treat the wastewater before it leaches into the drain field.  A T&D system, however, does not need those devices.  The drain field of a T&D system has more sandy surface area—that increases the available oxygen, which in turn increases the number of microorganisms that treat the wastewater.  Geomatrix markets and sells GeoMat, a T&D system, while many of its competitors, including defendants Hoot Systems and BioMicrobics, sell contained systems.

NSF offers a certification for the wastewater treatment industry:  Standard 40.  In use since 1970, it "contains minimum requirements for residential wastewater treatment systems having [certain] rated treatment capacities."  First Amended Complaint, R. 24, PageID 404–05 (quotation marks omitted).  Companies involved in this industry have a financial incentive to obtain this certification, for "[i]nclusion in [these] standards is vital to the commercial success"

of their products since it "provides [a] company access to the onsite residential wastewater market." *Id*. at 382, 406–07 (quotation marks omitted). Practically speaking, a manufacturer needs to obtain this certification before it can market products for sale in a given state—at least thirty-seven states have adopted Standard 40 in their own regulations, and others rely on it in making regulatory or product approval decisions. This standard, like all others promulgated by NSF, is developed through a voluntary consensus process, overseen by a joint committee staffed by NSF employees, state regulatory officers, industry manufacturers, and consumers.

Geomatrix sought and obtained a Standard 40 certification. Even though most septic systems certified under Standard 40 are contained systems, at least three T&D systems have received certification. NSF and Geomatrix agreed on a testing protocol in 2013 after NSF confirmed that GeoMat was eligible for Standard 40 certification. Then, after Geomatrix completed the testing protocol, it received Standard 40 certification in July 2014.

Geomatrix alleges that competitors in the wastewater industry then began conspiring against T&D systems. It claims that those competitors, including Hoot Systems and BioMicrobics, conspired with NSF to limit the market for Geomatrix products, to preserve the market for certain NSF customers, and to protect their own private interests without regard for scientific evidence. These alleged conspirators questioned whether T&D systems should be entitled to Standard 40 certification—this questioning allegedly "began the process of eroding confidence in Treatment and Dispersal Systems by state regulatory authorities." *Id*. at 427–28.

As to the particulars of the conspiracy, Geomatrix alleges that it began in September 2017 when an NSF employee circulated a paper to the joint committee suggesting that T&D systems be removed from Standard 40 certification and placed in a new, separate standard. The underlying, but allegedly unfounded, concerns about T&D systems have been raised at every joint committee since. And Geomatrix contends that certain actions or statements disparaged the efficacy of T&D systems, including: 1) individuals employed by manufacturers of contained systems (including defendant James Bell) "dominat[ing]" joint committee discussions; 2) adopting the disparaging term "uncontained" for T&D systems; 3) unsupported questioning of the reliability or efficacy of T&D systems; 4) falsely accusing T&D systems of clogging problems; 5) proposing double standards or straw polls weighted in favor of contained systems;

6) failing to adopt a fair test for T&D systems with the opportunity to prove performance; 7) proposing that T&D systems be eligible for certification under an entirely different standard, Standard 240, which has been adopted in only one state; and 8) developing a new proposed standard, Standard 441, for high-strength wastewater systems (used, for example, by restaurants) that would exclude T&D systems. In short, Geomatrix alleges that these actions demonstrate a conspiracy that harmed its business. Per its complaint:

> The Defendants in concert disparaged Treatment and Dispersal Systems, falsely asserted that they did not fit within the NSF/ANSI Standard 40, giving the impression that these technologies did not adequately protect public health and/or the environment, and attempt [sic] to create new standards in which to move Treatment and Dispersal Systems knowing that, if successful, it would take many years for those standards to be adopted; effectively shutting down their competitors.

First Amended Complaint, R. 24, PageID 460.

This alleged conspiracy affected Geomatrix's business by preventing it from obtaining state regulatory approval for GeoMat, even though its Standard 40 certification should have made it possible to do so. Ultimately, because of this uncertainty, Geomatrix decided to withraw its NSF certification: in February 2018, it informed NSF that, "due to the uncertainty surrounding which, if any, states will allow use of certified open bottom technologies" it did not know if continued certification would be beneficial and did "not intend to continue its active certification with NSF." R. 30-5, PageID 687. This happened despite GeoMat still being eligible for Standard 40 certification—as of today, NSF has not adopted the new Standard 441, as those discussions remain ongoing.

Plaintiff filed a complaint against NSF, BioMicrobics, Hoot Systems, and James Bell raising a host of claims, including violations of the Sherman Act, the Lanham Act, and Michigan law. Defendants moved to dismiss for two reasons: 1) for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) because Standard 441 had not yet been approved or rejected; and 2) for failing to state a claim upon which relief could be granted under Rule 12(b)(6), because, among other reasons, defendants' petitioning activity was immunized under the *Noerr-Pennington* doctrine or because Geomatrix failed to state any plausible claim, whether antitrust or otherwise.

The district court agreed with defendants.  It determined that, while much of Geomatrix's case centered on unripe injuries related to the adoption of Standard 441, claims for present "disparagement" injuries established standing.  Yet this did not save Geomatrix's case from dismissal.  The court concluded that the antitrust claims, Michigan common law business tort claims, and the Michigan Consumer Protection Act claims were based on immunized conduct protected by *Noerr-Pennington* or that those claims otherwise failed to state a claim.  Geomatrix further failed to show the proximate cause required for the federal and state unfair competition claims, and its promissory estoppel claims were based on statements that did not state a sufficiently definite promise.  Claiming error, Geomatrix timely appeals.

## II.

Before turning to the merits of Geomatrix's complaint, we must assure ourselves of jurisdiction.  Defendants raise two jurisdictional arguments:  1) Geomatrix's injuries are not ripe because they stem from a future, possible injury based on whether Standard 40 or 441 will exclude T&D systems, and 2) Geomatrix's case is moot because it declined to renew its Standard 40 certification.  We agree with both contentions but still conclude that we have subject-matter jurisdiction.

"To establish Article III standing, a plaintiff must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likelihood' that the injury 'will be redressed by a favorable decision.'"  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157–58 (2014) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)) (brackets omitted).  "A claim is not amenable to the judicial process when it is filed too early (making it unripe), when it is filed too late (making it moot) or when the claimant lacks a sufficiently concrete and redressable interest in the dispute (depriving the plaintiff of standing)."  *Warshak v. United States*, 532 F.3d 521, 525 (6th Cir. 2008) (en banc) (internal citation, quotation marks, and alteration omitted).  The prudential ripeness inquiry evaluates "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration."  *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003).  And a claim becomes moot "when the issues presented are no longer live or the parties lack a

legally cognizable interest in the outcome." *In re Flint Water Cases*, 53 F.4th 176, 188 (6th Cir. 2022) (internal quotation marks omitted).

Geomatrix's complaint relies in part on an injury that has yet to happen: "[t]he attempted exclusion of Treatment and Dispersal Systems from NSF Standard 441." First Amended Complaint, R. 24, PageID 494. As alleged, NSF is considering how to certify T&D systems but has not decided how to classify them going forward. *If* future versions of either Standard 40 or 441 do exclude T&D systems, *then* Geomatrix could be injured by that decision—yet that is not the situation today. So this injury is "dependent" on future events that may or may not occur, *see Trump v. New York*, 141 S. Ct. 530, 535 (2020) (per curiam), and is therefore unripe, *see Nat'l Park Hosp. Ass'n*, 538 U.S. at 808.

Geomatrix's decision not to renew its Standard 40 certification leads to a similar conclusion with mootness. By withdrawing its certification, whether a Standard 40 certification for T&D systems is actually "devalued" no longer makes any difference to Geomatrix—it lacks any interest in actual harm to a Standard 40 certification and, as such, such an injury is not cognizable. *See Flint Water Cases*, 53 F.4th at 188. Indeed, Geomatrix's decision to relinquish its certification also qualifies as a "self-inflicted injury," and such injuries fail "the second standing prerequisite, traceability." *Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 866 (6th Cir. 2020).

Such conclusions do not strip us of subject-matter jurisdiction. These unripe and moot injuries are different from the past and present "disparagement" or "committee dominance" injuries that Geomatrix alleges have already occurred and for which it seeks damages.[1] Geomatrix's complaint turns on an alleged conspiracy to disparage Geomatrix. Among those "disparagement" injuries are interested parties dominating NSF's decision-making process, the use of disparaging and false information, and the failure to adopt a certification process that

---

[1]At oral argument, Geomatrix raised multiple arguments that NSF "packed" the committees or "stacked" the certification process against them. Yet these do not appear in the complaint; the closest alleged injury is the "dominance" of the certification process by defendants. Because a party may not "amend its complaint at oral argument on appeal," *Airline Pros. Ass'n of the Int'l Brotherhood of Teamsters, Loc. Union No. 1224 v. Airborne, Inc.*, 332 F.3d 983, 989 (6th Cir. 2003), we construe this "packing" argument to refer to these "committee dominance" injuries.

treats T&D systems fairly. Those actions have already occurred and turn on a conspiracy that began in 2017. They also have an effect independent of the value of a Standard 40 certification, for these actions allegedly inhibited the marketability of Geomatrix's products, thereby causing economic injury. So yes, any claim based on a potential new standard has been made too early, and any claim based on the actual "devaluation" of Geomatrix's Standard 40 certification is now too late, *cf. Warshak*, 532 F.3d at 525, but claims based on underlying "disparagement" of T&D systems and "dominance" of the standard-setting process are live, *see Susan B. Anthony List*, 573 U.S. at 157–58; *see also Volvo N. Am. Corp. v. Men's Int'l Pro. Tennis Council*, 857 F.2d 55, 64 (2d Cir. 1988) ("[A] rule that has yet to be enacted or enforced may be ripe for review if its mere *proposal* is likely to inhibit competition." (emphasis added)). The conspiracy and proposals made in furtherance thereof are sufficient. As a result, Geomatrix has standing to assert claims based on these injuries and these injuries alone (i.e., not either the mooted or unripe one).

### III.

We now turn to the merits. The district court dismissed the complaint for failing to state a claim. Rejecting a "rifle" approach in favor of a "shotgun" one, Geomatrix now raises claims of error on nearly all the district court's conclusions. *See Simmons v. Napier*, 626 F. App'x 129, 133 (6th Cir. 2015). On de novo review and while "constru[ing] the complaint in the light most favorable to the plaintiff, accept[ing] its allegations as true, and draw[ing] all reasonable inferences in favor of the plaintiff," *Bassett v. National Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008), we conclude the district court correctly dismissed Geomatrix's complaint.

### A.

The main issue on appeal is Geomatrix's antitrust claims under Section 1 of the Sherman Act, 15 U.S.C. § 1, *et seq.* The district court dismissed this claim under the *Noerr-Pennington* doctrine, *see E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657 (1965), so we begin there.

"No violation of the Sherman Act can be predicated upon mere attempts to influence the enactment or the enforcement of laws, because those who petition the government for redress are generally immune from antitrust liability." 54 Am. Jur. 2d *Monopolies & Restraints of Trade*

§ 136 (2023) (footnotes omitted).  Under this antitrust principle rooted in the First Amendment, known as the *Noerr-Pennington* doctrine, "defendants are immune from antitrust liability for engaging in conduct aimed at influencing decision-making by the government" because "[a]ntitrust laws do not supersede the people's right to petition their government in favor of a desired monopoly."  *Id.*; *see also Eaton v. Newport Bd. of Educ.*, 975 F.2d 292, 298 (6th Cir. 1992) ("[The *Noerr-Pennington*] doctrine holds that business interests may combine and lobby to influence the legislative, executive, or judicial branches of government or administrative agencies without violating the antitrust laws, because such activities are protected by the first amendment right of petition.").  And immunity under this doctrine may apply notwithstanding any actor's anticompetitive purpose or whether the action produces a restraint on trade.  54 Am. Jur. 2d *Monopolies & Restraints of Trade* § 136.

1.

Before addressing the specifics of that doctrine, we take note of how the district court applied it.  It appeared to treat *Noerr-Pennington* as a jurisdictional issue, but it is better suited for Rule 12(b)(6).  Although *sovereign* immunity is a jurisdictional defect that should be addressed under Rule 12(b)(1), *see Does v. Whitmer*, 69 F.4th 300, 305 (6th Cir. 2023), general affirmative defenses, including other immunity claims, are usually brought under Rule (12)(b)(6), *see, e.g.*, *Peatross v. City of Memphis*, 818 F.3d 233, 240 (6th Cir. 2016); *Leech v. DeWeese*, 689 F.3d 538, 540 (6th Cir. 2012).  Further, while sovereign immunity (and other jurisdictional defects) protects a party from *suit*, *Noerr-Pennington* immunizes *conduct*, protected by the First Amendment, from antitrust liability.  *See Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 505 (1988) ("[I]n *Noerr* we immunized conduct that could be characterized as a conspiracy . . . .").  Accordingly, we address defendants' *Noerr-Pennington* arguments under Rule 12(b)(6).

2.

Several cases outline the doctrine's contours, starting with *Noerr* itself.  There, several railroad companies openly engaged in a publicity campaign against the trucking industry to maintain their economic edge in the long-distance freight industry, which ultimately influenced legislation.  365 U.S. at 129–30.  The Supreme Court held that this conduct did not violate the

Sherman Act, notwithstanding any anticompetitive purpose the railroads may have had. *Id*. at 139–42. As a threshold matter, the Court accepted that "no violation of the Act can be predicated upon mere attempts to influence the passage or enforcement of laws." *Id*. at 135. Nor did the Sherman Act "prohibit two or more persons from associating together in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly." *Id*. at 136. And it mattered not that the railroad companies' conduct involved "deception of the public, manufacture of bogus sources of reference, [and] distortion of public sources of information," for even if that conduct fell "far short of the ethical standards generally approved in this country," it did not constitute an antitrust violation. *Id*. at 140–41 (alteration in original). While it may be true that the publicity campaign injured the truckers' goodwill, this injury was an "incidental effect of the railroads' campaign to influence governmental action." *Id*. at 143; *see also Pennington*, 381 U.S. at 669–71 (reaffirming *Noerr*'s holding that "[j]oint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition").

Geomatrix contends that this case is controlled not by *Noerr*, but by the Supreme Court's subsequent decision in *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492 (1988). *Allied Tube* involved a private standard-setting organization—the National Fire Protection Association (NFPA)—which promulgated consensus standards for the electrical industry, much like NSF here. *Id*. at 495–97. Manufacturers of steel sheathing for electrical conduits used their influence in the NFPA to keep new manufacturers of less expensive plastic sheathing from the market—to accomplish this, they openly recruited members to the annual meeting who duly rejected the amendment for no apparent reason other than the manufacturers' influence. *Id*. Yet unlike in *Noerr* and *Pennington*, this conduct was not protected because the "arena" at issue was different—unlike public campaigns, "private standard-setting associations have traditionally been objects of antitrust scrutiny," and the NFPA was not a "quasi-legislative" body because it had no official governmental authority (even if legislatures often adopted its standards). *Id*. at 500–01. While the line between private and public action "may not always be obvious," it was clear that, when "the restraint is imposed by persons unaccountable to the public and without official authority, many of whom have personal financial interests in restraining competition, we have no difficulty concluding that the restraint has resulted from private action." *Id*. at 501–02.

Yet this did not resolve the issue—*Noerr-Pennington* could still immunize the conduct if the exclusion of plastic sheathing from the marketplace was "incidental to a valid effort to influence governmental action." *Id.* at 502. But unlike in *Noerr*, "the context and nature of petitioner's activity" removed the conduct at issue from the doctrine's ambit—the NFPA activity involved "commercial activity with a political impact" as it "did not take place in the open political arena, where partisanship is the hallmark of decisionmaking, but within the confines of a private standard-setting process." *Id.* at 505–07. As a result, *Allied Tube* held that, "at least where, as here, an economically interested party exercises decision-making authority in formulating a product standard for a private association that comprises market participants, that party enjoys no *Noerr* immunity from any antitrust liability flowing from the effect the standard has of its own force in the marketplace." *Id.* at 509–10. The Court also cautioned, however, that government solicitation, even in a private organization, may still be permitted: "[p]etitioner remains free to take advantage of the forum provided by the standard-setting process by presenting and vigorously arguing accurate scientific evidence before a nonpartisan private standard-setting body." *Id.* at 510.

*Allied Tube* is not alone in considering *Noerr-Pennington*'s applicability in the context of private standard-setting organizations. In *Sessions Tank Liners, Inc. v. Joor Manufacturing, Inc.*, the Ninth Circuit determined that *Noerr-Pennington* applied—a manufacturer of underground tanks convinced a private organization to change its standards to exclude those businesses (like the plaintiff's) that relined tanks, which in turn led regulatory agencies to deny the necessary permits to the plaintiff. 17 F.3d 295, 296 (9th Cir. 1994). Yet the doctrine still immunized the defendant's conduct because the injuries occurred from government action: "The plaintiff in *Allied* was awarded damages only on the theory that the stigma of banning the plaintiff's product from a uniform code caused independent marketplace harm to the plaintiff in jurisdictions that permitted the use of the plaintiff's products. In contrast, [the plaintiff] has never proved that it sustained injuries from anything other than the actions of municipal authorities." *Id.* at 299 (internal citation omitted).

Similarly, *Massachusetts School of Law at Andover, Inc. v. American Bar Ass'n* also concluded that the conduct of a private organization (the ABA) was entitled to immunity when it denied accreditation to a law school—meaning that the school's students could not take certain bar exams. 937 F. Supp. 435 (E.D. Pa. 1996), *aff'd,* 107 F.3d 1026 (3d Cir. 1997). In assessing the *Noerr-Pennington* inquiry, the court asked: "(1) what is the harm that the plaintiff alleges it suffered?; and, (2) is that harm the proximate result of governmental action or private conduct?" *Id.* at 439–40. But any harm to the school did not result from private conduct that "stigmatized" the school, resulting instead from the states' actions to deny students the ability to sit for bar examinations; thus, the injury was incidental to governmental action. *Id.* at 441–42. On appeal, the Third Circuit affirmed, concluding that the alleged injury (preclusion of students taking the bar examination) resulted from state action and the ABA's opinion was petitioning activity protected by *Noerr.* 107 F.3d at 1035–38; *see also Lawline v. Am. Bar Ass'n*, 956 F.2d 1378, 1383–84 (7th Cir. 1992) ("[W]hen a trade association provides information . . . but does not constrain others to follow its recommendations, it does not violate the antitrust laws.").

*Noerr*, *Allied Tube*, and their progeny outline the contours of the immunity analysis. We begin by considering the two questions noted by *Andover*: (1) what is the harm that the plaintiff suffered; and (2) whether that harm is the proximate result of governmental action or private conduct. 937 F. Supp. at 439–40. In this inquiry, we must consider the "context and nature" of the alleged activity. *Allied Tube*, 486 U.S. at 499. There may be overlap in the harms alleged as to what is caused by private or governmental action, but we must determine what harm is principal and what is "incidental." *See Noerr*, 365 U.S. at 143; *Allied Tube*, 486 U.S. at 502–03. If we determine that the nature of the harm is from "governmental action," our inquiry stops, and we must conclude that *Noerr-Pennington* immunity applies. *Noerr*, 365 U.S. at 135–36. But if the harm stems from "independent marketplace harm," *Sessions*, 17 F.3d at 299, including "the effect [a] standard has of its own force in the marketplace," *Allied Tube*, 486 U.S. at 510, then it results from private conduct. In that circumstance, we must consider one final question: whether the harm was nonetheless "incidental to a valid effort to influence governmental action." *Id.* at 502. If so, *Noerr-Pennington* immunity still applies—but if not, the conduct is not protected. *Compare Noerr*, 365 U.S. at 138–39, *with Allied Tube*, 486 U.S. at 509–10.

The involvement of a private standard-setting organization (like NSF) in an alleged antitrust conspiracy does not obviate this analysis. *See, e.g.*, *Allied Tube*, 486 U.S. at 502–03; *Sessions*, 17 F.3d at 299–300. But in this context, naturally a "less political arena[]," *Allied Tube*, 486 U.S. at 500, two other considerations are especially important. First, *Noerr-Pennington* immunity is not limited to "direct" petitioning of the government; indirect petitioning of the government through the media or other avenues is still protected. *Allied Tube*, 486 U.S. at 503; *Noerr*, 365 U.S. at 140–41. Thus, a party may use the forum provided by a standard-setting organization to influence government action by voicing its opinion. *See Allied Tube*, 486 U.S. at 510. Second, petitioning a private organization is not the same as petitioning the government—an association without official authority is not a "quasi-legislative" body just because governments often adopt its standards. *Id.* at 501. But whether or not a government adopts those standards still affects the injury inquiry: "when a state adopts as its own the conclusions reached" by a private standard-setting organization, and that adoption injures the plaintiff, "it is the state and not the private party that injures the plaintiff with anticompetitive conduct." *Andover*, 937 F. Supp. at 440; *accord Sessions*, 17 F.3d at 299.

3.

After careful review of plaintiff's complaint, we hold that the district court correctly concluded *Noerr-Pennington* immunity applies.

We first must determine the true harm Geomatrix suffered. It alleges that defendants conspired to devalue its products by dominating the NSF process to wrongly disparage T&D systems and to exclude them from the marketplace:

> Beginning in 2017, the Defendants entered into a conspiracy to collectively use the standard-setting process by initiating actions and discussion and providing a forum for disseminating such discussions and misinformation about Treatment and Dispersal Systems with the aim of excluding Treatment and Dispersal Systems from the market. The Defendants in concert disparaged Treatment and Dispersal Systems, falsely asserted that they did not fit within the NSF/ANSI Standard 40, giving the impression that these technologies did not adequately protect public health and/or the environment, and attempt [sic] to create new standards in which to move Treatment and Dispersal Systems knowing that, if successful, it would take many years for those standards to be adopted; effectively shutting down their competitors.

First Amended Complaint, R. 24, PageID 460.  These allegations give the initial impression that the conspiracy sought to devalue the independent value of NSF's own standards and exclude T&D systems from the market that way.  Any resulting injury, as *Allied Tube* held, is not protected as it would flow "from the effect the standard has of its own force in the marketplace." 486 U.S. at 510.

But the gravamen of the complaint is not so limited.  Geomatrix further alleges that its harm was not just this generic marketplace "disparagement" to T&D systems:

> Once Geomatrix received certification for GeoMat under NSF/ANSI Standard 40, it *should have been able to obtain state regulatory approvals* in states requiring NSF/ASNI [sic] Standard 40 certification.  However, as NSF conspired with the Co-conspirators to raise questions of the legitimacy of the certifications granted to Treatment and Dispersal Systems, *they were unable to receive approvals in most states*.  While acceptance of Treatment and Dispersal Systems should begin to gain acceptance as time passes and performance is further proven, Geomatrix has *experienced increasing difficulty in obtaining regulatory approval for GeoMat from state regulatory agencies* that have adopted NSF/ANSI Standard 40 due to NSF and its Co-conspirators' actions to exclude Treatment and Dispersal Systems from the market.

First Amended Complaint, R. 24, PageID 432 (emphasis added).  This allegation comes on the heels of Geomatrix describing NSF's role in the regulatory approval process.  *See id.* at 422–29. NSF "markets its standards" to regulatory agencies and "touts" its influence in the regulatory committee.  As a result, its "publication of these false and defamatory statements by its participants began the process of eroding confidence in Treatment and Dispersal Systems by state regulatory authorities."  For example, the publication of a disparaging issue paper used "NSF's influence to create uncertainty regarding Treatment and Dispersal Systems in the minds of regulatory authorities with the Co-conspirators."  The complaint thus makes clear that certification is the initial step in the road to ultimate approval by state regulators:  "Upon obtaining NSF certification, Treatment and Dispersal Systems *should be entitled* to approval as wastewater treatment systems in the majority of states in the same manner as Contained Systems."  Indeed, Geomatrix's cited reason for giving up its certification was not the independent value of its product or of its certification, but the uncertainty surrounding state regulator's decision-making.

Reading the complaint as a whole, the true harm alleged was one born from state action. The conspiracy made it difficult for Geomatrix to market its products. Why? Because of the independent decisions of state regulators. Geomatrix claims that it should have had access to certain states' markets once it received NSF certification; the fact that it did not means that an intervening act had occurred (i.e., rejection by state regulators). The "context and nature" of the conspiracy therefore demonstrates that Geomatrix's injury primarily flows from the actions of state agencies, *Allied Tube*, 486 U.S. at 499, for Geomatrix could not sell its products because of regulators' decision-making, not because of the effects of the conspiracy on the marketplace, *see Noerr*, 365 U.S. at 143; *Allied Tube*, 486 U.S. at 502–03; *accord Andover*, 937 F. Supp. at 440.

To be sure, there is some overlap in the harm. This disparagement caused some "incidental" harm to the value of the NSF Standard 40 certification or to the overall reputation of T&D systems generally, and "dominance" of the standard-setting process likely tilted the playing field against Geomatrix. *Allied Tube*, 486 U.S. at 499. Geomatrix thus contends that it was harmed by the conspiracy independent of state regulatory decisions. But those facts do not, by themselves, change the source of its injuries. As in *Noerr*, the complaint alleges that conspirators' actions influenced regulatory decisions because *those decisions* controlled access to the marketplace—i.e., that the underlying petitioning activity "did in fact injure" Geomatrix "can mean no more than that [Geomatrix] sustained some direct injury as an incidental effect" of the alleged conspiracy. 365 U.S. at 143. And the conspirators' alleged "dominance" of the certification process was not like the one in *Allied Tube*. *Cf.* 486 U.S. at 496–97. Though the conspirators' actions may have "disparaged" Geomatrix's products by "dominating" the certification process, NSF has taken no independent action in the certification process, and Geomatrix is as eligible for Standard 40 certification today as it was a decade ago. Regulators, not NSF, have made the decisions that harmed Geomatrix. Perhaps this outcome could be different if Geomatrix did not need to obtain approval from state regulators and if its injury resulted solely from the independent marketplace harm to NSF Standard 40 itself, more akin to *Allied Tube*. But that is not the crux of the complaint. Thus, the harm to Geomatrix that resulted from the conspiracy flowed from the independent decisions of state regulators.

This harm easily answers the second question:  Geomatrix's injury is the proximate result of governmental action, not private conduct.  *See Andover*, 937 F. Supp. at 439–40.  It does not flow from "independent marketplace harm," *Sessions*, 17 F.3d at 299, or "the effect the standard has of its own force in the marketplace," *Allied Tube*, 486 U.S. at 510.  And harm resulting from government action means that, by operation of *Noerr-Pennington*, Geomatrix cannot establish a violation of the Sherman Act.  *Noerr*, 365 U.S. at 136.

We therefore hold that the conduct of the alleged conspiracy falls within the ambit of *Noerr-Pennington* because governmental action, not private conduct, harmed Geomatrix.  *See Noerr*, 365 U.S. at 136 ("[W]here a restraint upon trade or monopolization is the result of valid governmental action, as opposed to private action, no violation of the Act can be made out.").  The conspirators may use NSF's forum to advocate for government legislation, even if NSF itself is not a quasi-legislative body.  *See Allied Tube*, 486 U.S. at 501, 510.  And because the conduct on which Geomatrix premises its § 1 claim is immunized under *Noerr-Pennington*, it has not raised "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Thus, the district court correctly dismissed the antitrust claims for failing to state a claim upon which relief can be granted.

## B.

Next, are Geomatrix's unfair competition claims, one under the Lanham Act, 15 U.S.C. § 1125(a), and another under Michigan common law.  The district court dismissed these claims, concluding that Geomatrix failed to plead proximate causation under *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014).

## 1.

The Lanham Act provides, as pertinent here, that a person is subject to civil liability when he uses any false name or description that, "in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities."  15 U.S.C. § 1125(a).  The Supreme Court has construed this language to require that plaintiffs plead two things.  First, the plaintiffs must show that their interests "fall within the zone of interests protected by the law invoked," meaning

that "a plaintiff must allege an injury to a commercial interest in reputation or sales." *Lexmark*, 572 U.S. at 129, 131–132 (citation omitted). Second, and crucial here, "a statutory cause of action is limited to plaintiffs whose injuries are proximately caused by violations of the statute." *Id*. at 132. This requirement merely reflects that a suit cannot rectify "every conceivable harm that can be traced to alleged wrongdoing," and especially those that are "too remote" from the defendant's conduct. *Id*. at 132–33 (citation and quotation marks omitted). Therefore, since the Lanham Act, by its terms, contemplates the "intervening step of consumer deception," a plaintiff must plead that the "deception of consumers causes them to withhold trade from the plaintiff." *Id*. at 133; *see also Grubbs v. Sheakley Grp., Inc.*, 807 F.3d 785, 798 (6th Cir. 2015) (noting that a plaintiff must show "some causal link between the challenged statements and harm to the plaintiff" in pleading a false advertising claim).

With this gloss, Geomatrix's complaint fails for two reasons. First, Geomatrix alleges that defendants' disparagement caused "independent harm in the market and influenc[ed] consumers' purchasing decisions," Appellant's Br. at 41, but the complaint fails to describe what "independent harm" occurred in the market or how defendants' actions actually "influenc[ed] consumers' purchasing decisions." For example, the complaint states that NSF published false statements to regulators and customers and then used the standard-setting process to limit competition. As for Hoot and BioMicrobics, they too made false statements about the reliability of T&D systems or adopted disparaging terms. None of these allegations describe how *consumers* "with[held] trade from the plaintiff." *Lexmark*, 572 U.S. at 133.

Second, even if Geomatrix did allege that the statements influenced consumers' purchasing decisions, it does not plausibly show that the statements caused independent market harm—i.e., that *these statements* were the "cause" of withheld trade. *Id*. As described above, the complaint relies on the fact that Geomatrix could not market its products in certain states because state regulators did not approve their product. This lack of regulatory approval was the actual cause of Geomatrix's injuries. While Geomatrix contends that its injuries resulted from the conspiracy by itself, the regulators' decisions were still an intervening cause *and* the proximate one. Any deception on defendants' part was not the cause of consumers' decisions, for consumers were not the ones who decided to do anything. These allegations thus do not

satisfy *Lexmark*'s proximate-cause analysis, *see id.* at 133, and Geomatrix thus fails to show a "plausible" claim to relief, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). So, for those reasons, Geomatrix's complaint fails to state a claim under the Lanham Act.

2.

We proceed to the separate, but similar, claim of unfair competition under Michigan common law. "Unfair competition ordinarily consists in the simulation by one person, for the purpose of deceiving the public, of the name, symbols, or devices employed by a business rival . . . , thus falsely inducing the purchase of his wares and thereby obtaining for himself the benefits properly belonging to his competitor." *Peninsular Stove Co. v. Augst*, 285 N.W. 24, 26 (Mich. 1939) (citation omitted). Among the elements that a party must prove are a likelihood of confusion to the public, *Wills v. Alpine Valley Ski Area, Inc.*, 118 N.W.2d 954, 956 (Mich. 1963), deception that is the probable result of the defendant's actions, *Burns v. Schotz*, 72 N.W.2d 149, 151 (Mich. 1955), and actual competition between the parties, *Good Housekeeping Shop v. Smitter*, 236 N.W. 872, 873 (Mich. 1931). Given the overlap in required elements between the Michigan common-law analysis and that under the Lanham Act, courts have noted that the "likelihood of confusion" merits analysis is the same for both. *See Carson v. Here's Johnny Portable Toilets, Inc.*, 698 F.2d 831, 833 (6th Cir. 1983); *compare Grubbs*, 807 F.3d at 794–95, *with Wills*, 118 N.W.2d at 956.

The district court summarily dismissed Geomatrix's common-law unfair competition claims, relying on this point that the analyses are the same. Yet Geomatrix's argument that it was error to do so in this context is well taken. *Lexmark* analyzed the statutory language of the Lanham Act to determine that "the meaning of the congressionally enacted provision creat[ed] a cause of action." 572 U.S. at 128. Michigan common law does not rely on the words of a statute, let alone a federal one. And the similar analyses for the two are under the "likelihood of confusion" test—a set of factors that guide our analysis in determining whether such likelihood exists. *Compare Grubbs*, 807 F.3d at 794–95, *with Wills*, 118 N.W.2d at 956. Simply put, our inquiry here does not implicate this test.

Yet this error does not mean that Geomatrix prevails, for it must still plead that defendants' actions are a proximate cause of its injuries. Michigan common law requires causation as an element of any tort action: "In a tort action, an injured party may seek damages for an injury *caused by* the breach of a legal duty." *Wright v. Genesee Cnty.*, 934 N.W.2d 805, 810 (Mich. 2019) (emphasis added); *accord Charles Reinhart Co. v. Winiemko*, 513 N.W.2d 773, 775 (Mich. 1994) ("As in any tort action, to prove proximate cause a plaintiff in a legal malpractice action must establish that the defendant's action was a cause in fact of the claimed injury."); Restatement (First) of Torts § 9 cmt. a (Am. L. Inst. 1934) ("To become liable to another under the principles of the law of Torts, an actor's conduct must not only be tortious in character but it must also be a legal cause of the invasion of another's interest."). This principle is deeply rooted in Michigan common law. *See Wilson v. Bowen*, 31 N.W. 81, 84 (Mich. 1887) ("[T]he purpose of an action of tort is to recover the damages which the plaintiff has sustained from an injury done him by the defendant . . . .").

Given that causation is an essential element in any Michigan common-law tort claim, Geomatrix's state-law unfair competition claim must fail, largely for the same reasons as the federal one. Its complaint fails to allege defendants' actions were a proximate cause of its injuries or that Michigan customers were confused or harmed by defendants' disparaging statements. *Cf. Iqbal*, 556 U.S. at 678. Instead, Geomatrix's economic injuries resulted from the decisions of state regulators that failed to certify Geomatrix's products. Geomatrix has therefore failed to state an unfair competition claim under Michigan law.

## C.

We next address Geomatrix's three other Michigan common-law business tort claims: business defamation/injurious falsehood, fraud/misrepresentation, and interference with prospective economic advantage.

### 1.

Geomatrix raised a "business defamation/injurious falsehood" claim against all defendants. The district court dismissed this claim for two reasons—operation of a one-year

limitations period and that the disparaging statements were not "of and concerning" Geomatrix specifically.

As a threshold matter, we note that business defamation and injurious falsehood, while similar, are separate actions. *See, e.g.*, 15 Mich. Civ. Jur. Libel & Slander §§ 4, 6 (2023); *compare Rouch v. Enquirer & News of Battle Creek*, 398 N.W.2d 245, 252 (Mich. 1986) (describing the elements of defamation), *with Neshewat v. Salem*, 173 F.3d 357, 364 (6th Cir. 1999) (describing the elements of injurious falsehood under Michigan law). This distinction matters. "A false statement that casts aspersion upon both an individual personally and upon that individual's tangible or intangible property interest may result in damages to either the individual's reputation or his or her pecuniary interests or both." *Kollenberg v. Ramirez*, 339 N.W.2d 176, 179 (Mich. Ct. App. 1983). Because the elements of the two overlap, a plaintiff "may bring suit for both torts as long as damages are not duplicated." *Id.* A plaintiff may recover damages for a "professional reputation" injury in the defamation action, *id.*, and "special damages" in the injurious falsehood action, *see Neshewat*, 173 F.3d at 364. Further, when, as here, there is a limitations question, these damages are also subject to separate limitations periods—reputational damages resulting from defamation are subject to a one-year limitations period, Mich. Comp. Laws § 600.5805(11), but "special pecuniary damages" are subject to a three-year limitations period, *id.* § 600.5805(2). *See Kollenberg*, 339 N.W.2d at 180; *Neshewat*, 173 F.3d at 363–64.

With this background, we consider the business defamation claim. We agree with the district court that the one-year limitations period, Mich. Comp. Laws. § 600.5805(11), applies, but only in part. First, this period precludes considering any defamatory statements that occurred before December 18, 2019 (and the complaint contains a host of these). Yet Geomatrix raises other defamatory statements that occurred after this date, including a letter questioning the "longevity of uncontained systems" in March 2020, publication of these letters to state regulatory authorities, and a second straw poll. These are not barred by the limitations period, but they run headlong into the need for the statements to be "concerning" Geomatrix specifically, as required by Michigan law. *See Rouch*, 398 N.W.2d at 252. None of the alleged 2020 statements were specifically about Geomatrix or its products; they instead questioned T&D systems generally.

Libel actions do not lie when a statement expresses a general opinion about a topic without a statement "of and concerning" the plaintiff. *See Weiss v. Whittemore*, 28 Mich. 366, 371–73 (Mich. 1873) (explaining that a libelous declaration must be "'of and concerning the plaintiff' with reference to his trade and business"); *see also N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 288–91 (1964) (rejecting a libel claim because a defamatory advertisement did not refer to the plaintiff specifically). Nor is this a case in which the statements were directed to a small, specific group of people. *Cf. Smith v. Fergan*, 450 N.W.2d 3, 4 (Mich. Ct. App. 1989) (per curiam) ("Because plaintiff was *one of two employees* towards whom the statement was directed, it is reasonable to conclude that the words were directed at plaintiff as a member of this group." (emphasis added)). Rather, all statements concerned an industry or type of product in general. So the district court correctly dismissed this claim.

The analysis is slightly different for the injurious falsehood claim. Because of the overlap between this and the defamation claim, Geomatrix's recovery is limited to special damages, not general reputational damages. *See Kollenberg*, 339 N.W.2d at 180. Moreover, these are governed by a three-year limitations period, *see id.*; Mich. Comp. Laws § 600.5805(2), so any statement in the complaint after December 18, 2017, may suffice. Though the complaint describes several, this claim runs into a separate problem—the need to plead "special pecuniary damages." *Kollenberg*, 339 N.W.2d at 180. "Special damages are those that are unusual for a type of claim," i.e., "those damages that are the natural but not the necessary consequence of the defendant's conduct." *Fleet Bus. Credit v. Krapohl Ford Lincoln Mercury Co.*, 735 N.W.2d 644, 648 (Mich. Ct. App. 2007) (per curiam) (citation and emphasis omitted). Thus, a plaintiff is entitled to them only if they are "specifically pleaded and proved." *Kratze v. Indep. Ord. of Oddfellows, Garden City Lodge No. 11*, 500 N.W.2d 115, 122 (Mich. 1993) (citation omitted). Geomatrix makes no such claim of special pecuniary damages. At most, it makes a general statement that it "has suffered actual damages, including pecuniary damages." These pleadings fail the heightened pleading requirement. As a result, Geomatrix has failed to state a claim for injurious falsehood.

2.

We next tackle Geomatrix's other two business tort claims—fraud/misrepresentation and interference with a prospective economic advantage. The district court dismissed these other tort claims as relying on conduct immunized by *Noerr-Pennington*.

Michigan courts have applied the *Noerr-Pennington* doctrine outside the antitrust context. While the *Noerr-Pennington* doctrine "has been applied mainly in antitrust matters," it "is a principle of constitutional law that bars litigation arising from injuries received as a consequence of First Amendment petitioning activity, *regardless of the underlying cause of action* asserted by the plaintiffs." *Azzar v. Primebank, FSB*, 499 N.W.2d 793, 796 (Mich. Ct. App. 1993) (per curiam) (emphasis added). In *Azzar*, the plaintiff sued a bank for breach of a fiduciary duty based on alleged misrepresentations the bank's board of directors had made to a federal regulatory board, and the court held this was petitioning activity protected by the doctrine. *See id.* at 795–96. And in *Arim v. General Motors Corp.*, the court applied *Noerr* to a suit for fraud and tortious interference—the exact claims at issue here. 520 N.W.2d 695, 699, 701–02 (Mich. Ct. App. 1994) (per curiam). The plaintiffs "offered nothing to show that allowing immunity for the private defendants in these cases would abuse the First Amendment into becoming the ultimate weapon—both a sword for achieving evil and a shield for preventing liability." *Id.* at 702 (internal quotation marks omitted); *see also J & J Constr. Co. v. Bricklayers & Allied Craftsmen, Loc. 1*, 631 N.W.2d 42, 47–50 (Mich. Ct. App. 2001) (applying the doctrine to a tortious interference claim), *rev'd on other grounds*, 664 N.W.2d 728 (Mich. 2003).

As Michigan courts have expressly applied the *Noerr-Pennington* doctrine to fraud and tortious interference claims, we conclude that they would do the same here.[2]  Thus, because Geomatrix cannot make out a claim for fraud or tortious interference because it relies on immunized conduct, *see Iqbal*, 556 U.S. at 678, dismissal of these claims is proper.

---

[2]Even though the Michigan Supreme Court has not addressed *Noerr-Pennington* in a similar context, *cf. J & J Constr. Co. v. Bricklayers & Allied Craftsmen, Loc. 1*, 664 N.W.2d 728, 735 (Mich. 2003) (expressly declining to consider the doctrine's applicability), decisions of the Michigan Court of Appeals are still "relevant data" for our consideration, *see Garden City Osteopathic Hosp. v. HBE Corp.*, 55 F.3d 1126, 1130 (6th Cir. 1995) (citation omitted). And plaintiffs give us no reason to find fault with those lower-court decisions.

### D.

We continue with Geomatrix's consumer protection claims under the Michigan Consumer Protection Act, Mich. Comp. Laws § 445.901, *et seq*. The district court dismissed these claims because the services provided by NSF fall outside the ambit of those covered by the MCPA and because the underlying conduct was protected under *Noerr-Pennington*.

Geomatrix argues the MCPA covers a business certification because the Act does not require a "consumer" transaction involving a "purchase" of goods. We disagree. Start with the Act's text. It prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce . . . ." Mich. Comp. Laws § 445.903(1). Yet "[t]rade or commerce" is defined as the "conduct of a business providing goods, property, or service *primarily for personal, family, or household purposes*." *Id.* § 902(g) (emphasis added). And consider caselaw construing this text, which establishes that we must consider the purpose of the "good" at issue. For example, in *Slobin v. Henry Ford Health Care*, the Michigan Supreme Court held that the MCPA did not cover a law firm's request for medical records, as "obtaining medical records for the purpose of litigation is not primarily for personal, family, or household use." 666 N.W.2d 632, 634 (Mich. 2003). It wanted these records "so that the law firm itself could engage in its own business or commercial enterprise, namely, the evaluation and pursuit of legal avenues to procure financial rewards and other relief for its client." *Id.* at 635; *see also Zine v. Chrysler Corp.*, 600 N.W.2d 384, 393 (Mich. Ct. App. 1999) (holding that a truck bought by a business was not protected by the MCPA because the court must consider "the primary use to which the consumer puts the product" and "if an item is purchased primarily for business or commercial rather than personal purposes, the MCPA does not supply protection"). And in *MacDonald v. Thomas M. Cooley Law School*, we followed the same analysis, holding that a law-school degree was not a consumer good; the students sought it out "to prospectively better themselves and their personal circumstances through the attainment of full-time employment in the legal sector," or, in other words, "to make money." 724 F.3d 654, 661–62 (6th Cir. 2013) (emphasis omitted).

The MCPA and related caselaw confirm that Standard 40 certification is not a "consumer" good or service. The service or product "sold" by NSF to Geomatrix was its Standard 40 certification. Geomatrix's purpose in obtaining NSF certification was to market and sell its product more effectively: because "[c]ertification to NSF/ANSI 40 provides . . . access to the onsite residential wastewater market" Geomatrix "should have been able to obtain state regulatory approvals in states requiring NSF/ASNI [sic] Standard 40 certification." First Amended Complaint, R. 24, PageID 406–07, 432 (first alteration in original). The consequence of the purported campaign against Geomatrix was its inability to sell its products. The complaint makes clear, then, that Geomatrix sought the certification for its own business purposes—i.e., obtaining regulatory approval and marketing its product to consumers. This certification is not a good that can be "pass[ed] . . . along" to consumers but something to help it "engage in its own business or commercial enterprise," *Slobin*, 666 N.W.2d at 635, or, in other words, "to make money," *MacDonald*, 724 F.3d at 661. Thus, since the good or service at issue is obviously not a consumer one, the MCPA cannot apply and Geomatrix has not made out a plausible claim for relief. *Iqbal*, 556 U.S. at 678. So dismissal of this claim was also proper.[3]

E.

We reach the last of Geomatrix's substantive merits claims on 12(b)(6) review, promissory estoppel. The district court concluded that this claim failed for lack of a "sufficiently definite" promise to Geomatrix.

Michigan follows the doctrine of promissory estoppel as stated in the Restatement: "A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." *State Bank of Standish v. Curry*, 500 N.W.2d 104, 107 (Mich. 1993) (quoting Restatement (Second) of Contracts § 90 (Am. L. Inst. 1981)). This analysis requires a "clear and definite" promise, that is, the "manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made." *Id.* at 108 (citation omitted).

---

[3]And given this conclusion, we expressly decline to address the district court's alternative holding that Michigan courts would apply *Noerr-Pennington* immunity to MCPA claims.

Moreover, this inquiry also depends on the surrounding context: "To determine the existence and scope of a promise, we look to the words and actions of the transaction as well as the nature of the relationship between the parties and the circumstances surrounding their actions." *Id*. at 109.

Geomatrix relies on purported promises espoused by NSF in its "Antitrust Guide" and "Standards Development Policy," both of which are internal documents detailing how NSF should operate. As for the Antitrust Guide, most of the alleged promises describe the actions that NSF, its employees, or participants "should" take. For example, "[a]ffected parties should be allowed [to] participate in the formulation of standards in a meaningful manner," and "[s]tandards should not limit the number and type of products, except for safety reasons." Only one statement describes something that NSF must do: "Standards programs must not be used as devices to fix prices, reduce output, boycott competitors, or otherwise lessen competition. Standard setting activities may raise antitrust concerns when competitors are required to share competitive information with each other." As for the Development Policy, Geomatrix does not identify any specific statement made by NSF; it instead points to overall sections of the policy that NSF allegedly violated, such as "Openness," "Communications," and "Meetings." Though Geomatrix does not identify any specific statement here, this policy largely says that NSF "shall" act in certain ways in developing its standards.

We agree with the district court that these statements are not promises. For one, the statements' words themselves do not convey a promise. "Must" and "should" in this context suggest a command or request. *See Must*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/must (last accessed August 8, 2023). They indicate internal directives, not promises. Just because NSF tells itself to act in a particular way does not mean that it will do so. These statements are like NSF expressing an opinion on how it should or will act in the future. *See Curry*, 500 N.W.2d at 108 ("[A] promise must [also] be distinguished from a statement of opinion or a mere prediction of future events." (second alteration in original; quotation marks omitted)). And as for the supposed statements in the Development Policy, Geomatrix does not point to any *specific* promise, meaning that it fails to plead that part of its case with sufficient particularity. *See Iqbal*, 556 U.S. at 686–87; *cf. McGrew v. Duncan*, 937

F.3d 664, 669 (6th Cir. 2019) ("A party may not present a skeletal argument, leaving the court to put flesh on its bones." (citation omitted)).

In any event, the context of these statements confirms that none were intended to be a promise, let alone one to external entities. *See Curry*, 500 N.W.2d at 109. The statements are in guides published for NSF's own internal benefit. Overall, the guides contain generic directives designed to guide NSF's standard-setting process and to help the organization avoid antitrust issues. They were disseminated to individuals involved in the standard-setting process and used at the accompanying meetings. So these statements were not directed toward Geomatrix or similarly situated entities; rather, they were directed to NSF and its employees as directions on how they "should," "must," or "shall" act. Nothing identified by Geomatrix indicates a warranty or assurance to outside parties as to how NSF will *actually* conduct its business or whether it will be successful in avoiding antitrust concerns. In sum, these statements are not "manifestation[s] of intention[s] to act" in a specific way, but guidelines as to how NSF instructs its employees to act. *Id.* at 108–09; *see also DBI Invs., LLC v. Blavin*, 617 F. App'x 374, 385–87 (6th Cir. 2015) (holding that a financial advisor's generic statements about "investment principles" and "intentions to perform with integrity" in a partnership agreement were not promises). This claim also fails.

## IV.

In addition to its substantive claims, Geomatrix raises one procedural claim—that the district court committed error requiring reversal by failing to address its informal and nonspecific request to amend its complaint.[4] Federal Rule of Civil Procedure 15(a)(2) allows a party to amend its complaint with the court's leave, and the court should "freely" do so "when justice so requires." When such a motion to amend is brought, the district court must act upon it and should explain its reasons for granting or denying the motion; failure to do so is an abuse of discretion. *See Foman v. Davis*, 371 U.S. 178, 182 (1962). Yet this does not apply when a party does not file a "a formal motion to amend." *See Crosby v. Twitter, Inc.*, 921 F.3d 617, 627–28

---

[4]Geomatrix also makes vague complaints about the district court's decision to decide the case without oral argument. But it did not include this issue "in the table of contents or in the 'issues presented' section" of its brief, so such contentions are forfeited. *See United States v. Calvetti*, 836 F.3d 654, 664 (6th Cir. 2016).

(6th Cir. 2019). When "a party does not file a motion to amend or a proposed amended complaint, it is not an abuse of discretion for the district court to dismiss the claims with prejudice." *Id.* (citations omitted).

This dooms Geomatrix's arguments. Here, it is undisputed Geomatrix never filed a motion to amend its complaint and thus the district court never addressed the issue. Instead, Geomatrix's nonspecific request was in a couple of paragraphs at the end of its response to defendants' motion for dismissal. Geomatrix neither moved to amend its complaint nor put forward a proposed second amended complaint, meaning that it never filed a motion under Rule 15(a). Consequently, *Foman*'s requirement that the district court explain its reason for the denial of a motion does not apply. *See id*.

## V.

For the foregoing reasons, we affirm the judgment of the district court.

---

### CONCURRENCE

---

MURPHY, Circuit Judge, concurring in part and concurring in the judgment in part. I agree with Judge Griffin's excellent opinion in all respects but one. I would prefer to resolve two of Geomatrix's state-law claims—for fraud and tortious interference with prospective economic advantage—on different grounds. The majority reasons that the Michigan Supreme Court would extend the U.S. Supreme Court's "*Noerr-Pennington*" doctrine to these claims. I am not so sure.

In *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961), the Supreme Court held that the Sherman Antitrust Act did not reach an agreement among competitors to lobby "the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly." *Id.* at 136. The Court presumed that Congress did not mean to cover petitioning activity because the First Amendment protects the right "to petition the government for a redress of grievances." U.S. Const. amend I; *Noerr*, 365 U.S. at 138. Critically, however, the Court disavowed ruling on any First Amendment claim. *Noerr*, 365 U.S. at 132 n.6. It instead invoked the canon of constitutional avoidance and interpreted the antitrust laws to exclude this type of activity as a matter of statutory interpretation. *Id.*; *see also United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 669–71 (1965). I thus read *Noerr-Pennington* to adopt an *antitrust* rule, not a *constitutional* one.

Yet some Michigan courts have instead treated the *Noerr-Pennington* doctrine as "a principle of constitutional law that bars litigation arising from injuries received as a consequence of First Amendment petitioning activity, regardless of the underlying cause of action asserted by the plaintiffs." *Azzar v. Primebank, FSB*, 499 N.W.2d 793, 796 (Mich. Ct. App. 1993) (per curiam); *see Arim v. Gen. Motors Corp.*, 520 N.W.2d 695, 700–01 (Mich. Ct. App. 1994) (per curiam). These courts have rejected common-law claims for breach of fiduciary duty, fraud, or tortious interference (among others) when the claims rested on the defendants' decision to petition government officials. *See Arim*, 520 N.W.2d at 699, 701; *Azzar*, 499 N.W.2d at 795–96. They reasoned that this petitioning activity was "constitutionally protected under the First

Amendment." *Arim*, 520 N.W.2d at 700. One case even accepted a complaint's allegations that the defendants had intentionally lied to the government but then held that "knowing falsehoods are generally protected from liability under the First Amendment right to petition because citizens would be deterred from petitioning the government if that were not so." *Azzar*, 499 N.W.2d at 796.

I have two concerns with relying on this caselaw to dispose of Geomatrix's fraud and tortious-interference claims. For one thing, I do not believe we need to give any persuasive weight to these cases on the question that they decide. To be sure, I agree that we would have to accept the Michigan Supreme Court's interpretation of Geomatrix's common-law claims if that court chose to incorporate *Noerr-Pennington*'s constitutional-avoidance logic into the state causes of action. *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 80 (1938). And I also agree that we may look to Michigan intermediate decisions to help make this "*Erie* guess" on the scope of these state-law claims. *See, e.g.*, *AtriCure, Inc. v. Meng*, 12 F.4th 516, 531 (6th Cir. 2021). But the plain language of these Michigan intermediate decisions shows that they did not interpret the scope of the *state-law* claims. They instead purported to resolve a *federal constitutional* question about the meaning of the First Amendment. And no *Erie* principle of which I am aware requires a federal circuit court to defer to a state intermediate court about the meaning of the U.S. Constitution. *See, e.g.*, *Tower Realty Co. v. City of East Detroit*, 185 F.2d 590, 593 (6th Cir. 1950).

For another thing, I am dubious of the state courts' resolution of this federal constitutional question. In a significant departure from traditional common law, the U.S. Supreme Court famously held that the First Amendment restricts some defamation actions by requiring the plaintiff to prove that the defendant made a false statement "with 'actual malice'— that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964); *cf. Coral Ridge Ministries Media, Inc. v. S. Poverty L. Ctr.*, 142 S. Ct. 2453, 2454 (2022) (Thomas, J., dissenting from the denial of certiorari). But the state courts would go much further than *New York Times* by holding that the First Amendment protects even *knowingly false* statements. *See Azzar*, 499 N.W.2d at 796. That view strikes me as questionable. Even the Supreme Court case giving the most expansive

protection to intentional lies recognized that the First Amendment would not insulate those lies if they caused a "legally cognizable harm[.]"  *United States v. Alvarez*, 567 U.S. 709, 719 (2012) (plurality opinion).

The state courts' broad view also conflicts with established Michigan law in other areas. For example, under the tort of malicious prosecution, Michigan imposes liability on an alleged "victim" who knowingly lies to prosecutors that another person has committed a crime.  *See Matthews v. Blue Cross & Blue Shield of Mich.*, 572 N.W.2d 603, 613 (Mich. 1998); *see also* Restatement (Second) of Torts § 653 (Am. L. Inst. 1977).  Under the logic of these state intermediate decisions, however, the First Amendment might protect this "petitioning" activity. So I do not find it surprising that the Michigan Supreme Court has expressed "reservations" about the way in which the intermediate courts have extended the *Noerr-Pennington* doctrine. *J & J Constr. Co. v. Bricklayers & Allied Craftsmen, Local 1*, 664 N.W.2d 728, 734 (Mich. 2003).

I would instead resolve these two tort claims on other grounds.  As for Geomatrix's fraud claim against NSF, that claim required the company to prove that NSF's conduct proximately caused its economic harms.  *See, e.g.*, *Kheder Homes at Charleston Park, Inc. v. Charleston Park Singh, LLC*, 2014 WL 60326, at *3 (Mich. Ct. App. Jan. 2, 2014).  And the majority explains well why Geomatrix has failed to plausibly plead this proximate-causation element.  As for Geomatrix's tortious-interference claim, that claim required the company to identify a business expectancy that had "a reasonable likelihood or probability" of coming to fruition. *Cedroni Ass'n, Inc. v. Tomblinson, Harburn Assocs., Architects & Planners, Inc.*, 821 N.W.2d 1, 3 (Mich. 2012) (citation omitted).  "[M]ere wishful thinking" does not cut it.  *Id.* (citation omitted).  Michigan courts have also suggested that a plaintiff should "identify a relationship with [a] particular business partner or a particular expectancy that was terminated." *Endoscopy Corp. of Am. v. Kennan*, 2023 WL 2439487, at *5 (Mich. Ct. App. Mar. 9, 2023) (per curiam). Here, however, Geomatrix's complaint plausibly pleaded, at most, "wishful thinking" that it would have generally increased its sales but for the defendants' conduct.  That type of allegation fails to state a tortious-interference claim.

For these reasons, I concur in part and concur in the judgment in part.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 22-1947

GEOMATRIX, LLC,

     Plaintiff - Appellant,

     v.

NSF INTERNATIONAL; BIOMICROBICS, INCORPORATED; HOOT SYSTEMS, LLC; JAMES BELL,

     Defendants - Appellees.

```
┌─────────────────────────────┐
│           FILED             │
│        Sep 12, 2023         │
│   DEBORAH S. HUNT, Clerk    │
└─────────────────────────────┘
```

Before: McKEAGUE, GRIFFIN, and MURPHY, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Eastern District of Michigan at Port Huron.

THIS CAUSE was heard on the record from the district court and was argued by counsel for the appellant and NSF International.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is AFFIRMED.

**ENTERED BY ORDER OF THE COURT**

Deborah S. Hunt, Clerk